# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| WASHINGTON COUNTY HEALTH CARE AUTHORITY, INC. d/b/a WASHINGTON COUNTY HOSPITAL & NURSING HOME; CÉSAR CASTILLO, INC.; WARREN GENERAL HOSPITAL; and ERIE COUNTY MEDICAL CENTER CORPORATION on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) ) | Civil Action No. 16-cv-10324 |
| Plaintiffs, | ) ) | Judge John J. Tharp |
| v. | ) ) | |
| BAXTER INTERNATIONAL INC.; BAXTER HEALTHCARE CORPORATION; HOSPIRA, INC. AND HOSPIRA WORLDWIDE, INC., | ) ) ) ) ) | |
| Defendants. | ) ) | |

# HOSPIRA'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION
# TO DISMISS THE CONSOLIDATED ANTITRUST CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

Page

INTRODUCTION.................................................................................................1

BACKGROUND ..................................................................................................3

LEGAL STANDARD ..........................................................................................3

ARGUMENT .......................................................................................................5

I.     The Complaint Fails to Allege Parallel Conduct .................................5

II.    Plaintiffs' Claim Is Implausible .............................................................7

    A.    The Complaint's Recall-Based Conspiracy Theory Defies Common Sense...........7

        1.    Product Recalls Are Mandated by Law, and Plaintiffs Allege No Facts Making Plausible That Any Defendant's Recall Was Not So Mandated or Was Otherwise a Sham...........7

        2.    Product Recalls Are Scrutinized by the Federal Government and a Costly Distraction for the Recalling Company...........11

    B.    Plaintiffs' Signaling Allegations Do Not Suggest a Conspiracy ...........15

    C.    The Barebones Allegation That Defendants "Collusively" Pressured Customers Does Not Make a Conspiracy Plausible ...........16

    D.    The Complaint's Allegations of Conspiracy Are Purely Conclusory...........18

    E.    The Complaint Fails to Allege an Enforcement Mechanism...........19

    F.    Plaintiffs' Other Allegations Cannot Save Their Implausible Claim ...........20

        1.    Plaintiffs' Assorted Unremarkable Allegations About Industry Structure Do Not Suggest a Conspiracy ...........20

        2.    Alleged Opportunities to Conspire Fail to Make Plaintiffs' Claim Plausible...........21

        3.    Plaintiffs' Claims About Plastic and Resin Costs Do Not Make Their Conspiracy Claim Plausible...........22

        4.    Settlements in Earlier Lawsuits Do Not Suggest a Conspiracy Here ........23

    CONCLUSION ...........23

Americas 92509972

# <u>TABLE OF AUTHORITIES</u>

<u>**Page(s)**</u>

## CASES

*Agnew v. NCAA*,
    683 F.3d 328 (7th Cir. 2012) ................................................3

*Anderson v. Simon*,
    217 F.3d 472 (7th Cir. 2000) ................................................9

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................4

*In re Baby Food Antitrust Litig.*,
    166 F.3d 112 (3d Cir. 1999)................................................6

*In re Beef Indus. Antitrust Litig.*,
    907 F.2d 510 (5th Cir. 1990) ................................................4, 7

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................ passim

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    94 C 897, 1995 U.S. Dist. LEXIS 4738 (N.D. Ill. Apr. 11, 1995)..........................................23

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    186 F.3d 781 (7th Cir. 1999) ................................................4

*In re Brand Name Prescription Drugs Antitrust Litig.*,
    288 F.3d 1028 (7th Cir. 2002) ................................................10

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)................................................18, 20

*Brooks v. Ross*,
    578 F.3d 574 (7th Cir. 2009) ................................................4

*Campos v. BP Prods. N. Am.*,
    No. 13 CV 9038, 2014 U.S. Dist. LEXIS 159242 (N.D. Ill. Nov. 12, 2014) ........................19

*In re Cardizem CD Antitrust Litig.*,
    332 F.3d 896 (6th Cir. 2003) ................................................11

*In re Chocolate Confectionary Antitrust Litig.*,
    801 F.3d 383 (3d Cir. 2015)................................................22

Americas 92509972

*Clark v. Actavis Group*,
    567 F. Supp. 2d 711 (D.N.J. 2008) ........................................................................................12

*Contractor Utility Sales Co. v. Certain-Teed Products Corp.*,
    638 F.2d 1061 (7th Cir. 1981) ...............................................................................................3

*Eddins v. Redstone*,
    134 Cal. App. 4th 290 (Cal. Ct. App. 2005) .........................................................................20

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007)............................................................................................18, 21

*Express Scripts, Inc. v. Pharmland, LLC*,
    No. 15CV1251, 2016 U.S. Dist. LEXIS 138104 (E.D. Mo. Sept. 30, 2016) .........................13

*Flying J, Inc. v. Van Hollen*,
    621 F.3d 658 (7th Cir. 2010) ...............................................................................................5

*G.D. Searle & Co. v. Comm'r*,
    88 T.C. 252 (Tax Ct. 1987)..................................................................................................13

*Gale v. Smith & Nephew, Inc.*,
    989 F. Supp. 2d 243 (S.D.N.Y. 2013)....................................................................................9

*Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*,
    998 F.2d 391 (7th Cir. 1993) ..............................................................................................10

*In re Guidant Corp. Sec. Litig.*,
    536 F. Supp. 2d 913 (S. D. Ind. 2008) ................................................................................12

*Harlem River Consumers Coop., Inc. v. Associated Grocers of Harlem, Inc.*,
    408 F. Supp. 1251 (S.D.N.Y. 1976).......................................................................................6

*Hot Stuff Foods, LLC v. Hous. Cas. Co.*,
    771 F.3d 1071 (8th Cir. 2014) ..............................................................................................8

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
    No. 11 C 07834, 2014 U.S. Dist. LEXIS 167887 (N.D. Ill. Dec. 4, 2014) ............................5

*In re Human Tissue Prods. Liab. Litig.*,
    488 F. Supp. 2d 430 (D.N.J. 2007) ......................................................................................12

*In re Late Fee & Over-Limit Litig.*,
    528 F. Supp. 2d 953 (N.D. Cal. 2007) .................................................................................19

Americas 92509972

*In re LTL Shipping Servs. Antitrust Litig.*,
    No. 1:08-MD-01895, 2009 U.S. Dist. LEXIS 14276 (N.D. Ga. Jan. 29, 2009)..........16, 20, 22

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
    466 U.S. 2 (1984)................................................................................................................17

*Kleen Prods., LLC v. Packaging Corp. of Am.*,
    775 F. Supp. 2d 1071 (N.D. Ill. 2011) ...............................................................................15

*LaFlamme v. Societe Air France*,
    702 F. Supp. 2d 136 (E.D.N.Y. 2010) ...............................................................................23

*Limestone Dev. Corp. v. Vill. of Lemont*,
    520 F.3d 797 (7th Cir. 2008) ...............................................................................................5

*Mallozzi v. Zoll Med. Corp.*,
    No. 94-11579, 1996 U.S. Dist. LEXIS 22953 (D. Mass. Mar. 5, 1996)................................12

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
    709 F.3d 129 (2d Cir. 2013)................................................................................................19

*Medtronic, Inc. v. Comm'r*,
    T.C. Memo 2016-112 (Tax Court 2016)..............................................................................14

*Monsanto v. Spray-Rite Service Corp.*,
    465 U.S. 752 (1984).............................................................................................................3

*Moore v. Boating Indus. Ass'n.*,
    819 F.2d 693 (7th Cir. 1987) .............................................................................................21

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1190 (9th Cir. 2015) .....................................................................................19, 21

*Nitz v. Birkette*,
    No. 11-c-44, 2011 U.S. Dist. LEXIS 25960 (N.D. Ill. Mar. 11, 2011) ..................................18

*Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*,
    998 F.2d 1224 (3d Cir. 1993)............................................................................................19

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
    No. 15-CV-7199, 2016 U.S. Dist. LEXIS 138439 (S.D.N.Y. Oct. 5, 2016)...........................14

*Planned Parenthood Ass'n of Utah v. Herbert*,
    828 F.3d 1245 (10th Cir. 2016) .........................................................................................13

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
    661 F. Supp. 2d 218 (E.D.N.Y. 2009) ..................................................................................6

Americas 92509972

*Ryan v. Mary Immaculate Queen Ctr.*,
  188 F.3d 857 (7th Cir. 1999) ...................................................................................19

*Schubert v. Genzyme Corp.*,
  No. 12CV587DAK, 2013 U.S. Dist. LEXIS 126291 (D. Utah Sept. 4, 2013)......................14

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
  782 F. Supp. 2d 1059 (E.D. Cal. 2011)...................................................................19

*Std. Iron Works v. Arcelormittal*,
  639 F. Supp. 2d 877 (N.D. Ill. 2009) ....................................................................16

*Superior Offshore Int'l, Inc. v. Bristow Group*,
  738 F. Supp. 2d 505 (D. Del. 2010)......................................................................20

*Taylor v. First Med. Mgmt.*,
  508 F. App'x 488 (6th Cir. 2012) .........................................................................23

*In re Text Messaging Antitrust Litig.*,
  782 F.3d 867 (7th Cir. 2015) .........................................................................3, 18

*Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*,
  850 F. Supp. 470 (E.D. Va. 1994) .......................................................................10

*In re Travel Agent Comm'n Antitrust Litig.*,
  583 F.3d 896 (6th Cir. 2009) .............................................................................21

*Wallace v. Bank of Bartlett*,
  55 F.3d 1166 (6th Cir. 1995) .............................................................................16

*Will v. Comprehensive Accounting Corp.*,
  776 F.2d 665 (7th Cir. 1985) .............................................................................17

*Zoslaw v. MCA Distrib. Corp.*,
  693 F.2d 870 (9th Cir. 1982) ...............................................................................6

**STATUTES AND RULES**

21 CFR §§ 7.40-7.59..........................................................................................8, 11, 12

21 CFR § 211.192 ....................................................................................................8

21 U.S.C. § 331 ......................................................................................................7

21 U.S.C. § 351 ......................................................................................................8

21 U.S.C. § 356c ...................................................................................................15

Fed. R. Evid. 201 ...................................................................................................9

v

Sherman Act § 1.................................................................................................................3

**MISCELLANEOUS**

Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (2016) .............................18, 20

Earl W. Kinter et al., 2 Federal Antitrust Law (Matthew Bender 2016) ......................10

Jonathan Berman, *A Few Lessons on Managing Product Recalls*, Law 360 (Feb. 22, 2012) ......................................................................................................14

M. Lemov & J. Hewitt, *Can You Risk a Recall? Insuring Against Product Liability*, ABA Section of Business Law/Business Law Today (Sept./Oct. 1999) ...........................................................................................................13

Philip Brewster, *Johnson & Johnson and the "Phantom" Recall: Practical Advice to Prevent Risk Management and Quality Systems from Failing to Identify and Address Sentinel Events*, 23 Health Law. 1 (2011)............................8, 11, 12, 13, 14

Press Release, U.S. Senator Orrin Hatch (Oct. 26, 2015)............................................18

Sunil D. Shewale et al., *Pharmaceutical Product Recall: Lesson Learned*, International Pharmaceutical Indus. 6:1 (Spring 2014) ........................................12

U. Nagaich & D. Sadhna, *Drug Recall: An Incubus for Pharmaceutical Companies and Most Serious Drug Recall of History*, Int'l J. Pharm. Investigation 5(1) (Jan.-Mar. 2015) ............................................................13

Americas 92509972

## INTRODUCTION

Defendants Hospira and Baxter are producers of intravenous saline solution ("IV Saline Solution") and other medical infusion technologies.[1]  Plaintiffs' central contention is that Defendants "create[d] and maintain[ed]" a shortage of IV Saline Solution by "announc[ing] several voluntary and nearly parallel recalls."  Consolidated Antitrust Class Action Compl. ("Complaint"), ¶ 59. This claim utterly fails the basic plausibility requirements of *Twombly*, *Iqbal*, and their progeny.

Perhaps most fundamentally, the product recalls, as alleged by Plaintiffs themselves, are not parallel or even "nearly parallel."  According to the Complaint, Hospira recalled *over fourteen times* as much product as Baxter, even though the two companies have nearly identical market shares.  The dramatic disparity between the two Defendants' conduct nullifies any argument that they were acting in any meaningfully parallel fashion, let alone acting pursuant to an agreement.

Moreover, the idea that Defendants would use product recalls to implement a conspiracy is far-fetched in the extreme, and Plaintiffs allege no facts to make such a theory plausible. Product recalls are costly, distracting, and bad for a company's reputation.  Companies are forced to scrap products that they spent the time and money to manufacture, often having to track down the goods after they have been sent to customers.  The reputational damage can be even greater, and in the drug and medical device industry, where product safety is paramount, a company's reputation for safety is critical.  Recalls also can lead to product liability and securities litigation, which companies of course want to avoid.  This common-sense reality alone renders Plaintiffs' theory wholly implausible.

---

[1] In this memorandum, "Hospira" refers collectively to Defendants Hospira, Inc. and Hospira Worldwide, Inc., and "Baxter" refers collectively to Defendants Baxter International Inc. and Baxter Healthcare Corporation.

The matter is sealed when one considers that product recalls are mandated by law if a product is deemed to be out of specification or otherwise flawed. Plaintiffs allege no facts to suggest that any of the alleged recalls did not satisfy these criteria, or were somehow shams. Indeed, the Complaint even acknowledges the legitimate reasons for the recalls, such as "particulate matter" in the product. Thus, as alleged, Hospira and Baxter were legally required to undertake the alleged recalls – and those recalls would have occurred even if there had been an agreement between Hospira and Baxter (there was not).

Moreover, when a company initiates a recall, it must work with the Food and Drug Administration ("FDA" or "Agency") to identify the problem and design a strategy to fix it. The FDA is empowered to investigate the company and the reasons for the recall. It defies belief to think that Defendants would *invite* the FDA to scrutinize the very means by which they allegedly executed the claimed cartel.

Given the sheer implausibility of Plaintiffs' conspiracy theory, one might expect them to compensate by setting forth detailed allegations of suspicious conduct by Defendants. But the Complaint contains nothing of the sort. Indeed, it offers little more than the same cookie-cutter allegations routinely found to be inadequate without more, *e.g.*, claims that Defendants were members of trade associations and the industry is concentrated. These allegations fail to make Plaintiffs' alleged conspiracy plausible.

Put simply, Plaintiffs' conspiracy claim is pure fantasy and falls far short of stating a plausible claim. And while the law alone mandates dismissal, important policy reasons support that result as well. In particular, giving credence to Plaintiffs' assertion that product recalls are "highly indicative" of a conspiracy risks discouraging companies from initiating otherwise appropriate recalls for fear of being dragged into a treble-damages antitrust lawsuit. When it

2

comes to public safety, companies should be incentivized to err on the side of caution.

For these reasons and the additional reasons discussed below, the Complaint should be dismissed with prejudice.[2]

## BACKGROUND

To avoid duplication, Hospira incorporates by reference the Background section of the Baxter Memorandum.

## LEGAL STANDARD

The Complaint alleges that Defendants violated Section 1 of the Sherman Act by conspiring to reduce production of IV Saline Solution.  Compl. ¶ 1.  To properly plead a violation of Section 1, a plaintiff must set forth facts making plausible: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in [a] relevant market; and (3) an accompanying injury."  *Agnew v. NCAA*, 683 F.3d 328, 335 (7th Cir. 2012) (alteration in original).

**Pleading a conspiracy requires an agreement**.  To satisfy the conspiracy element, a complaint must allege an *agreement* – the "fundamental prerequisite" of a Section 1 claim.  *Contractor Utility Sales Co. v. Certain-Teed Products Corp.*, 638 F.2d 1061, 1074 (7th Cir. 1981).  An agreement is a "meeting of the minds" or a "conscious commitment to a common scheme."  *Monsanto v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984).  The agreement must be "explicit[]," not merely implicit.  *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 872 (7th Cir. 2015).

An antitrust plaintiff can allege an agreement in two ways:  (1) by pleading "direct evidence" of an agreement, which would be "admissions or eyewitness accounts," or (2) with

---

[2] Hospira also joins in the arguments set forth in Baxter's Memorandum in Support of its Motion to Dismiss the Consolidated Amended Complaint ("Baxter Memorandum"), filed today in this case.

Americas 92509972

circumstantial allegations that lead to a plausible inference of an agreement. *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 785 (7th Cir. 1999). Circumstantial pleading requires, first, that defendants acted in parallel fashion, *i.e.*, took approximately the same actions at approximately the same time. *See In re Beef Indus. Antitrust Litig.*, 907 F.2d 510, 514 (5th Cir. 1990) (plaintiffs asserting circumstantial claims "must first demonstrate that the defendants' actions were parallel"). But parallel conduct alone does not state a claim for conspiracy, because it is "just as much in line with a wide swath of rational and competitive business strategy." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). Thus, a plaintiff must also allege facts that place the alleged parallel conduct "in a context that raises a suggestion of a preceding agreement." *Id.* at 557 (plaintiff must allege "further circumstance pointing toward a meeting of the minds").

Plaintiffs here assert no direct evidence of the claimed agreement; they present circumstantial pleadings, relying almost entirely on purported parallel conduct.

**The alleged conspiracy must be plausible**. *Twombly* made clear that a plaintiff's conspiracy claim must be "plausible on its face" to survive a motion to dismiss. *Id.* at 570. If the alleged wrongdoing is merely "conceivable," a plaintiff has not stated a claim for relief. *Id.* In evaluating plausibility, a court must consider "context" and "draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Where there is an "obvious alternative explanation" for Defendants' actions, courts cannot deem conspiracy allegations plausible. *Twombly*, 550 U.S. at 567; *see also Brooks v. Ross*, 578 F.3d 574, 581-82 (7th Cir. 2009) (affirming dismissal of complaint because alleged conduct "is just as consistent with lawful conduct as it is with wrongdoing"). As the Supreme Court emphasized in *Twombly*: insisting that a claim be plausible is especially important in antitrust cases, because the "costs of

4

modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery" absent a plausible claim. 550 U.S. at 558 (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)); *see also Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 802-03 (7th Cir. 2008) ("a defendant should not be forced to undergo costly discovery unless the complaint contains enough detail . . . to indicate that the plaintiff has a substantial case") (Posner, C.J.); *House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11 C 07834, 2014 U.S. Dist. LEXIS 167887 at *14 (N.D. Ill. Dec. 4, 2014) (*Twombly* "was heavily influenced by the need to avoid subjecting antitrust defendants to costly and burdensome discovery where a complaint fails to allege facts sufficient to provide any 'reasonably founded hope that the discovery process will reveal relevant evidence'" (quoting 550 U.S. at 559-60) (alteration in original)).

## ARGUMENT

## I.     THE COMPLAINT FAILS TO ALLEGE PARALLEL CONDUCT

Plaintiffs repeatedly seek to label Defendants' product recalls as "nearly parallel," Compl. ¶¶ 12, 13, 59, and they claim that "overlapping recalls" are "highly indicative" of a conspiracy, *id.* ¶ 63. As an initial matter, even if the alleged recalls were parallel, that is not enough to state a plausible claim for conspiracy. *Flying J, Inc. v. Van Hollen*, 621 F.3d 658, 665 (7th Cir. 2010) ("Without more, parallel conduct does not suggest conspiracy . . . .") (quoting *Twombly*, 550 U.S. at 556-57). But even a casual review of the alleged recalls shows that the claimed recalls are *not at all* parallel. Specifically, the four instances where the Complaint alleges that a specific volume of product was recalled reveal widely divergent conduct:

Americas 92509972

| Recalls Alleged in the Complaint With a Volume Specified | | |
|---|---|---|
| Recalling Party | Date | Volume (in bags) |
| Hospira | Oct. 14, 2014 | 16,500,000 |
| Baxter | Dec. 8, 2014 | 542,080 |
| Hospira | Dec. 22, 2014 | 30,840 |
| Baxter | Mar. 18, 2015 | 597,498 |

*See id.* ¶ 61(b)-(d).

The above table shows that, by Plaintiffs' own allegations, Hospira recalled *fourteen times more product* than Baxter, despite the fact that the two companies are alleged to have essentially the same market shares. *Id.* ¶ 43. There is nothing "parallel" about one firm reducing its output fourteen times more than another (where both firms are of comparable size).[3] Such conduct is no more parallel than if Company A announced a price increase of 30%, and Company B then announced it was raising prices by 2%. *See In re Baby Food Antitrust Litig.*, 166 F.3d 112, 128-32 (3d Cir. 1999) (holding price increases not parallel because "they were neither uniform nor within any agreed upon price range of each other"); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 884 (9th Cir. 1982) (holding conduct not parallel because there was "considerable variation" in defendants' practices and "variance in prices"); *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 231 (E.D.N.Y. 2009) (dismissing refusal-to-deal complaint where some defendants did not respond to plaintiffs' proposal while those that did gave different reasons for their decisions to decline plaintiffs' proposal); *Harlem River*

---

[3] Nor is the timing of the alleged recalls plausibly "parallel." Plaintiffs claim that Baxter recalled product in May 2013, then Hospira in June 2013, and then neither party recalled anything for over a year before Hospira suddenly recalled 16.5 million bags. *See id.* ¶ 61(a)-(b). After that, the Complaint alleges there was another months-long break before Baxter recalled anything. *Id.* ¶ 61(c).

Plaintiffs also claim that recalls prior to 2013 were "infrequent" and "sporadic," but that could just as well describe the recalls set forth in the Complaint, which alleges that Hospira issued one recall in 2013, two in 2014, and two in 2015. *Id.* ¶¶ 60-61.

Americas 92509972

*Consumers Coop., Inc. v. Associated Grocers of Harlem, Inc.*, 408 F. Supp. 1251, 1277 (S.D.N.Y. 1976) ("[M]ore than a general similarity of action is required for a finding of consciously parallel behavior." (citing *Independent Iron Works, Inc. v. United States Steel Corp.*, 322 F.2d 656, 661 (9th Cir. 1963))).

For that reason alone, there is no basis for inferring that Hospira and Baxter *agreed* to recall product, and the Complaint must be dismissed. *See Beef Indus.*, 907 F.2d at 514.

## II.     PLAINTIFFS' CLAIM IS IMPLAUSIBLE

Even if the recalls could be deemed parallel, the Complaint also must be dismissed for the independent reason that it is not "plausible on its face." *Twombly*, 550 U.S. at 570. Plaintiffs' primary claim is that "Defendants announced several voluntary and nearly parallel recalls" in order to "to create and maintain . . . [a] shortage of IV Saline Solution." Compl. ¶ 59; *see also id*. ¶ 12 (alleging Defendants implemented conspiracy with "several unprecedented (and nearly parallel) product recalls").[4]   But the theory that Defendants would conspire through product recalls is facially *implausible*, and Plaintiffs plead no facts to overcome that threshold deficiency.

### A.     The Complaint's Recall-Based Conspiracy Theory Defies Common Sense

#### 1.     Product Recalls Are Mandated by Law, and Plaintiffs Allege No Facts Making Plausible That Any Defendant's Recall Was Not So Mandated or Was Otherwise a Sham

The Federal Food, Drug, and Cosmetic Act (the "FDCA") makes it a crime to distribute an "adulterated or misbranded" drug or device in interstate commerce.   21 U.S.C. § 331(a). Public health and safety considerations require no less.   The FDCA defines an adulterated drug to include, among other things, a drug that (1) "may have been rendered injurious to health" due

---

[4] If Plaintiffs are claiming a conspiracy based on something other than output cuts effected through product recalls, they allege no facts to support such a theory (or even enough facts to make it clear what they are alleging).

7

to "insanitary conditions," (2) "its manufacture, processing, packing, or holding do not conform to or are not operated or administered in conformity with current good manufacturing practice," or (3) was "mixed or packed [with another substance] so as to reduce its quality." 21 U.S.C. § 351(a), (d).

Any drug or device meeting these criteria must be removed from interstate commerce. As one authority makes clear: "Drug manufacturers have a legal duty to prevent adulterated or misbranded products from entering interstate commerce and to take measures to protect the public health upon such an occurrence."[5]  Philip Brewster, *Johnson & Johnson and the "Phantom" Recall: Practical Advice to Prevent Risk Management and Quality Systems from Failing to Identify and Address Sentinel Events*, 23 Health Law. 1, 3 (2011) (citing 21 U.S.C. § 351(a-b)).

The FDA has published detailed guidelines for conducting recalls, 21 CFR §§ 7.41-7.59, and has made clear that recalls are part of a manufacturer's "responsibility to protect the public health and well-being," 21 CFR § 7.40.  Although FDA guidelines reference "voluntary" recalls, there is nothing truly voluntary about a company's decision to recall a product that is out of specification and/or may be flawed; the product must be recalled.  A voluntary recall is merely one that occurs *instead of* FDA "court action for removing or correcting violative, distributed products."  21 CFR § 7.40; *see Hot Stuff Foods, LLC v. Hous. Cas. Co.*, 771 F.3d 1071, 1075 (8th Cir. 2014) ("Food and drug companies that refuse to conduct an agency-recommended voluntary recall risk facing the agencies' draconian enforcement powers, such as product seizure and adverse publicity."); Brewster, *supra*, at 3 ("The word 'voluntary' in the recall context is somewhat misleading because the FDA is permitting manufacturers to initiate recall measures in

---

[5] FDA regulations require manufacturers to investigate and keep records of product quality results.  *See* 21 CFR § 211.192.

lieu of the FDA's commencement of legal action.").[6]  And the FDA made clear in 2009, the first

year of President Obama's administration, that it would increase oversight of drug manufacturers

through "swift, aggressive, and effective enforcement of FDA laws and regulations."[7]  FDA,

*FDA Commissioner Sets Out Vision on Enforcement to Support Public Health* (Aug. 6, 2009).[8]

      In sum, Hospira and Baxter are each required by law – on pain of potential criminal

penalty – to recall products found to be out of specification and/or that may have been flawed.

As noted, the Complaint itself cites the legitimate reasons for the recalls, such as "presence of

particulate matter," "potential for leakage," and "missing closures."  *See* Compl. ¶ 61.  Plaintiffs

do not even attempt to assert, let alone with plausible facts, that any of these recalls was not

required by law.  Thus, the Complaint provides no basis for asserting that the alleged recalls

were conspiratorial or that Defendants would not have been obligated to undertake the recalls

whether or not there was a conspiracy.

      That the recalls were necessary is not surprising because the risk of adulteration is

particularly high for IV Saline Solution.  Even the Complaint implicitly recognizes this.  *See id.*

¶ 41 ("IV Saline Solution must be kept sterile" and "can become contaminated if the bag is

punctured or contains particulates . . . [which] may lead to adverse health consequences . . . .").

Moreover, the FDA has specifically identified sterile injectables, of which IV Saline Solution is

---

[6] "Almost all recalls are conducted on a voluntary basis."  FDA, *Recalls, Corrections and Removals (Devices)* (Jan. 3, 2017), *available at* https://www.fda.gov/MedicalDevices/DeviceRegulationand Guidance/PostmarketRequirements/RecallsCorrectionsAndRemovals/.

[7] Perhaps as a result, product recalls have been a frequent occurrence.  In 2016 alone, the FDA announced 1,216 drug product recalls – an average of over three recalls every day.  FDA Recall Information, *available at* http://www.accessdata.fda.gov/scripts/ires/index.cfm#tabNav_advancedSearch [search for category "drugs" between dates 1/1/2016 and 12/31/2016].  A court may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment.  *See Anderson v. Simon*, 217 F.3d 472, 474-75 (7th Cir. 2000); *see also Gale v. Smith & Nephew, Inc.*, 989 F. Supp. 2d 243, 250 n.6 (S.D.N.Y. 2013) (taking judicial notice of FDA recall records).  The court "*must* take judicial notice if a party requests it and the court is supplied with the necessary information."  Fed. R. Evid. 201(c)(2) (emphasis added).

[8] *Available at* https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm176119.htm.

one, as prone to quality control problems, because "the manufacturing of sterile injectables is particularly complex and involves many steps where things can go wrong." FDA, *Frequently Asked Questions about Drug Shortages*, Answer to *Why Are There So Many Quality Problems with Drugs Occurring Recently?* (Dec. 12, 2016).[9]

This high risk of recall explains why, as the Complaint itself admits, Hospira recalled IV Saline Solution *before* the alleged conspiracy. *See* Compl. ¶ 60. That alone casts significant doubt on Plaintiffs' claim, because the Complaint sets forth no facts to make it plausible that Hospira's recalls suddenly became conspiratorial in 2013. *See, e.g.*, *In re Brand Name Prescription Drugs Antitrust Litig.*, 288 F.3d 1028, 1033-34 (7th Cir. 2002) (rejecting argument defendants conspired "because . . . the chargeback system was adopted before the alleged collusion of the manufacturers began and because the system is supported by commercial reasons independent of any desire to . . . to facilitate collusive pricing"); *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 850 F. Supp. 470, 480 (E.D. Va. 1994) (dismissing Sherman Act claim because contracts at issue were used before alleged conspiracy); Earl W. Kinter et al., 2 Federal Antitrust Law § 11.4 (Matthew Bender 2016) ("[T]hat a practice began before the alleged conspiracy began tends to show that there is an independent justification for the practice.").

Plaintiffs' failure to allege that any recall was unwarranted not only renders the claimed conspiracy implausible in the extreme (why conspire to do something that is mandated by law in any event?), but it exposes that Plaintiffs cannot plead that the claimed conspiracy *caused* antitrust harm (since recalls would have been required regardless).[10]  *See, e.g., Greater Rockford*

---

[9] *Available at* http://www.fda.gov/Drugs/DrugSafety/DrugShortages/ucm050796.htm.

[10] Nor do Plaintiffs adequately plead that the claimed recalls caused the alleged shortage. Indeed, recalls of 500,000 bags of saline in an industry that produces somewhere between 240 million and 1 billion bags

Americas 92509972

*Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 402 (7th Cir. 1993) (granting summary judgment for defendants because plaintiffs failed to show claimed antitrust violation caused their alleged injuries where there were "numerous intervening economic and market factors"); *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 900 (6th Cir. 2003) (ruling complaint must be dismissed if "plaintiffs' injury would have occurred even if there had been no antitrust violation").

These failures alone warrant dismissal.

> **2.     Product Recalls Are Scrutinized by the Federal Government and a Costly Distraction for the Recalling Company**

Plaintiffs' recall-based conspiracy theory is all the more implausible because, for a number of reasons, it is highly unlikely that firms would use product recalls to carry out a conspiracy:

*First*, when a company recalls a medical device or drug, it sets in motion an intensive review by the FDA, which among other things:

- Evaluates "the health hazard presented by a product being recalled," 21 CFR § 7.41;

- Requires the recalling company to create a "recall strategy," which the FDA reviews and "recommend[s] changes as appropriate," 21 CFR § 7.42(a);

- "[I]mplements a recall audit program to monitor the progress and effectiveness of the recall," Brewster, *supra*, at 4;

- Asks the company to submit "periodic recall status reports," generally every two to four weeks, 21 CFR § 7.53(a);

- May conduct "an establishment inspection . . . [to] determine the root causes of the problem and document violations for possible regulatory action" and collect samples that

---

a year (the Complaint alleges multiple disparate annual production volumes, Compl. ¶¶ 4, 62), are hardly significant.

11

"best demonstrate the defect and potential hazard," FDA, *Regulatory Procedures Manual*, Ch. 7 at 7-9 (Oct. 2013);[11]

- Recommends that recalling firms submit to the FDA explanations of "how the problem occurred and the date(s) it occurred" and "how the problem was discovered and the date discovered." FDA, *Guidance for Industry: Product Recalls, Including Removals and Corrections* (Aug. 22, 2014);[12]

- "[A]ssigns audit checks as appropriate," Regulatory Procedures Manual, Ch. 7 at 5.

Product recalls also "can trigger a specific or wide ranging investigation by the FDA into compliance with current good manufacturing practices ('cGMP'), which may result in adverse FDA action." Brewster, *supra*, at 4. It is not plausible that a company would invite the federal government to investigate the very means by which it was implementing a conspiracy.[13]

*Second*, product recalls are expensive and disruptive to the recalling company, as the FDA itself recognizes. *See* 21 CFR § 7.59 ("A recall can be disruptive of a firm's operation and business.") As one commentator explains, "Product recalls can be complex and will always involve many departments within the company such as production, quality control, quality assurance, marketing, R & D, as well as dealers, distributors and customers. . . . Product recalls are certainly expensive . . . ." Sunil D. Shewale et al., *Pharmaceutical Product Recall: Lesson Learned*, International Pharmaceutical Indus. 6:1 (Spring 2014), at 16-17[14]; *see also In re Guidant Corp. Sec. Litig.*, 536 F. Supp. 2d 913, 919 (S. D. Ind. 2008) (manufacturer's share price dropped 4.5% after FDA recall announcement, costing investors over $1 billion); *Mallozzi v. Zoll*

---

[11] *Available at* http://www.fda.gov/downloads/ICECI/ComplianceManuals/RegulatoryProceduresManual/UCM074312.pdf.

[12] *Available at* http://www.fda.gov/Safety/Recalls/IndustryGuidance/ucm129259.htm

[13] Because of the FDA's expertise in managing and scrutinizing recalls, courts avoid interfering with FDA recall strategy or questioning the sufficiency of the FDA's recall oversight. *See Clark v. Actavis Group hf*, 567 F. Supp. 2d 711, 717-19 (D.N.J. 2008) (describing FDA recall procedures and denying plaintiff's motion to interfere with recall); *In re Human Tissue Prods. Liab. Litig.*, 488 F. Supp. 2d 430, 433 (D.N.J. 2007) (Assessing recall procedures "is best left to the FDA's considered competence in these matters.").

[14] *Available at* http://ipimediaworld.com/wp-content/uploads/2014/03/Pharmaceutical-product%E2%80%A6pdf.pdf.

12

*Med. Corp.*, No. 94-11579, 1996 U.S. Dist. LEXIS 22953, at *3 (D. Mass. Mar. 5, 1996) (major FDA recall forced manufacturer to shut down manufacturing and sales operations for two years.); U. Nagaich & D. Sadhna, *Drug Recall: An Incubus for Pharmaceutical Companies and Most Serious Drug Recall of History*, Int'l J. Pharm. Investigation 5(1) (Jan.-Mar. 2015), at 13 ("A recall is an expensive undertaking even where patient safety is not at stake").[15]

And the most significant cost of a recall may be the impact on a firm's reputation. *See, e.g.*, *G.D. Searle & Co. v. Comm'r*, 88 T.C. 252, 297-98 (Tax Ct. 1987) ("Recalls of prescription pharmaceutical products are considered very serious in the pharmaceutical industry" and can be considered "evidence[] [of] deep-seated problems in [a company's] manufacturing operations"); Brewster, *supra*, at 4 (recalls pose "risk of significant reputational harm"); Sunil D. Shewale et al., *supra*, at 16 ("Product recall could significantly damage a company's reputation, profitability and brand integrity"); M. Lemov & J. Hewitt, *Can You Risk a Recall? Insuring Against Product Liability*, ABA Section of Business Law/Business Law Today (Sept./Oct. 1999), at 26 ("losses . . . may include loss of customer goodwill and the company's good name").[16] It goes without saying that, in the medical device and pharmaceutical industries, a provider's reputation is of utmost importance. *See, e.g.*, *Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1264 (10th Cir. 2016) ("[A]s a provider of medical services, [plaintiff's] reputation is . . . critical to maintaining the trust of its patients.") (second alteration in original) (quotations omitted); *Express Scripts, Inc. v. Pharmland, LLC*, No. 15CV1251, 2016 U.S. Dist. LEXIS 138104, at *2 (E.D. Mo. Sept. 30, 2016) ("The integrity and reputation of Express Scripts' pharmacy provider network is critical.").

---

[15] *Available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4286830/.
[16] *Available at* http://www.abanet.org/buslaw/blt/9-1recall.html.

Americas 92509972

It is hardly plausible that prominent firms such as Hospira and Baxter would bring such reputational risks upon themselves through contrived product recalls. This is particularly so since either firm could have reduced supply simply by adjusting production in the first instance. *See, e.g.*, *Schubert v. Genzyme Corp.*, No. 12CV587DAK, 2013 U.S. Dist. LEXIS 126291, at *17 (D. Utah Sept. 4, 2013) ("there is no statutory duty placed on a [drug] manufacturer to ensure a continued supply of any given pharmaceutical").

*Third*, companies that recall products become targets for product liability lawsuits, which are time-consuming, expensive to defend, and can even pose an existential threat to a business. *See Medtronic, Inc. v. Comm'r*, T.C. Memo 2016-112, at *12 (Tax Court 2016) ("The threat of class action lawsuits or multidistrict proceedings are frequent consequences of product recalls in the medical device industry"); *see also* Brewster, *supra*, at 4 ("recalls also expose drug manufacturers to potential product liability litigation"); Jonathan Berman, *A Few Lessons on Managing Product Recalls*, Law 360 (Feb. 22, 2012) ("[P]roduct recall announcements can quickly lead to class action lawsuits. Recalls generate copious adverse publicity, and plaintiffs' lawyers can learn of many recalls almost immediately, even before most of the affected consumers."). Product recalls can also lead to securities litigation. *See, e.g.*, *Pirnik v. Fiat Chrysler Automobiles, N.V.*, No. 15-CV-7199, 2016 U.S. Dist. LEXIS 138439, at *2 (S.D.N.Y. Oct. 5, 2016) (class action lawsuit alleging defendant "improperly accounted for vehicle recall costs").

In sum, it is not remotely plausible that Defendants would choose to implement a conspiracy in a way that puts them directly in the crosshairs of the FDA and plaintiffs' lawyers, let alone do so through a process that is as costly, burdensome, and disruptive as product recalls.

14

### B.    Plaintiffs' Signaling Allegations Do Not Suggest a Conspiracy

To try to shore up their claim, Plaintiffs contend that Defendants "signaled" each other by submitting letters to the FDA Drug Shortage website, allegedly to "ensure that all Defendants also restricted output." Compl. ¶¶ 66, 68. But the Complaint alleges just four such shortage letters, and none of those letters was submitted any time near a claimed recall. *Id.* ¶¶ 69-70, 72. Indeed, all four alleged letters were submitted during a four-month window between December 2013 and March 2014, more than six months from the closest alleged recall. *Id.*

| Date | Alleged Event |
|------|---------------|
| May 21, 2013 | Baxter Recall |
| December 16, 2013 | First Shortage Letter |
| March 12, 2014 | Last Shortage Letter |
| October 14, 2014 | Hospira Recall |

*Id.* ¶¶ 61, 69, 72. These alleged "signals" do not make a recall-based conspiracy theory plausible because Plaintiffs "have not tied [Defendants' letters] temporally," or in any other way, to the allegedly conspiratorial recalls. *Kleen Prods., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1080 (N.D. Ill. 2011).

Plaintiffs' signaling theory also fails because, in publishing information about shortages on the FDA website, Defendants were merely doing what the law requires. Federal law provides that drug makers must notify the FDA if there is likely to be "a meaningful disruption in the supply of that drug." 21 U.S.C. § 356c(a). The FDA specifically requires manufacturers to post shortage information on the Agency's website.[17]  *See id.*; FDA, *Frequently Asked Questions*

---

[17] The purpose of the FDA's Shortage Website is to "allow for better drug shortage monitoring and mitigation." FDA, *Drug Shortages* (Feb. 16, 2017), https://www.fda.gov/Drugs/DrugSafety/DrugShortages/default.htm.

Americas 92509972

*about Drug Shortages*, Answer to *Are Companies Required to Notify FDA of a Potential Drug Shortage?* (manufacturers are "required to report the reasons for shortages and the expected duration of shortages on the FDA website").[18]

Courts have not hesitated to reject allegations of conspiratorial "signaling" where, as here, the claims are based on public statements that have a clear, non-conspiratorial purpose. *See, e.g.*, *Std. Iron Works v. Arcelormittal*, 639 F. Supp. 2d 877, 894 (N.D. Ill. 2009) ("Public statements about output reduction, in the form of press releases or SEC filings, are fundamentally distinct from statements made at trade meetings directly to competing executives."); *see also Wallace v. Bank of Bartlett*, 55 F.3d 1166, 1169-70 (6th Cir. 1995) (declining to infer conspiracy from defendants' publication of retail prices because allowing such an inference would impede ability of consumers to obtain information needed to make "efficient market decisions" (quoting *In re Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 448 n.14 (9th Cir. 1990))); *In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-MD-01895, 2009 U.S. Dist. LEXIS 14276, at *70 (N.D. Ga. Jan. 29, 2009) (dismissing complaint alleging defendants shared price data on their websites). Notably, some of the shortage letters referenced by Plaintiffs also reported shortages of products other than IV Saline Solution – only underscoring the compliance purposes of the communications, and undercutting the notion of a conspiracy as to IV Saline Solution. *See* Compl. ¶¶ 70, 72.

**C.** **The Barebones Allegation That Defendants "Collusively" Pressured Customers Does Not Make a Conspiracy Plausible**

The Complaint asserts that Defendants "collusively exploited their market power . . . by pressuring customers to purchase more products than IV Saline Solution alone." *Id.* ¶ 76. According to Plaintiffs, such conduct suggests conspiracy because, if the IV Saline Solution

---

[18] *Available at* http://www.fda.gov/Drugs/DrugSafety/DrugShortages/ucm050796.htm.

16

industry were "truly competitive," each IV Saline Solution manufacturer would "lower its prices for IV Saline Solution and sell IV Saline Solution separately from other products." *Id.* ¶ 79. This argument does not salvage Plaintiffs' claim.

*First*, even if true that either Defendant encouraged its customers to buy more than just IV Saline Solution, there is nothing suspicious about this, as companies across the economy try to sell as many of their products as they can, often seeking to incent a customer for product A to also buy products B and C (*e.g.*, computer packages with monitor, keyboard, and mouse or a combo meal at a fast food restaurant). Moreover, the Supreme Court has recognized that even outright tying, which Plaintiffs do *not* claim here, can be pro-competitive and a different dimension of competition. *See, e.g.*, *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 11-12 (1984) ("It is clear, however, that not every refusal to sell two products separately can be said to restrain competition. . . . Buyers often find package sales attractive; a seller's decision to offer such packages can merely be an attempt to compete effectively."); *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 673 (7th Cir. 1985) ("[T]ying may have competitive benefits. Sometimes the sale of the package is just a way to compete. . . . [M]ethods that revolve around tied packages . . . may be beneficial to some customers."). In short, the mere possibility that each firm wanted to maximize sales of its broader portfolio – in competition with the other – hardly makes plausible the conspiracy alleged here.

*Second*, to the extent Plaintiffs' allusion to a "truly competitive market" is meant to suggest that the marketplace for IV Saline Solution should be viewed as perfectly competitive, this is also belied by their own allegations. Plaintiffs themselves assert that there are only two major suppliers of IV Saline Solution in the U.S., Compl. ¶¶ 96-97, making it a classic oligopoly, *i.e.*, a market "in which a few relatively large sellers account for the bulk of the output." Phillip

17

E. Areeda & Herbert Hovenkamp, *Antitrust Law*, ¶ 404a (2016). By definition, oligopolies are not perfectly competitive. *See, e.g.*, *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) (oligopolists may lawfully "set[] their prices at a profit-maximizing, supracompetitive level").

Firms in an oligopoly often engage in similar conduct without any need for an agreement or conspiracy. *See, e.g.*, *Text Messaging*, 782 F.3d 867, 871 (7th Cir. 2015) (stating "the fewer the firms" in an industry, the more likely they are to take the same actions "without an actual agreement"); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) (affirming dismissal because parallel actions could have resulted from "common perceptions of the market" (quoting *Twombly*, 550 U.S. at 554)). Thus, the mere possibility that Hospira and Baxter both encouraged customers to purchase more than just IV Saline Solution is not suggestive of a conspiracy as to that practice, let alone a conspiracy to cut output via product recalls.[19]

### D. The Complaint's Allegations of Conspiracy Are Purely Conclusory

While Plaintiffs fill the Complaint with antitrust buzzwords such as "collusive" and "scheme," *e.g.*, Compl. ¶¶ 12, 58, 65, such conclusory allegations do not make a claim plausible. *See, e.g.*, *Nitz v. Birkette*, No. 11-c-44, 2011 U.S. Dist. LEXIS 25960, at *6 (N.D. Ill. Mar. 11, 2011) (holding "buzzwords" inadequate where plaintiff "provides no facts whatsoever that might support an inference of a conspiracy" (citing *Twombly*, 550 U.S. at 544, 554-55)).

Particularly where, as here, the theory of conspiracy is inherently implausible, it is all the more important that a plaintiff allege facts suggesting when and how the alleged conspiracy was

---

[19] Notably, B. Braun is not alleged to be a conspirator, but it purportedly did exactly what Defendants are alleged to have done, illustrating that the claimed conduct is in fact in the independent economic self-interest of a manufacturer. *See* Press Release, U.S. Senator Orrin Hatch (Oct. 26, 2015), *available at* http://www.hatch.senate.gov/public/index.cfm/2015/10/blumenthal-lee-klobuchar-hatch-urge-ftc-to-investigate-antitrust-violations-connected-to-iv-solution-shortages-increasing-costs-of-hospital-operations-and-patient-care.

Americas 92509972

formed, how it is supposed to have worked, and how it was enforced, among other things. *See, e.g., Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 860 (7th Cir. 1999) (implausible conspiracy claim dismissed where complaint failed to identify "when an agreement between . . . defendants was formed, what its terms were . . . or what [defendant]'s role was") (Posner, C.J.). But the Complaint here furnishes no clue how the conspiracy was supposed to have worked. For example, how did Defendants determine which company would recall product, when it would do so, or how much product would be recalled?

Courts routinely dismiss conspiracy claims lacking such basic allegations. *See, e.g., In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1190, 1190 (9th Cir. 2015) (affirming dismissal of complaint where "plaintiffs failed to identify in their complaint 'who is alleged to have conspired with whom, what exactly they agreed to, and how the alleged conspiracy was organized and carried out'" (citation omitted)); *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 139-40 (2d Cir. 2013) (affirming dismissal of complaint alleging only scattered interfirm communications); *Campos v. BP Prods. N. Am.*, No. 13 CV 9038, 2014 U.S. Dist. LEXIS 159242, at *29 (N.D. Ill. Nov. 12, 2014) (dismissing civil conspiracy claim where "plaintiffs say nothing about when the agreement took place, what form it was in, or which defendants participated"); *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1075 (E.D. Cal. 2011) (dismissing claim where plaintiff alleged no details of agreement); *In re Late Fee & Over-Limit Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) (dismissing claim that "provides no details as to when, where, or by whom this alleged agreement was reached").

## E.    The Complaint Fails to Allege an Enforcement Mechanism

Essential to any antitrust conspiracy is a mechanism to detect and punish cheating. *See, e.g., Petruzzi's IGA Supermarkets v. Darling-Delaware Co.*, 998 F.2d 1224, 1233 (3d Cir. 1993)

Americas 92509972

("a cartel cannot survive absent some enforcement mechanism"); *Eddins v. Redstone*, 134 Cal. App. 4th 290, 314 (Cal. Ct. App. 2005) (affirming summary judgment under California antitrust law where "no evidence indicates [defendant] 'enforced' the alleged agreement . . . and indeed no evidence showed any mechanism by which [defendant] *could* enforce such an agreement" (emphasis in original) (citing *Petruzzi's*, 998 F.2d at 1233)). The Complaint here is utterly devoid of allegations regarding enforcement of the terms of the supposed conspiracy (as noted, the Complaint is also silent on terms of the conspiracy itself). This silence renders Plaintiffs' conspiracy yet more implausible.

**F.     Plaintiffs' Other Allegations Cannot Save Their Implausible Claim**

The Complaint includes a patchwork of other allegations, none of which makes plausible, either individually or collectively, the claim that Defendants conspired to reduce supply through product recalls.

**1.     Plaintiffs' Assorted Unremarkable Allegations About Industry Structure Do Not Suggest a Conspiracy**

Plaintiffs contend that the IV Saline Solution industry is concentrated and has high barriers to entry, and they also assert that IV Saline Solution is homogenous and demand for the product is inelastic. Compl. ¶¶95-112. These allegations merely indicate that the IV Saline Solution marketplace may be an oligopoly, which (as noted) is not unlawful and certainly does not suggest a conspiracy. *Brooke Grp.*, 509 U.S. at 227; Areeda & Hovenkamp, *Antitrust Law*, ¶ 1429a. Courts have not hesitated to dismiss otherwise implausible conspiracy claims despite the presence of similar "structural" allegations. *See, e.g.*, *Superior Offshore Int'l, Inc. v. Bristow Group*, 738 F. Supp. 2d 505, 508, 513 (D. Del. 2010) (dismissing complaint alleging conspiracy among companies in concentrated industry with similar costs structures); *LTL Shipping*, 2009 U.S. Dist. LEXIS 14276, at *21-22 (dismissing conspiracy claims alleging a concentrated

Americas 92509972

industry with high barriers to entry, interchangeable services, inelastic demand, and similar costs); *Elevator Antitrust Litig.*, No. 04 CV 1178(TPG), 2006 WL 1470994, at *10 (S.D.N.Y. May 30, 2006), *aff'd*, 502 F.3d 47 (2d Cir. 2007) ("[C]ourts have repeatedly stated that allegations of oligopoly are insufficient to state a claim under the antitrust laws.").

### 2. Alleged Opportunities to Conspire Fail to Make Plaintiffs' Claim Plausible

The Complaint asserts that Defendants had the "opportunity to meet" because they are "members of industry associations." Compl. ¶ 113. It is well-established, however, that mere participation in industry associations is no basis for inferring a conspiracy. *See, e.g.*, *Moore v. Boating Indus. Ass'n.*, 819 F.2d 693, 712 (7th Cir. 1987) (trade association activities are "not . . . condemned or even discouraged by the antitrust laws"). Indeed, such associations "often serve legitimate functions, such as providing information to industry members, conducting research to further the goals of the industry, and promoting demand for products and services." *Musical Instruments*, 798 F.3d at 1196 (quoting *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999)). Thus, courts regularly dismiss complaints where defendants had "opportunities" to conspire through attendance at trade association meetings and the like. *See, e.g.*, *Twombly*, 550 U.S. at 567 n.12; *Musical Instruments*, 798 F.3d at 1196 (affirming dismissal of complaint and stating "mere participation in trade organization meetings where information is exchanged and strategies are advocated does not suggest an illegal agreement"); *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 910-11 (6th Cir. 2009) (affirming dismissal of price-fixing claims despite allegations of parallel conduct and attendance at trade meetings).

The case for dismissal is even stronger here, where Plaintiffs do not actually allege that Defendants attended any industry events, just that they were *members* of two trade associations. Compl. ¶¶ 114-15. Even weaker is the claim that Defendants are headquartered "less than 10

21

miles" from each other.  *Id.* ¶ 116.  These allegations of purported "opportunities" to conspire fall far short of suggesting a conspiracy.

### 3.  Plaintiffs' Claims About Plastic and Resin Costs Do Not Make Their Conspiracy Claim Plausible

Plaintiffs cannot salvage their conspiracy claim by alleging that costs of plastic and resin were "stable" or falling.  *Id.* ¶ 123.  There are numerous reasons that prices of IV Saline Solution would not track the cost of plastic and resin.  First, as noted, plaintiffs themselves contend that the IV Saline Solution industry is an oligopoly, where prices are not expected to follow costs. *See, e.g.*, *LTL Shipping*, 2009 U.S. Dist. LEXIS 14276, at *27 (dismissing complaint where plaintiffs alleged oligopolists' prices "were not justified by actual increases in the price of fuel"); *see also In re Chocolate Confectionary Antitrust Litig.*, 801 F.3d 383, 400 (3d Cir. 2015) (holding oligopolies may produce "a price increase disconnected from changes in costs").

Therefore, even if pricing did not precisely track changes in input costs, that does not make plausible a conspiracy claim.  Second, even assuming that plastic and resin are the "primary inputs" for IV Saline Solution, Plaintiffs do not allege that those inputs are the main drivers of the cost of manufacturing the product.  They conveniently ignore the substantial manufacturing and compliance costs of producing drugs under tight FDA regulations, even though the Complaint recognizes those costs elsewhere.  *See* Compl. ¶ 100 (IV Saline Solution manufacturers "need to meet strict FDA requirements, adding additional burdens and costs"); *see also* FDA, *Why Are There So Many Quality Problems with Drugs Occurring Recently?* ("the manufacturing of sterile injectables is particularly complex and involves many steps where things can go wrong").[20]

---

[20] *Available at* http://www.fda.gov/Drugs/DrugSafety/DrugShortages/ucm050796.htm.

Americas 92509972

4.      **Settlements in Earlier Lawsuits Do Not Suggest a Conspiracy Here**

Plaintiffs describe Baxter as a "recidivist violator of the antitrust laws" and argue the Court should infer a conspiracy as a result.  Compl. ¶ 94.  As an initial matter, Plaintiffs' claim has nothing to do with Hospira.  More importantly, the mere fact that Baxter was previously sued and chose to settle in no way makes Baxter a "violator of the antitrust laws."  Defendants settle litigation for many reasons that have nothing to do with liability.  *See, e.g.*, *Taylor v. First Med. Mgmt.*, 508 F. App'x 488, 497 (6th Cir. 2012) ("[C]ourts should not assume that a case has merit because it settled.  Cases settle for many reasons and sometimes for reasons entirely unrelated to the merits of the case . . . ."); *LaFlamme v. Societe Air France*, 702 F. Supp. 2d 136, 154 (E.D.N.Y. 2010) ("neither mere participation in an investigatory interview nor the receipt of a subpoena is necessarily probative of conspiracy").  In the antitrust context, the pressure to settle is especially powerful – even for innocent defendants – as the Supreme Court and courts in this district have recognized.  *See Twombly*, 550 U.S. at 559 ("the threat of [antitrust] discovery expense will push cost-conscious defendants to settle even anemic cases"); *In re Brand Name Prescription Drugs Antitrust Litig.*, 94 C 897, 1995 U.S. Dist. LEXIS 4738, at *10 (N.D. Ill. Apr. 11, 1995) (discussing how plaintiffs can "coerce[]" settlements in antitrust cases by "exploit[ing] the immense exposure" of defendants).

Plaintiffs cannot construct a conspiracy claim against Hospira by making baseless accusations about Baxter.

## CONCLUSION

For all of the foregoing reasons, Plaintiffs' Complaint should be dismissed in its entirety with prejudice.

23

Dated:  February 21, 2017

Respectfully submitted,

HOWARD & HOWARD ATTORNEYS PLLC

By: _/s/David C. Van Dyke_____
    David C. Van Dyke

David C. Van Dyke (ARDC No. 06204705)
Emily E. Bennett (ARDC No. 06305461)
Howard & Howard Attorneys PLLC
200 S. Michigan Avenue #1100
Chicago, IL 60604
Telephone: 312-372-4000
Fax: 312-939-5617
dvandyke@howardandhoward.com
ebennett@howardandhoward.com


WHITE & CASE LLP

By:  /s/ _Robert A. Milne_____
Robert A. Milne
Brendan Woodard
Raj Gandesha
David H. Suggs
Kathryn Swisher
1155 Avenue of the Americas
New York, NY 10036
(212) 819-8200
rmilne@whitecase.com
bwoodard@whitecase.com
rgandesha@whitecase.com
dsuggs@whitecase.com
kswisher@whitecase.com


*Attorneys for Defendants Hospira, Inc. and
Hospira Worldwide, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2017, a true and correct copy of the foregoing

**Hospira's Memorandum of Law in Support of Its Motion to Dismiss the Consolidated**

**Antitrust Class Action Complaint** was electronically filed with the Clerk of the Court using the

Court's CM/ECF system, which will automatically e-mail notification of such filing to all

counsel of record.

By: */s/David C. Van Dyke*
David C. Van Dyke
HOWARD & HOWARD ATTORNEYS
PLLC
200 S. Michigan Ave. #1100
Chicago, IL 60604
Telephone: (312) 456-3641
Fax: (312) 939-5617

1

Americas 92509972