**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| WASHINGTON COUNTY HEALTH CARE AUTHORITY, INC. d/b/a WASHINGTON COUNTY HOSPITAL & NURSING HOME, CÉSAR CASTILLO, INC., WARREN GENERAL HOSPITAL, and ERIE COUNTY MEDICAL CENTER CORPORATION, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> BAXTER INTERNATIONAL INC.; BAXTER HEALTHCARE CORPORATION; HOSPIRA, INC. and HOSPIRA WORLDWIDE, INC., <br><br> Defendants. | Hon. John J. Tharp, Jr. <br> Judge Presiding <br><br> No. 1:16-cv-10324 |

**BAXTER'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED ANTITRUST CLASS ACTION
<u>COMPLAINT FOR FAILURE TO STATE A CLAIM</u>**

# **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND .......................................................................................................... 4

    A.    The Parties ....................................................................................... 4

    B.    IV Saline ......................................................................................... 5

    C.    Plaintiffs' Conspiracy Theory........................................................ 5

    D.    Allegations and Authorities Regarding IV Saline Regulation and Pricing............ 6

STANDARD OF REVIEW .......................................................................................... 7

ARGUMENT................................................................................................................ 9

    I.    THE CAC FAILS TO PLEAD AN ANTITRUST CLAIM ................................... 9

        A.    The CAC Pleads No Direct or Plausible Circumstantial Conspiracy ......... 9

            1.    The CAC Fails to Plead Price Collusion....................................... 10

            2.    The CAC Fails Even to Plead Parallel Recalls ............................ 12

            3.    The CAC's Conspiracy Theory is Facially Implausible .............. 14

            4.    The CAC Fails to Plead Any Collusive Communications............ 16

            5.    Plaintiffs' Market and Motive Allegations Do Not Save Their Claims .......... 19

        B.    The CAC Fails to Plead Antitrust Injury ................................... 21

    II.    THE CAC'S OWN SOURCES SUPPORT DISMISSAL WITH PREJUDICE .. 21

        A.    Plaintiffs' Own Sources Contradict Their Price-Fixing Claim................. 22

        B.    Plaintiffs' Sources Also Undercut Their Claim of an Output Conspiracy 23

    III.    PLAINTIFFS' RELIANCE ON FDA COMMUNICATIONS INDEPENDENTLY DEFEATS THEIR CLAIMS ............................................. 26

CONCLUSION.......................................................................................................... 28

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)....................................................................................................4, 7, 8, 19

*AT&T Mobility LLC* v. *Concepcion,*
   563 U.S. 333 (2011)..........................................................................................................4

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)................................................................................................. *passim*

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
   509 U.S. 209 (1993)...............................................................................................12, 19, 20

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
   429 U.S. 477 (1977)........................................................................................................21

*Burtch v. Milberg Factors, Inc.,*
   662 F.3d 212 (3d Cir. 2011)..........................................................................................13, 19

*In re Buspirone Patent Litig.,*
   185 F. Supp. 2d 363 (S.D.N.Y. 2002)..............................................................................27

*Cause of Action v. Chicago Transit Auth.,*
   815 F.3d 267 (7th Cir. 2016) ...........................................................................................4

*Cook Inc. v. Boston Sci. Corp.,*
   No. 01-C-9479, 2002 WL 335314 (N.D. Ill. Feb. 28, 2002) ............................................22, 23

*In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.,*
   60 F. Supp. 3d 914 (N.D. Ill. 2014), *aff'd sub nom. In re Dairy Farmers of*
   *Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758 (7th Cir. 2015)..............................................10

*Darne v. Ford Motor Co.,*
   No. 13-C-03594, 2015 WL 9259455 (N.D. Ill. Dec. 18, 2015) (Tharp, J.)...........................11

*E.I. du Pont de Nemours & Co. v. F.T.C.,*
   729 F.2d 128 (2d Cir. 1984)............................................................................................12

*Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,*
   365 U.S. 127 (1961)........................................................................................................27

*In re Elevator Antitrust Litig.,*
   502 F.3d 47 (2d Cir. 2007)............................................................................................12, 20

*Ennenga v. Starns,*
   677 F.3d 766 (7th Cir. 2012) ...........................................................................................4

*Fisher v. Aurora Health Care, Inc.*,
  558 F. App'x 653 (7th Cir. 2014) ........................................................21

*Frantz v. U.S. Powerlifting Fed'n*,
  No. 85 C 6132, 1986 WL 12593 (N.D. Ill. Nov. 3, 1986) ........................8

*Gorgoni v. OneWest Bank, FSB*,
  No. 11-C-08738, 2013 WL 1278475 (N.D. Ill. Mar. 28, 2013) (Tharp, J.)...........................16

*Gubala v. CVS Pharmacy, Inc.*,
  No. 14-C-9039, 2016 WL 1019794 (N.D. Ill. Mar. 15, 2016) ................................24

*Hirst v. Skywest, Inc.*,
  No. 15-C-02036, 2016 WL 2986978 (N.D. Ill. May 24, 2016) (Tharp, J.) ...........................11

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
  No. 11 C 07834, 2014 WL 64657 (N.D. Ill. Jan. 8, 2014) (Tharp, J.).......11, 12, 20, 22, 23, 26

*Ill. Tool Works Inc. v. Indep. Ink, Inc.*,
  547 U.S. 28 (2006).........................................................................19

*LaSalle v. Medco Research, Inc.*,
  1994 WL 535106 (N.D. Ill. Sept. 30, 1994), *rev'd on unrelated grounds*, 54
  F.3d 443 (7th Cir. 1995) .................................................................4

*In re Late Fee & Over-Limit Fee Litig.*,
  528 F. Supp. 2d 953 (N.D. Cal. 2007) ...............................................13

*U.S. ex rel. Lisitza v. Par Pharma., et al.*,
  No. 06-C-6131, 2013 WL 870623 (N.D. Ill. Mar. 7, 2013) (Tharp, J.)...................10

*Loren Data Corp. v. GXS, Inc.*,
  501 F. App'x 275 (4th Cir. 2012) ......................................................14

*In re LTL Shipping Servs. Antitrust Litig.*,
  No. 1:08-MD-01895, 2009 WL 323219 (N.D. Ga. Jan. 28, 2009)...........................12

*McCauley v. City of Chi.*,
  671 F.3d 611 (7th Cir. 2011) ......................................................8, 18

*In re Musical Instruments & Equip. Antitrust Litig.*,
  798 F.3d 1186 (9th Cir. 2015) .................................................9, 10, 26

*Oliver v. SD-3C LLC*,
  No. 11-CV-01260-JSW, 2016 WL 5950345 (N.D. Cal. Sept. 30, 2016) ...............21

*Organon Inc. v. Mylan Pharm., Inc.*,
  293 F. Supp. 2d 453 (D.N.J. 2003) ...............................................27

*Pharmacia & Upjohn Co. v. Generation Health*,
    No. 1:97-CV-259, 1997 WL 750605 (W.D. Mich. July 15, 1997)........................................14

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
    764 F. Supp. 2d 991 (N.D. Ill. 2011) ..................................................................................20

*In re Potash Antitrust Litig.*,
    667 F. Supp. 2d 907 (N.D. Ill. 2009), *unrelated ruling aff'd sub nom. Minn-*
    *Chem, Inc. v. Agrium, Inc*., 683 F.3d 845 (7th Cir. 2012) .................................................13, 21

*Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*,
    508 U.S. 49 (1993)......................................................................................................27, 28

*Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*,
    971 F.2d 37 (7th Cir. 1992) ...............................................................................................19

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
    842 F.3d 883 (5th Cir. 2016) ..............................................................................................14

*RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*,
    661 F. Supp. 2d 218 (E.D.N.Y. 2009) ................................................................................13

*Serfecz v. Jewel Food Stores*,
    67 F.3d 591 (7th Cir. 1995) ...............................................................................................21

*Sidney Hillman Health Ctr. of Rochester v. Abbott Labs., Inc.*,
    782 F.3d 922 (7th Cir. 2015) ..............................................................................................24

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) .......................................................................................2, 8, 9

*In re Travel Agent Comm'n Antitrust Litig.*,
    583 F.3d 896 (6th Cir. 2009) ..............................................................................................20

*Tri–Corp Hous. Inc. v. Bauman*,
    826 F.3d 446 (7th Cir. 2016), *Cert. denied sub nom. Tri-Corp Hous. Inc. v.*
    *Bauman*, 137 S. Ct. 592 (2016)..........................................................................................27

*U.S. v. Int'l Harvester Co*.,
    274 U.S. 693 (1927)...........................................................................................................19

*United Mine Workers of Am. v. Pennington*,
    381 U.S. 657 (1965)...........................................................................................................27

*United States v. Andreas*,
    216 F.3d 645 (7th Cir. 2000) ..............................................................................................14

*Vincent v. Medtronic, Inc.*,
  2016 WL 7374271 (N.D. Ill. Dec. 20, 2016) ................................................................4, 25

*Williamson v. Curran*,
  714 F.3d 432 (7th Cir. 2013) ................................................................................................4

**Statutes**

21 U.S.C. § 356c ................................................................................................................7, 15, 17

**Other Authorities**

21 C.F.R. § 7.3 ................................................................................................................................14

21 C.F.R. § 7.40 ................................................................................................6, 14, 15, 27

21 C.F.R. § 7.41 ................................................................................................................14, 15

21 C.F.R. § 7.42 ................................................................................................................14, 16

21 C.F.R. § 7.45 ................................................................................................................................14

21 C.F.R. § 7.46 ................................................................................................14, 15, 27, 28

21 C.F.R. § 7.49 ................................................................................................................................14

21 C.F.R. § 7.50 ................................................................................................................................14

21 C.F.R. § 7.53 ................................................................................................................................14

21 C.F.R. § 7.55 ................................................................................................................................14, 16

21 C.F.R. § 7.59 ................................................................................................................................14

21 C.F.R. § 314.81 ................................................................................................................7, 16, 17

Fed. R. Civ. P. 12(b)(6) ................................................................................................................1, 7

Defendants Baxter International Inc. and Baxter Healthcare Corporation (collectively, "Baxter") submit this memorandum in support of their Motion to Dismiss Plaintiffs' Consolidated Antitrust Class Action Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

## PRELIMINARY STATEMENT

Intravenous saline solution ("IV Saline") is used to treat everything from critical medical conditions to routine dehydration. It is produced under strict protocols to ensure sterility, and its manufacturing and distribution are heavily regulated by the U.S. Food and Drug Administration ("FDA"). In January 2014, FDA announced nationwide shortages of IV Saline and other sterile solutions. The initial complaints in these actions accused Baxter and two other manufacturers of conspiring to create the IV Saline shortage in order to raise prices. Plaintiffs' Consolidated Antitrust Class Action Complaint ("CAC") abandons one supplier (B.Braun) as a named defendant, and asserts that the remaining two (Baxter and Hospira) colluded to "restrict output and artificially fix, raise, maintain and/or stabilize the prices of IV Saline" under "the pretext of a supply shortage, in violation of Section 1 of the Sherman Act." CAC ¶ 1.

Like the abandoned allegations against B.Braun, the CAC's current allegations do not come close to stating an antitrust claim. Indeed, its extraordinary theory of collusion—that Defendants "signal[ed] the timing and frequency of intended output restrictions and price increases through FDA's shortage website" and a handful of FDA-approved safety recalls, *id.* ¶¶ 12, 66-70, 72—is the definition of facially implausible. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

Dismissal is warranted, first and foremost, because Plaintiffs *do not plead a conspiracy*. A Section 1 conspiracy requires an agreement. *Id.* at 557. But Plaintiffs do not plead any direct evidence of an agreement between Baxter and Hospira. Nor do they plead facts from which the Court could plausibly infer one. The CAC's allegations boil down to the claim that Defendants

somehow coordinated a series of supposedly sham recalls and shortage notices not just under the noses of FDA regulators, but through the agency itself. CAC ¶ 14. The CAC does not explain how the communications it cites—which require FDA review and approval—were pretextual or coordinated, or how they affected either Defendant's production or prices. That is not surprising, because the notion that Defendants would risk massive criminal and civil liability as well as their reputations and relationships with FDA, vendors, investors and customers by *openly* colluding through the agency (which has oversight over virtually all Baxter products) to manipulate the price of IV Saline—a liter of which costs less than a cup of coffee—makes no sense. As the CAC itself reveals, the recalls and shortage communications it cites were *required by law* and responsive to industry-wide regulatory and market developments that Plaintiffs never connect to the supposed conspiracy or their unspecified "direct[]" IV Saline purchases. *Id.* ¶¶ 28-31. These points alone should dispose of these cases even under the most generous circuit precedents on Section 1 pleading. *See, e.g., In re Text Messaging Antitrust Litig.*, 630 F.3d 622 (7th Cir. 2010).

But the grounds for dismissal do not stop there. The CAC's own sources confirm the case for dismissal with prejudice because they illustrate why further opportunities to plead the agreement and antitrust injury elements of a Section 1 claim would be futile. First, the CAC's sources show that IV Saline prices are typically constrained by individually-negotiated contracts with Group Purchasing Organizations ("GPOs") that impose multi-year price freezes and varying types of volume discounts inherently at odds with Plaintiffs' conclusory price-fixing assertions. Second, the CAC's sources document obvious, non-conspiratorial explanations for all of the conduct the CAC cites as circumstantial evidence of collusion. Notably, these sources show that the IV Saline shortage Plaintiffs identify as the lynchpin of their case, CAC ¶ 58, resulted from a perfect storm of events including increased FDA scrutiny of sterile drug production in the wake of

deadly pharmacy contamination cases unrelated to Baxter,[1] an ensuing industry-wide increase in safety-related inspections and plant shutdowns, and an unusually severe flu season compounded by unprecedented winter weather in the south (where major IV Saline plants are located) that taxed U.S. manufacturing and distribution operations. Plaintiffs' own sources also confirm that during the shortage Defendants were operating at maximum U.S. capacity and worked with FDA to alleviate the shortage by importing additional saline solution from abroad—conduct that conclusively distinguishes these cases from the precedents Plaintiffs mistakenly cite in support of their claims here. The CAC's suggestion that a manufacturer would purposely short product in the United States only to pay the added expense of importing it from another country to alleviate the impact of that shortage, CAC ¶ 120, is simply not plausible, as the CAC's own sources confirm.

Third, the CAC's own sources rebut Plaintiffs' attempt to transform a handful of FDA-regulated recall notices and shortage communications into an output conspiracy. These sources confirm that the "nearly parallel" recalls Plaintiffs cite, CAC ¶ 61—which varied in several respects and together involved only a marginal amount of alleged yearly IV Saline demand—were common responses to FDA safety regulations. These recalls thus do not—and cannot—explain the "substantial" market effects Plaintiffs assert even on the irrational assumption that suppliers could coordinate forward-looking output restraints through backward-looking, immensely expensive, FDA-regulated drug safety recalls. Plaintiffs' sources likewise confirm that the remaining communications the CAC cites as the basis for the supposed conspiracy were all required by, or directed to, FDA action. Accordingly, they would require dismissal under the *Noerr-Pennington* doctrine even if Plaintiffs could plead an antitrust claim, which they cannot.

---

[1] *See, e.g,* Ex. 1, *Pharmacy Compounding: Implications of the 2012 Meningitis Outbreak, Hearing Before the Senate Comm. on Health, Educ., Labor and Pensions*, 112th Cong. (2012), 16-23 (Statement of Margaret A. Hamburg, M.D., Comm'r of Food and Drugs, FDA).

In short, allowing these suits to proceed would upend controlling pleading standards and endorse a theory of antitrust liability that has no basis in law or precedent. *See Twombly*, 550 U.S. at 556-57; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The public can ill afford such a mistake. Baxter has already expended enormous resources to address the IV Saline shortage, *see, e.g.*, CAC ¶ 120, and punishing those efforts by subjecting it to the "sprawling, costly, and hugely time-consuming" task of continued litigation, *Twombly*, 550 U.S. at 560 n.6, would sanction precisely the kind of "'in terrorem'" use of antitrust class actions the law does not allow. *AT&T Mobility LLC* v. *Concepcion*, 563 U.S. 333, 350 (2011); *Twombly*, 550 U.S. at 558-59. These cases should be dismissed with prejudice.

## BACKGROUND

The following points are drawn from the CAC, the sources it incorporates by reference, and public materials central to its claims that are subject to judicial notice under Federal Rule of Evidence 201. *See, e.g.*, *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013) ("a court may consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice").[2]

### A.    The Parties

Baxter manufactures and sells IV Saline throughout the United States, as do the Hospira defendants. CAC ¶¶ 32-35. The named plaintiffs are two health care facilities, a hospital, and a

---

[2] *See also, e.g., Ennenga v. Starns*, 677 F.3d 766, 773–74 (7th Cir. 2012) ("[a] court may take judicial notice of facts that are (1) not subject to reasonable dispute and (2) either generally known within the territorial jurisdiction or capable of accurate and ready determination through sources whose accuracy cannot be questioned"); *LaSalle v. Medco Research, Inc.*, 1994 WL 535106, at *4 n.5 (N.D. Ill. Sept. 30, 1994) (noticing contents of FDA Enforcement Report), *rev'd on unrelated grounds*, 54 F.3d 443 (7th Cir. 1995); *Vincent v. Medtronic, Inc.*, 2016 WL 7374271, at *3 (N.D. Ill. Dec. 20, 2016) (noticing FDA approvals as "publicly-available government agency determinations that appear on an agency website"); *Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 277 n.13 (7th Cir. 2016) (noticing publicly-available administrative agency reports).

4

corporation, *id.* ¶¶ 28-31, each of which claims to have "purchased IV Saline Solution directly from one or more Defendants" at "artificially inflated prices." *Id.* No plaintiff alleges the purchase of IV Saline at any specific price from Baxter or any other manufacturer.

### B. IV Saline

IV Saline is a sterile solution consisting of 0.9% sodium chloride (salt) dissolved in water, and packaged in plastic bags, plastic bottles or glass. *Id.* ¶ 39. It is indispensable to a wide variety of medical treatments. *Id.* ¶ 40. Accordingly, it is considered an essential product that health care facilities must stock at all times, and hospitals are its largest purchasers. *Id.* ¶¶ 42, 106. "IV Saline Solution must be kept sterile" and "can become contaminated if the bag is punctured or contains particulates . . . which can be generated during production or caused by the breakdown of coating or packaging materials." *Id.* ¶ 41. "IV Saline may be recalled if its sterility is compromised or if it is damaged." *Id.*

The CAC alleges that Baxter and Hospira "each control[] approximately 45% of the IV Saline Solution market" in the United States, *id.* ¶ 43, but is inconsistent in pleading the amount of IV Saline this market allegedly encompasses. Plaintiffs variously assert that "[o]ver a billion units of IV Saline Solution are used in the United States every year," *id.* ¶ 4; that 389 million units ("740 units . . . each minute") of IV Saline "and other sterile solutions are used per year," *id.* ¶ 42; and that some 240 million bags per year ("approximately 20 million bags of IV Saline . . . per month") are used "in the United States," *id.* ¶ 62. Assuming some combination of these contrary allegations can be taken as true, Baxter accepts solely for purposes of this motion that some 500 million IV Saline bags (of varying sizes) are used in the U.S. each year.

### C. Plaintiffs' Conspiracy Theory

As noted, the CAC drops B.Braun as a named defendant but otherwise simply reasserts the

conspiracy theory in Plaintiffs' initial complaints, namely:  that since 2013, IV Saline manufacturers participated in a "combination and conspiracy" to use "[a] purported shortage of IV Saline Solution, which they created, as a pretext for unlawful and collusive price increases."  *Id.* ¶ 58.  According to the CAC, Baxter and Hospira "implemented their unlawful anticompetitive output restriction scheme" through three primary "methods":  (1) "voluntary" and "nearly parallel recalls"; (2) "signal[ing] their output restrictions and price increases to each other through publicly available communications with customers and the FDA"; and (3) "pressur[ing] customers to abide by similar restrictive purchasing terms and artificially inflated prices."  *Id.* ¶¶ 12-13, 59.

With regard to the supposed "signaling," the CAC claims that recalls facially associated with safety concerns were used to indicate each Defendant's "intent to restrict supply of IV Saline Solution to the market," and that Defendants further indicated their intent by "exchanging information through the FDA's Drug Shortage website."  *Id.* ¶¶ 12, 14.  According to the CAC, this highly public, FDA-mediated "signaling" "had a substantial impact on the available supply of IV Saline Solution in the U.S. market" that allowed Defendants "to charge [unspecified] supracompetitive prices" to "[a]ll persons and entities in the United States who directly purchased IV Saline" *except* Defendants' affiliates and "governmental entities."  *Id.* ¶¶ 62-63, 65, 80, 134.

### D. Allegations and Authorities Regarding IV Saline Regulation and Pricing

The CAC concedes that the recalls it cites were for safety reasons including the presence of particulate matter or compromised bag integrity.  *Id*. ¶¶ 13, 59-64.  Federal regulations require FDA to review and classify proposed recalls for such safety concerns, and make the recalls "voluntary," *id*. ¶ 13, only as an alternative to agency enforcement action.  *See* 21 C.F.R. § 7.40(c).  The amount of IV Saline involved in the cited recalls, *see* CAC ¶ 61, was marginal compared to the average annual demand Plaintiffs allege, *see id*. ¶¶ 4, 42, 62.  The shortage communications

Plaintiffs identify as the basis for the supposed conspiracy are required by FDA regulations, *see* 21 C.F.R. § 314.81(b)(3)(iii)(b); 21 U.S.C. § 356c(b), and the "Drug Shortage website" postings they cite, CAC ¶ 14, are controlled by FDA, *see* 21 C.F.R. § 314.81(b)(3)(iii)(d)(2).

The sources cited in the CAC elaborate on the foregoing and other allegations central to Plaintiffs' claims. First, these sources explain that IV Saline prices are typically governed by multi-year GPO contracts that guarantee "protracted periods of price protection." *E.g.*, Ex. 2 at 2-4, Valerie Lapointe, *Hospital Drug Shortages: What is Really Causing Them?*, MEDILL REPORTS CHICAGO (May 26, 2016), http://news.medill.northwestern.edu/chicago/hospital-drug-shortages-what-is-really-causing-them (incorporated at CAC ¶¶ 11 & nn.5-6, 92 & n.19) (hereinafter "Lapointe"). Second, they explain that the IV Saline shortage central to Plaintiffs' case: (i) arose during a period of increased regulatory vigilance toward injectable solutions manufacturing that was followed by increased shutdowns of U.S. facilities and recall activity, *see, e.g.*, Ex. 3 at 2, April Dembosky, *Saline Shortages Create Troubles for U.S. Hospitals*, PBS (Jun. 25, 2014, 6:45 PM), http://www.pbs.org/newshour/rundown/saline-shortages-create-troubles-u-s-hospitals (incorporated in CAC ¶¶ 5 & n.2, 54 & n.14, 100 & n.20) (hereinafter "Dembosky"); Ex. 4 at 3, Erika Fry, *There's a National Shortage of Saline Solution. Yeah We're Talking Salt Water. Huh*?, FORTUNE (Feb. 5, 2015), http://fortune.com/2015/02/05/theres-a-national-shortage-of-saline (incorporated at CAC ¶¶ 42 & n.7, 50 & n.10, 52 & n.12) (hereinafter "Fry"); and (ii) that an unexpectedly severe flu season in late 2013 increased IV Saline demand and prolonged the shortage, *see* Dembosky, *supra*, Ex. 3 at 1-2; Fry, *supra*, Ex. 4 at 2.

## STANDARD OF REVIEW

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

*Iqbal*, 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570). In antitrust conspiracy cases, this standard requires "enough factual matter (taken as true) to suggest that an agreement was made," *Twombly*, 550 U.S. at 556, because "section 1 of the Sherman Act . . . does not require sellers to compete; it just forbids their agreeing or conspiring not to compete." *Text Messaging*, 630 F.3d at 627. "[P]arallel conduct [alone] does not suggest conspiracy." *Twombly*, 550 U.S. at 556-57. Plaintiffs must allege facts that, if true, demonstrate that each defendant "had a 'conscious commitment to a common scheme designed to achieve an unlawful objective.'" *Frantz v. U.S. Powerlifting Fed'n*, No. 85 C 6132, 1986 WL 12593, at *3 (N.D. Ill. Nov. 3, 1986) (quoting *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984)). Legal conclusions will not satisfy this test. *See Twombly*, 550 U.S. at 553-56; *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011). Plaintiffs must plead *facts* suggesting both parallel conduct (which alone accords "with a wide swath of rational and competitive business strategy") *and* a "preceding agreement" or "meeting of the minds" that is "plausible on its face." *Twombly*, 550 U.S. at 554, 557, 570.

"Making the plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *McCauley*, 671 F.3d at 616 (7th Cir. 2011) (quoting *Iqbal*, 556 U.S. at 679). To avoid dismissal, "allegations of parallel conduct . . . must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 556-57; *Frantz*, 1986 WL 12593, at *3. This pleading burden is particularly important where, as here, plaintiffs allege collusion in a highly concentrated market, CAC ¶¶ 96-98, because conscious parallelism is a "common reaction of firms" in such markets, and "interdependence with respect to price and output decisions is not in itself unlawful." *Twombly*, 550 U.S. at 553-54 (internal quotation marks omitted). Accordingly, plaintiffs alleging circumstantial conspiracies in

concentrated markets must generally plead "plus factors," or "economic actions and outcomes that are largely *inconsistent* with unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1194 (9th Cir. 2015). If the conduct they challenge as collusive nonetheless has "an obvious alternative explanation," the complaint "stop[s] short of the line between possibility and plausibility of entitlement to relief" and must be dismissed. *Twombly*, 550 U.S. at 557, 567, 570.

## ARGUMENT

The foregoing standards support dismissal for at least three reasons. First, the CAC fails to allege facts sufficient to plead a conspiracy or any other element of a Section 1 violation. Second, the sources it cites document non-conspiratorial reasons for the challenged conduct that preclude a plausible conspiracy claim. Third, the CAC's allegations depend upon FDA communications immune from antitrust liability under the *Noerr-Pennington* doctrine.

## I.     THE CAC FAILS TO PLEAD AN ANTITRUST CLAIM

### A.     The CAC Pleads No Direct or Plausible Circumstantial Conspiracy

"[I]t is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no reasonably founded hope that the discovery process will reveal relevant evidence to support a [Section] 1 claim." *Twombly*, 550 U.S. at 559 (internal quotation marks omitted). Strict adherence to this standard is critical, because "[w]hen a district court by misapplying the *Twombly* standard allows a complex case of extremely dubious merit to proceed, it bids fair to immerse the parties in the discovery swamp . . . and by doing so create[s] irrevocable as well as unjustifiable harm to the defendant [absent reversal on immediate appeal]." *Text Messaging*, 630 F.3d at 625-26. That is exactly what would happen if the Court were to credit the CAC's claims.

"Direct evidence 'is explicit and requires no inferences to establish the proposition or conclusion being asserted.'" *In re Dairy Farmers of Am., Inc., Cheese Antitrust Litig.*, 60 F. Supp. 3d 914, 950 (N.D. Ill. 2014), *aff'd sub nom. In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 801 F.3d 758 (7th Cir. 2015) (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 118 (3d Cir. 1999). The CAC pleads no such evidence of an agreement between Baxter and Hospira. And the facts it alleges as circumstantial "evidence" of collusion—unspecified price increases, a handful of recalls, and a smattering of FDA and customer shortage communications—do not satisfy *Twombly*. *See* 550 U.S. at 555-56 (factual allegations must "raise a right to relief above the speculative level"); *U.S. ex rel. Lisitza v. Par Pharma., et al.*, No. 06-C-6131, 2013 WL 870623, at *3-4 & n.5 (N.D. Ill. Mar. 7, 2013) (Tharp, J.) (dismissing complaint with prejudice).

### 1. The CAC Fails to Plead Price Collusion

The glaring absence of any allegations about the prices that Plaintiffs paid for IV Saline highlights the first (of many) reasons the CAC fails to state a claim. Plaintiffs fail to allege a single specific price action by Baxter on any occasion, and they fail to allege any parallel price actions except in wholly conclusory fashion. *See, e.g.*, CAC ¶ 153(b) ("Prices for IV Saline Solution provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States"). Plaintiffs do allege an upward trend in Medicare and Medicaid prices of IV Saline from 2013 to 2016, *id.* ¶¶ 64, 81, but a rise in the average price of a product for one purchaser—the U.S. government, which is expressly *excluded* from Plaintiffs' purported class, CAC ¶ 134—is just as consistent with unilateral market action as conspiracy, especially in a concentrated industry. *See, e.g.*, *In re Musical Instruments*, 798 F.3d at 1197 & n.14 (declining to infer conspiracy from parallel conduct based on rising average price of all relevant products across the market).

The remaining price allegations in the CAC are threadbare and facially contradictory. The

10

CAC alleges half a dozen times a supposed "200-300%" increase in the price of IV Saline. CAC ¶¶ 7, 56, 64, 83, 119, 126. But it pleads no facts that support this figure, which Plaintiffs apparently plucked from a public inquiry letter from four Senators directed equally to B.Braun, which Plaintiffs no longer name as an alleged conspirator.[3] Figure 1 in the CAC's paragraph 81, which addresses government pricing for IV Saline, fails to corroborate the alleged "200-300%" increase, and shows only a change in certain government program prices from just over $1 for a 1-liter bag in mid-2013, to around $1.90 for that same bag in mid-2016. *Id.* ¶ 81. Figures 2 and 3 show even smaller price differences for other bag sizes. *See id.* ¶¶ 82-84. And Paragraph 64 alleges a 36% increase in certain government prices that Plaintiffs speculate "was undoubtedly larger for private customers who, according to the Senators, have paid price increases of 200-300%." *Id.* ¶ 64. But Plaintiffs, who purport to be direct purchasers, CAC ¶¶ 28-31, should know what they paid for IV Saline. And their failure after four complaints to plead such prices alone compels dismissal of their claim. *House of Brides, Inc. v. Alfred Angelo, Inc.,* No. 11 C 07834, 2014 WL 64657, at *9 (N.D. Ill. Jan. 8, 2014) (Tharp, J.) (plaintiffs' failure to plead the prices they paid "in any transaction . . . alone warrants dismissal of" their antitrust claim).[4]

Plaintiffs' reliance on generalized information about rising revenues across the entire Baxter injectable solutions business (not limited to IV Saline), CAC ¶ 84 & fig.3, and on generalized comments from Baxter and Hospira (made months apart) about rising prices of IV

---

[3] *See* Ex. 5, Press Release (Oct. 26, 2015), http://www.hatch.senate.gov/public/index.cfm/2015/10/blumenthal-lee-klobuchar-hatch-urge-ftc-to-investigate-antitrust-violations-connected-to-iv-solution-shortages-increasing-costs-of-hospital-operations-and-patient-care (incorporated at CAC ¶ 7 & n.4).

[4] *Cf. Hirst v. Skywest, Inc.,* No. 15-C-02036, 2016 WL 2986978, at *6 (N.D. Ill. May 24, 2016) (Tharp, J.) (dismissing FLSA claim because "the Amended Complaint does not even include any of the named plaintiffs' hourly wages or any examples of the total compensation they received for any workweek"); *Darne v. Ford Motor Co.,* No. 13-C-03594, 2015 WL 9259455, at *5 (N.D. Ill. Dec. 18, 2015) (Tharp, J.) (dismissing warranty claims that contained "virtually no allegations that would support a plausible inference that the problems appeared during the warranty period," including plaintiff's own "date of purchase and the date that the [allegedly warrantied] problem appeared").

Saline or solutions generally, *id.* ¶¶ 85-90, are likewise deficient. "If prices rise in response to an excess of demand over supply . . . the market is functioning in a competitive manner." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 232 (1993). Further, the mere fact of industry wide price increases is not evidence of collusion, because "similar pricing can suggest competition at least as plausibly as it can suggest anticompetitive conspiracy." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007); *see also E.I. du Pont de Nemours & Co. v. F.T.C.*, 729 F.2d 128, 132 (2d Cir. 1984) (competitors in concentrated markets for homogenous products are independently motivated to increase prices); *In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-MD-01895, 2009 WL 323219, at *17-18 (N.D. Ga. Jan. 28, 2009). That is at most what the CAC alleges. Accordingly, it does not plead a price-fixing conspiracy at all. *See, e.g.*, *Twombly*, 550 U.S. at 557 ("parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory"); *House of Brides*, 2014 WL 6845862, at *4 (Tharp, J.) ("While the pleading standard under the federal rules is very liberal, the price of entry, even to discovery, is for the plaintiff to allege a factual predicate concrete enough to warrant further proceedings, which may be costly and burdensome.") (internal quotation marks and citations omitted).

### 2. The CAC Fails Even to Plead Parallel Recalls

Plaintiffs' far-fetched conspiracy claim rests primarily on a hand-picked series of what they term "nearly parallel" recall announcements, CAC ¶¶ 12, 61, that they say had "a substantial impact on the available supply of IV Saline Solution in the U.S. market," *id.* ¶ 62. These allegations cannot support a conspiracy claim for at least three reasons.

First, these recalls are not even parallel. Plaintiffs conspicuously omit the amounts and IV Saline bag specifications for five of the nine recalls they cite, *see id.* ¶ 61(a), (d), (e), and on the

remaining four, the timing and reasons for the recalls differ. *Compare, e.g.*, ¶ 61(b) (October 2014 Hospira puncture recall) *with* ¶ 61(c) (December 2014 Baxter particulate recall). These differences are fatal to the allegation of parallel conduct. *See Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 228-29 (3d Cir. 2011) (affirming dismissal of "allegations [that fell] far short of demonstrating parallel behavior by [Defendants who] were choosing to decline, decrease, and even increase credit . . . at different time periods").[5]

Second, adding up the number of bags affected by the cited recalls—to the extent Plaintiffs plead numbers at all—shows that the quantities involved were miniscule compared to the CAC's allegations of annual IV Saline demand. CAC ¶¶ 4, 42, 62 (alleging an average of about 500 million bags per year). The CAC pleads no specific recall volumes for 2013. *Id.* ¶ 61(a). For 2014 the CAC cites affected volume of approximately 17 million bags (a marginal 3% of the CAC's average alleged annual demand). *See id.* ¶¶ 61(b)-(c); 4, 42, 62. And for 2015 the CAC pleads only 597,498 affected bags (a mere 1% of the CAC's average alleged annual demand). *See id.* ¶¶ 61(d)-(e); 4, 42, 62. The CAC does not explain how such marginal volumes could have the "substantial" market impact Plaintiffs allege. *Id.* ¶ 62.

Third, the CAC does not plead any causal connection between the marginal recalls it cites, *id.* ¶¶ 60-63, and any specific (much less collusive) price or output activity. *See, e.g.*, *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 940-41 (N.D. Ill. 2009), *unrelated ruling aff'd sub nom. Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) (dismissing complaint that "fail[ed] to allege . . . a chain of causation between the alleged restraint in the market—an illicit agreement to fix the price of potash—and their injury—paying higher prices").

---

[5] *See, e.g.*, *RxUSA Wholesale, Inc. v. Alcon Labs., Inc.*, 661 F. Supp. 2d 218, 231, 237 (E.D.N.Y. 2009) (dismissing claim where it was "questionable whether Plaintiff's allegations even establish a pattern of parallel conduct")*; In re Late Fee & Over-Limit Fee Litig.*, 528 F. Supp. 2d 953, 962 (N.D. Cal. 2007) (dismissing claim where allegedly parallel prices "followed different pricing paths at different times").

### 3.    The CAC's Conspiracy Theory is Facially Implausible

Even if the CAC's cited recalls could be viewed as "parallel," it is entirely implausible that manufacturers would use them as the mechanism for a conspiracy.  As a threshold matter, the CAC does not explain how the recalls it cites even qualify as output restrictions.  As the Seventh Circuit has explained, "a prototypical output restriction raises prices by reducing supply below demand." *United States v. Andreas*, 216 F.3d 645, 667 (7th Cir. 2000).  But a product recall—*unlike* a restriction on future output—involves offering refunds to undo previous sales of a unit that the supplier has already paid to produce.  Further, safety-related recalls for FDA-regulated drugs involve customer and public notice of potential product hazards that can be devastating to the supplier's business, *see* 21 C.F.R. §§ 7.42(b)(2); 7.49-50, and involve extensive costs associated with ensuring that recalls are administered in accordance with FDA regulations.  21 C.F.R. §§ 7.3; 7.40-50; 7.53; 7.55.  For all of these reasons, drug recalls can be massively harmful to a manufacturer's business and involve staggering costs.  *See, e.g.*, 21 C.F.R. § 7.59 ("recall[s] can be disruptive of a firm's operation and business"); *Pharmacia & Upjohn Co. v. Generation Health*, No. 1:97-CV-259, 1997 WL 750605, at *13 (W.D. Mich. July 15, 1997) (denying relief that would involve a recall that could result "not only [in] harm to [Defendant's] reputation but also possible destruction of its corporate existence").

The CAC does not even attempt to account for these undisputed realities in blithely asserting that Defendants risked civil and criminal sanctions—including the business death penalty of federal debarment—by asking FDA to approve sham safety recalls of their own products in order to signal output restrictions that might someday allow an increase in unspecified, contract-restricted IV Saline prices.  That theory of conspiracy "simply makes no practical or economic sense." *Loren Data Corp. v. GXS, Inc.*, 501 F. App'x 275, 281 (4th Cir. 2012); *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 842 F.3d 883, 897 (5th Cir. 2016) ("*RTT*") (concluding that an

alleged scheme to sell "flawed" products in order to "taint" defendants' own product market was an "entirely illogical . . . vehicle to prove [anticompetitive] conduct").[6]

Plaintiffs seek to distract from the facial implausibility of their recall allegations by emphasizing that the recalls they cite were "voluntary," CAC ¶¶ 13, 60-65, thus implying that Defendants would not have initiated them without a conspiracy. This assertion is not only factually unsupported; it is wrong as a matter of law. The recalls the CAC cites are "voluntary" only in the sense that they are "an alternative to [FDA]-initiated" enforcement action. 21 C.F.R. § 7.40(a). Safety-related recalls are implemented with extensive input from FDA, whose regulations favor supplier recalls over product seizures or other agency enforcement action because a recall is "generally more appropriate and affords better protection for consumers." *Id*. § 7.40(c). In keeping with this regulatory preference and Baxter's commitment to product safety and customer satisfaction, Baxter initiates recalls where appropriate. But it must notify FDA of any intended removal of regulated products from production or commerce, and "[s]uch removal or correction will be considered a recall only if [FDA] regards the product as involving a violation that is subject to legal action, e.g., seizure." *Id*. § 7.46(a); 21 U.S.C. § 356c(a). Accordingly, the recalls the CAC cites could not have been designated as such absent an FDA judgment that the affected products failed to comply with regulatory standards.

Further, where FDA concludes a recall is appropriate, it must classify the recall based on its "evaluation of the health hazard presented by [the] product being recalled," which evaluation addresses, among other things, "the degree of seriousness of the health hazard to which the populations at risk would be exposed," "the likelihood of occurrence of the hazard," and "the consequences (immediate or long-range) of occurrence of the hazard." 21 C.F.R. § 7.41(a).

---

[6] Although *RTI* was a Section 2 case, the theory of self-inflicted harm it rejected is just as illogical here.

Publication of recall notices is likewise driven by FDA. Federal regulations require the agency to publish a list of every new recall "according to its classification," but do *not* require publication of "product removals or corrections which the agency determines to be market withdrawals or stock recoveries." *Id.* § 7.50. The regulations also require ongoing oversight of recalls to ensure adequacy, *see id.* § 7.42(a)(2), and require FDA approval for termination, *see id.* § 7.55. For all of these reasons, the recalls the CAC cites are equally (and far more) consistent with unilateral responses to common regulatory requirements than they are with Plaintiffs' fanciful claim of an FDA-mediated output conspiracy. *See Twombly*, 550 U.S. at 557 (complaint must allege factual "allegations plausibly suggesting (*not merely consistent with*)" an antitrust offense) (emphasis added); *Gorgoni v. OneWest Bank, FSB*, No. 11-C-08738, 2013 WL 1278475, at *2 (N.D. Ill. Mar. 28, 2013) (Tharp, J.) (plaintiffs "are not entitled to proceed with a federal case by positing that one of two situations occurred, one of which would entitle them to relief and one of which would not") (citing circuit precedent).

4. *The CAC Fails to Plead Any Collusive Communications*

The CAC attempts to bolster its implausible recall-based conspiracy theory by citing a hodgepodge of supposedly "collusive" shortage communications. CAC ¶¶ 66-70 (citing shortage reports to FDA and customer letters regarding supply allocation). But these communications (like the recall notices Plaintiffs cite) show nothing more than common responses to FDA regulations. Those regulations require suppliers to report to FDA any "interruption in manufacturing . . . that is likely to lead to a meaningful disruption in supply of . . . [a] drug [that is] . . . is life sustaining[] or . . . used in emergency medical care or during surgery."[7] 21 C.F.R. § 314.81(b)(3)(iii); *see also*

---

[7] FDA considers "shortage" to mean "a period of time when the demand or projected demand for the drug within the [U.S.] exceeds the supply of the drug." 21 C.F.R. § 314.81(b)(3)(iii)(f).

21 U.S.C. § 356c(a). Such reports are required at least six months in advance of an upcoming production interruption, or no later than five business days after an unanticipated interruption, 21 C.F.R. § 314.81(b)(3)(iii)(b); 21 U.S.C. § 356c(b), and FDA uses the reports to maintain "a publicly available list of drugs that are determined by FDA to be in shortage." 21 C.F.R. § 314.81(b)(3)(iii)(d)(1).[8] Although Baxter and Hospira would face enforcement action for failing to make these shortage reports, *see* 21 C.F.R. § 314.81(b)(3)(iii)(e); 21 U.S.C. § 356c(f), FDA decides whether to disclose them on its website. "FDA may choose not to make information . . . available on the drug shortages list . . . if FDA determines that disclosure of such information would adversely affect the public health (such as by increasing the possibility of hoarding . . .)." 21 C.F.R. § 314.81(b)(3)(iii)(d)(2). Accordingly, whether and when Baxter's shortage reports posted to "FDA's Shortage database," CAC ¶ 66, was up to FDA, and the CAC pleads no reason to treat FDA's decisions on that, or submission of the underlying reports, as proof of a conspiracy.

The same is true of the customer letters the CAC says Defendants submitted to FDA in an effort to use the agency's "publicly accessible Drug Shortage database to engage in price signaling." *Id*. ¶ 66; *see also id.* ¶¶ 68-75. Plaintiffs' discussion of these letters does not address prices at all. *See id*. ¶¶ 69-70, 72. And their insistence that the letters nonetheless "highly suggest" price collusion, *id*. ¶ 75, is absurd given the governing regulatory framework. Plaintiffs make much of the fact that Baxter and Hospira sent customer allocation letters to FDA "on the same day, January 17, 2014." CAC ¶ 70. But the link between Baxter and Hospira that day was FDA itself, and specifically its announcement of the shortage addressed in each company's letters:

---

[8] As relevant here, this public list includes the reason for the shortage (from predetermined categories) and its expected duration. 21 C.F.R. § 314.81(b)(3)(iii)(d)(1). The reason categories are: "[r]equirements related to complying with good manufacturing practices; regulatory delay; shortage of an active ingredient; shortage of an inactive ingredient component; discontinuation of the manufacture of the drug; delay in shipping of the drug; demand increase for the drug; or other reason." *Id.* § 314.81(3)(iii)(d)(1)(iii).

> FDA is aware of the shortage situation for intravenous (IV) solutions, particularly 0.9% sodium chloride injection (i.e., saline) used to provide patients with the necessary fluids for hydration and other conditions. The shortage has been triggered by a range of factors including a reported increased demand by hospitals, potentially related to the flu season.
>
> We are working with the three manufacturers of these products, Baxter Healthcare Corp., B.Braun Medical Inc., and Hospira Inc., to help preserve the supply of these necessary products. …

Ex. 6 at 2-3, *FDA Updates on Saline Drug Shortage*, U.S. FOOD AND DRUG ADMIN., http://www.fda.gov/Drugs/DrugSafety/ucm382255.htm (last updated Nov. 1, 2016).  The January 17, 2014 letters thus reflect nothing more than lawful attempts to manage customer relationships during an FDA-regulated shortage.  Anticipating this obvious conclusion, Plaintiffs assert that "[w]hile the FDA has stated that it is working with all Defendants to address the purported IV Saline shortage, Defendants are using this communication as a means to facilitate their conspiracy."  CAC ¶ 74.  But that is precisely the type of "conclusory" assertion that is *not* entitled to a presumption of truth and cannot support a conspiracy claim.  *See Twombly*, 550 U.S. at 556-57; *McCauley*, 671 F.3d at 616-17, 619 (noting that the "level of factual specificity" required in the complaint "rises with the complexity of the claim" in affirming dismissal of "allegations . . . entirely consistent with lawful conduct").

Plaintiffs' remaining allegations about customer communications, CAC ¶¶ 15, 76, are similarly unavailing.  The CAC asserts that in late 2013 "both Defendant Baxter and . . . B.Braun indicated that they would not take on any new customers, or might only do so on a case-by-case basis."  *Id.* ¶ 15.  Such behavior is entirely consistent with, if not required by, FDA-regulated supply management practices during the shortage period the CAC acknowledges.  *See id*. ¶¶ 44-45.  And the CAC's assertion that Defendants used the shortage to "pressure [customers] to purchase more products than IV Saline Solution alone," CAC ¶ 76, is not supported by any facts regarding Plaintiffs' own purchases, and relies solely on unattributed hearsay in the Senate inquiry

18

letter that was directed equally at B.Braun. *Id.* ¶¶ 7, 76. This confirms the CAC's focus on conduct equally consistent with independent behavior. And Plaintiffs' remaining generic assertions about IV Saline contracts, CAC ¶¶ 76-79, describe nothing more than cross-product discounting and sales practices the Supreme Court recently reaffirmed as "fully consistent with a free, competitive market." *Ill. Tool Works Inc. v. Indep. Ink, Inc.*, 547 U.S. 28, 41, 44-45 (2006).

5.      *Plaintiffs' Market and Motive Allegations Do Not Save Their Claims*

Plaintiffs' allegations regarding the IV Saline market and Defendants' "opportunities" or "motives" to conspire, CAC ¶¶ 93-116, cannot save their case. The CAC spends several paragraphs asserting high concentration, barriers to entry, inelastic demand, and product homogenization in the IV Saline industry. *Id.* ¶¶ 95-112. But even taken as true and in the light most favorable to Plaintiffs, these allegations do not help them because the mere fact "that defendants operate in an oligopolistic market . . . may simply restate the (legally insufficient) fact that market behavior is interdependent and characterized by conscious parallelism." *E.g.*, *Burtch*, 662 F.3d at 227 (citations omitted); *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.*, 971 F.2d 37, 53 (7th Cir. 1992) (similar). As the Supreme Court has explained, "oligopolistic price coordination or conscious parallelism"—*i.e.*, a situation in which "firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions"—is "not in itself unlawful." *Brooke Grp.*, 509 U.S. at 227; *U.S. v. Int'l Harvester Co.*, 274 U.S. 693, 708–09 (1927) ("[T]he fact that competitors may see proper, in the exercise of their own judgment, to follow the prices of another manufacturer, does not establish any suppression of competition[.]"). The CAC here does not even plead such parallel pricing, much less "facts" that would "permit the court to infer more than the mere possibility of misconduct" as required to survive a Rule 12 motion. *Iqbal*, 556 U.S. at 679.

Controlling precedents likewise foreclose Plaintiffs' attempt to plead a conspiracy based on public statements to investors, CAC ¶¶ 86-90, 120, membership in trade associations, *id*. ¶¶ 113-16, or involvement in past antitrust litigation, *id*. ¶¶ 130-33. Public statements to investors regarding opportunities to raise prices "in response to an excess of demand" are entirely consistent with competitive market behavior. *Brooke Grp.*, 509 U.S. at 232. Merely "belong[ing] to the same trade guild as one['s] . . . competitors" does not suggest a conspiracy. *Twombly*, 550 U.S. at 567 n.12; *see also, e.g.*, *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 910-11 (6th Cir. 2009) (rejecting trade association meetings as evidence of collusion). And a plaintiff cannot substitute allegations of past antitrust offenses for adequate factual allegations in support of a current claim. As the Second Circuit has explained, "allegations of anticompetitive wrongdoing" in a different market "[w]ithout an adequate allegation of facts linking" the two markets "is merely to suggest . . . that 'if it happened there, it could have happened here'" which suggestion cannot "'nudge [Plaintiffs'] claims across the line from conceivable to plausible'" as needed to avoid dismissal. *Elevator*, 502 F.3d at 52 (quoting *Twombly*, 550 U.S. at 570);[9] *see also Twombly*, 550 U.S. at 555 (requiring factual allegations that "raise a right to relief above the speculative level").

For all the foregoing reasons, the CAC fails to plead a plausible basis for inferring the agreement required for a Section 1 claim. *Twombly*, 550 U.S. at 556-57 (dismissal required where complaint combines allegations of "merely parallel conduct that could just as well be independent action" with a "conclusory allegation of agreement"); *House of Brides*, 2014 WL 6845862, at *5 (Tharp, J.) (applying this principle in dismissing antitrust claims with prejudice).

---

[9] The antitrust claims in the plasma derivatives MDL—a collection of nearly 20 class actions that did not result in any finding of liability against Baxter—do not even show that anything "happened" in the market at issue there. *Elevator*, 502 F.3d at 52. The MDL claims survived Rule 12 scrutiny based on, among other things, *allegations* of specific collusive communications purportedly uncovered during an FTC investigation that have no parallel here. *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991 (N.D. Ill. 2011).

### B. The CAC Fails to Plead Antitrust Injury

In order to maintain an antitrust action, Plaintiffs must not only plead a conspiracy; they must also plead antitrust injury caused by the conspiracy and antitrust standing to challenge it. *See, e.g.*, *Fisher v. Aurora Health Care, Inc.*, 558 F. App'x 653, 655 (7th Cir. 2014). The reason is that "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 595 (7th Cir. 1995). The antitrust laws permit claims only by plaintiffs who adequately plead an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful"—here allegedly collusive (as opposed to independent parallel) price or output behavior. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

The CAC's conclusory assertions that "[d]rug shortages have a significant financial impact on health care facilities," CAC ¶ 54, and that the IV Saline shortage coincided with certain government price increases, CAC ¶¶ 64, 81-82, do not meet this standard because such consequences would flow equally from a shortage unrelated to alleged collusion. *Brunswick*, 429 U.S. at 489; *see also Potash*, 667 F. Supp. 2d at 940-41 (dismissing complaint that failed to allege causal connection between challenged conduct and plaintiffs' alleged price injury); *Oliver v. SD-3C LLC*, No. 11-CV-01260-JSW, 2016 WL 5950345, at *9 (N.D. Cal. Sept. 30, 2016) (same where complaint failed to plead "any factual details which would provide the necessary causal link between the challenged [conduct] and Plaintiffs' alleged economic harm") (internal quotations omitted). For these reasons as well, the CAC fails to state a Section 1 claim.

## II. THE CAC'S OWN SOURCES SUPPORT DISMISSAL WITH PREJUDICE

Although the foregoing pleading defects alone compel dismissal, *see Twombly*, 550 U.S. at 566-67, 570, the CAC's own sources underscore the case for dismissal with prejudice because they document "obvious [non-conspiratorial] explanation[s]" for the only conduct Plaintiffs

challenge as collusive. *Twombly*, 550 U.S. at 567. As this Court has held, a "claim that alleges facts undermining the plaintiff's right to relief cannot survive a 12(b)(6) motion." *Cook Inc. v. Boston Sci. Corp.*, No. 01-C-9479, 2002 WL 335314, at *3 (N.D. Ill. Feb. 28, 2002) (dismissing claims that were "contradict[ed]" by press release incorporated in the complaint); *House of Brides*, 2014 WL 6845862, at *4 (Tharp, J.) (dismissing antitrust claims with prejudice).

## A. Plaintiffs' Own Sources Contradict Their Price-Fixing Claim

The CAC's (inadequate) price-fixing allegations imply that Baxter and Hospira could raise the price of IV Saline at any time. CAC ¶¶ 77, 118-19. But Plaintiffs' own sources show otherwise. As noted, those sources state that Group Purchasing Organizations (GPOs) play a critical role in the alleged relevant market by serving as intermediaries between manufacturers and purchasers on the vast majority of IV Saline purchases, and that Baxter "primarily supplies hospitals through [GPO] contracts." Fry, *supra*, Ex. 4 at 3.[10] One of the benefits that GPOs purportedly furnish hospitals and other purchasers is "protracted periods of price protection." Lapointe, *supra*, Ex. 2 at 4 (emphasis added).[11] Such pricing mechanisms are inconsistent with Plaintiffs' bald assertion that a handful of FDA-required recall and shortage communications allowed Defendants to fix prices for an alleged nationwide class of purchasers. CAC ¶¶ 58, 134.

Plaintiffs' allegations are further undercut by their own sources on the cause of the shortage the CAC identifies as the "pretext" for alleged price-fixing. CAC ¶ 58. These sources state that

---

[10] Plaintiffs' sources similarly state that "an overwhelming majority of hospitals go through GPOs for their drugs and medical supplies." Lapointe, *supra*, Ex. 2 at 2, 4 (citing statistics during the shortage period).

[11] Plaintiffs assert that "long-term contracts with certain customers were set to expire during the Class Period," which gave Baxter a motivation to "create panic among customers to force them into long-term contracts with higher price terms." CAC ¶ 118. This claim is unsupported by *any* factual allegations regarding specific contracts (including Plaintiffs' own). And the CAC's sources describe aspects of IV Saline pricing that cut against Plaintiffs' assertions of concerted price increases across a putative nationwide purchaser class. *See* Lapointe, *supra*, Ex. 2 at 4 (explaining that "[o]pportunities for better pricing through individual contracting may exist for specialized health systems that purchase a large volume of a selected drug") (quoting American Society of Health System Pharmacists).

the physicians' group and economist the CAC quotes for the proposition that "[s]hortages simply do not occur like this in a market economy," CAC ¶ 11 (quoting Physicians Against Drug Shortages ("PADS")); *id.* ¶ 92 (quoting economist Craig Garthwaite), actually "blame" GPOs—not manufacturers—for the shortage. Lapointe, *supra*, Ex. 2 at 2-3 (explaining that GPOs often pay suppliers "'just enough to cover production, and not enough to reinvest into maintaining facilities, or replacing aging equipment'"); Fry, *supra*, Ex. 4 at 4 (citing remarks by PADS Chairman that the "five biggest GPOs have outsize control over the drug supply" and use it to "erod[e] [manufacturers'] ability to invest" in production operations). True or not, these assertions contradict Plaintiffs' claim that the IV Saline shortage was a conspiratorial "pretext" for unspecified price collusion by manufacturers, CAC ¶ 58, which one of Plaintiffs' own sources says are run "ragged" and "into the ground" by GPOs. Lapointe, *supra*, Ex. 2 at 6; see *House of Brides*, 2014 WL 6845862, at *4 (Tharp, J.); Cook, 2002 WL 335314, at *3.

### B. Plaintiffs' Sources Also Undercut Their Claim of an Output Conspiracy

The CAC's own sources further undercut Plaintiffs' claims by attributing the recall and shortage activity they challenge to a variety of regulatory and market factors—notably increased FDA scrutiny of sterile solutions in 2012 and an ensuing market-wide increase in recall activity and plant shutdowns—that provide obvious lawful reasons for all the conduct cited in the CAC.

First, several of the CAC's sources attribute the IV Saline shortage in part to "increased FDA scrutiny" of sterility and other safety issues that impacted manufacturing operations and thus "interfer[ed] with drug production." Dembosky, *supra*, Ex. 3 at 2. *See also* Fry, *supra*, Ex. 4 at 3 (citing a Novation executive's comment that "the [shortage] began two or so years ago [2012], when the FDA increased scrutiny of IV fluid manufacturers. Particulate matter was found in products, which . . . 'threw us into this rolling back order situation'"). This phenomenon was documented in various government filings and reports, including: (i) a 2015 FDA Citizen Petition

23

observing that the confluence of regulatory and market developments from 2012 to 2015 made "shortages of critical drug products . . . inevitable, whether caused by regulatory pressure, recalls, or industry-initiated compliance attempts," Ex. 7 at 1-2, 6-7;[12] and (ii) a 2016 GAO report citing "manufacturer slowing or halting production to address quality problems," market economics, and "more rigorous inspections of drug manufacturing establishments by FDA and an increase in warning letters issued by the agency" as causes of recent sterile injectable drug shortages. Ex. 8 at 1-2, *Drug Shortages: Certain Factors Are Strongly Associated with This Persistent Public Health Challenge* (U.S. GAO, July 2016), http://www.gao.gov/assets/680/678281.pdf.

Second, the CAC's sources debunk Plaintiffs' assertion that the explanations in Defendants' shortage communications—notably a severe flu season—were pretextual. *See* CAC ¶¶ 18, 58, 94; *see, e.g.*, Dembosky, *supra*, Ex. 3 at 1 ("The flu season hit much harder than expected, and sick people flooded into hospitals. Saline bags flew off the shelves to treat dehydration, and demand far outstripped supply."). Indeed, one such source highlights how the allocation explanations aligned with statements from FDA itself: "While manufacturing issues can be blamed for most medicine supply problems, [FDA officials] say[] that with normal saline, there's simply been an increase in demand. Need for the fluid reportedly spiked during the 2013-2014 flu season, and hasn't let up since." Fry, *supra*, Ex. 4 at 2.

Third, the CAC's sources document obvious lawful explanations for what Plaintiffs describe as the shortage's suspicious "duration." CAC ¶¶ 16-17, 136. The CAC itself concedes that it would "take three to five years, and hundreds of millions of dollars, to open a new IV Saline

---

[12] *Available at* http://www.fdanews.com/ext/resources/files/04-15/04-17-15-particulatespetition.pdf?1487704864 (last visited Feb. 21, 2017). The Court may take judicial notice of publicly-available submissions to administrative agencies. *See Gubala v. CVS Pharmacy, Inc.*, No. 14-C-9039, 2016 WL 1019794 at *2 n.5 (N.D. Ill. Mar. 15, 2016) (noticing comments submitted to the FDA); *see also Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*, Inc., 782 F.3d 922, 929 (7th Cir. 2015) (noticing news reports).

Solution plant" in the U.S. CAC ¶ 100. The CAC's sources corroborate this and the "very complex" nature of IV Saline manufacturing. *E.g.*, Dembosky, *supra*, Ex. 3 at 2 (quoting FDA's observation that "even though the drug itself is simple . . . [i]t takes about three weeks to make one batch of normal saline from start to finish"); *see also* Fry, Ex. 4 at 3 ("[A]s straightforward as it would seem, it's not so easy to ramp up production of salt water. . . . [I]t's 'complicated' because of the need to ensure the solution is sterile[,]" a process that for Baxter "consists of 29 steps— conducted over 10 days—to produce each batch of sterile solution" with "350 regulatory checks along the way."). The CAC's own sources go on to say that because of these production complexities, compliance with regulatory and manufacturing requirements—combined with the unusual flu season Defendants and FDA publicly identified—prolonged the IV Saline shortage. *See, e.g.*, Ex. 9 at 2, Lena Weiner, *Basic Emergency Department Meds in Short Supply*, HEALTHLEADERS MEDIA (June 12, 2015), http://www.healthleadersmedia.com/quality/ basic-emergency-department-meds-short-supply (incorporated at CAC ¶ 6 & n.3, 52 & n.11) ("[w]hen you have a small number of manufacturers in a market and one drops, it increases the likelihood of a shortage. Other manufacturers just can't pick up the slack fast enough"); Fry, *supra*, Ex. 4 at 2 ("2013-2014 flu season" caused a "spike[]" in IV Saline demand that "hasn't let up").[13]

These and other sources confirm the legally deficient and futile nature of Plaintiffs' claims, *Twombly*, 550 U.S. at 566-67, because "[m]anufacturers' decisions to heed similar demands made by [] common, important [sources]"—here FDA regulations and market demand—"do not suggest

---

[13] Public FDA correspondence amply documents how precisely such compliance efforts affected Baxter's U.S. manufacturing operations. A public FDA warning letter dated May 31, 2013 reflects that Baxter was forced to order a temporary shutdown of its Marion, North Carolina plant during an FDA inspection in November 2012. *See* Ex. 10, Letter from John R. Gridley, Food and Drug Administration, to Robert L. Parkinson, Jr., Baxter Int'l Inc. (May 31, 2013), http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/2013/ucm355993.htm. And the letter documents additional steps to "identify[], correct[], and prevent[]" issues at the plant, which forced a further shutdown and ensuing remediation. *Id.* at 2. Such agency action is judicially noticeable. *See Vincent*, 2016 WL 7374271, at *3.

conspiracy or collusion. They support a different conclusion: self-interested independent parallel conduct in an interdependent market." *Musical Instruments*, 798 F.3d at 1195. The CAC pleads no facts otherwise, and further undermines Plaintiffs' case by citing reports during the shortage that "[t]he country's three normal saline manufacturers—Baxter, Hospira, and the much smaller B. Braun—*are already operating 24/7*" and "producing and shipping *as much as they can possibly produce.*'" Fry, *supra*, Ex. 4 at 3 (quoting FDA statements and noting that Baxter "invested in additional manufacturing capacity" to address the supply shortages in IV Saline) (emphasis added);[14] Ex. 11 at 5, *IV Shortage Tests Providers and Suppliers*, REPERTOIRE (June 2014), http://www.repertoiremag.com/iv-shortage-tests-providers-and-suppliers.html (incorporated in CAC ¶ 5 & n.1) (reporting that Baxter "increased its production of IV solutions by 3 percent in 2013, and is investing to increase production by an additional 9 percent in 2014").

Against this backdrop, the CAC offers no "'reasonably founded hope'" that repleading or discovery "will reveal relevant evidence" of an unlawful agreement to "reduce output" as a "pretext" for "collusive price increases," CAC ¶ 58, and the cases should therefore be dismissed with prejudice. *See, e.g.*, *House of Brides*, 2014 WL 6845862, at *4 (Tharp, J.) (quoting *Twombly*, 550 U.S. at 559-60).

## III. PLAINTIFFS' RELIANCE ON FDA COMMUNICATIONS INDEPENDENTLY DEFEATS THEIR CLAIMS

Finally, even if Plaintiffs' allegations could satisfy the *Twombly* standard (they cannot), their claims would require dismissal under the *Noerr-Pennington* doctrine, which holds that "speech and other efforts to influence governmental activity cannot be the basis of legal penalties."

---

[14] Consistent with Baxter's acknowledged efforts to source from Spain and Mexico, CAC ¶ 120, Plaintiffs' sources emphasize that "U.S. companies also *don't have the capacity to ramp up production*. They only have so many machines, and a lot of them are *tied up producing other essential drugs*. Building new facilities is hardly an option." Dembosky, *supra*, Ex. 3 at 4 (emphasis added).

*Tri–Corp Hous. Inc. v. Bauman*, 826 F.3d 446, 450 (7th Cir. 2016) (citing *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965)). This doctrine specifically "shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose," *Pennington*, 381 U.S. at 670, and applies "unless the [efforts are] a sham and the speech itself imposes costs independent of what the governmental body does." *Tri–Corp Hous.*, 826 F.3d at 450. While originally focused on legislative lobbying, *Noerr-Pennington* protection has long extended to petitioning "administrative agencies." *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 57 (1993) (citing *Calif. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)).

The recall and shortage notifications the CAC describes clearly were designed to influence administrative action, including to convince the FDA to refrain from actions it might otherwise take. As noted, the "voluntary recalls" the CAC describes are heavily regulated and "an alternative" to seizure or other enforcement action against a manufacturer and its products. *Id.* § 7.40(a). Further, a manufacturer's description of a recall or shortage directly influences FDA's classification and handling of the products affected, as well as the steps necessary to address associated manufacturing and market impact. *See, e.g.*, *id.* § 7.46. Accordingly, communications concerning "voluntary recalls" and critical drug shortages are a form of petition within the scope of *Noerr-Pennington* protection. *See, e.g.*, *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 369 (S.D.N.Y. 2002) (explaining that "petitioning activity" includes actions from "which [FDA] acts or renders a decision only after an independent review of the merits of a petition"); *Organon Inc. v. Mylan Pharm., Inc.*, 293 F. Supp. 2d 453, 458–59 (D.N.J. 2003) (same). And FDA's undisputed oversight of the recall and shortage activity cited in the CAC, *see* ¶¶ 45, 47 & n.8, 61, 67, precludes

any characterization of such communications a pretext or "sham" that could support antitrust liability.  21 C.F.R. § 7.46.[15]

## CONCLUSION

For any or all of the foregoing reasons, these cases should be dismissed with prejudice.

---

[15] The Supreme Court "regard[s] as [a] sham private action that is not genuinely aimed at procuring favorable government action, as opposed to 'a valid effort to influence government action.'"  *Columbia Pictures*, 508 U.S. at 58 (internal quotation omitted).  The Complaint pleads no such facts here.

Respectfully submitted,

Dated: February 21, 2017

By: _____ */s/ Elizabeth P. Papez* _____

Elizabeth P. Papez
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
(202) 282-5000
EPapez@winston.com

James F. Herbison
Brook R. Long
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois  60601
(312) 558-5600
JHerbison@winston.com
BLong@winston.com

*Counsel for Defendants Baxter International*
*Inc. and Baxter Healthcare Corporation*

29

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that on February 21, 2017, the foregoing BAXTER'S MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED ANTITRUST CLASS ACTION COMPLAINT was filed electronically with the Clerk of Court using the CM/ECF system. Copies of the document will be served on all counsel of record automatically by operation of the Court's CM/ECF filing system.

Dated: February 21, 2017             *  /s/ Elizabeth P. Papez  *