UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WASHINGTON COUNTY HEALTHCARE AUTHORITY, INC. d/b/a WASHINGTON COUNTY HOSPITAL & NURSING HOME; CESAR CASTILLO, INC.; WARREN GENERAL HOSPITAL; and ERIE COUNTY MEDICAL CENTER CORPORATION, on behalf of themselves and all others similarly situated, | Civil Action No. 16-cv-10324 |
| Plaintiffs, | Hon. John J. Tharp |
| vs. | |
| BAXTER INTERNATIONAL INC.; BAXTER HEALTHCARE CORPORATION; HOSPIRA, INC.; and HOSPIRA WOLDWIDE, INC., | |
| Defendants. | |

PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTIONS TO DISMISS THE
CONSOLIDATED ANTITRUST CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT ................................................................. 1

II.   LEGAL STANDARD................................................................................ 7

III.  ARGUMENT ........................................................................................... 9

    A.    PLAINTIFFS ALLEGE A PLAUSIBLE CONSPIRACY .................................. 9

        1.    Plaintiffs Plausibly Allege That Defendants Colluded to Restrain Supply and Raise Prices in the IV Saline Solution Market ..................... 9

        2.    Plaintiffs Plausibly Allege That Defendants Profited from Their Conspiracy ...................................................................................... 13

    B.    PLAINTIFFS PLAUSIBLY ALLEGE PARALLEL CONDUCT ...................... 15

    C.    DEFENDANTS' SIGNALING ACTIVITIES SUPPORT THE INFERENCE OF COLLUSION................................................................... 17

    D.    "PLUS FACTORS" SUPPORT THE EXISTENCE OF A PLAUSIBLE CONSPIRACY ..................................................................... 22

        1.    It Is Settled Law That Well-Pleaded Antitrust Plus Factors Support an Inference of Conspiracy ................................................... 22

        2.    The Structure of the IV Saline Industry Is Conducive to Conspiracy ...................................................................................... 25

        3.    Defendants Had Motives and Opportunities to Conspire, Reinforcing the Plausibility of Plaintiffs' Claim ................................... 28

        4.    Stable or Declining Input Costs Make Plaintiffs' Claim Plausible.......... 31

        5.    Baxter's Prior History of Antitrust Violations Supports an Inference of Collusion.............................................................. 33

    E.    DEFENDANTS' CONTENTIONS REGARDING FDA PROCEDURES FAIL TO UNDERMINE THE PLAUSIBILITY OF PLAINTIFFS' CLAIMS ......................................................................... 34

        1.    Plaintiffs Plausibly Allege That Defendants' Recalls Were Pretextual ....................................................................................... 34

        2.    Even If Defendants' Recalls Were Required by the FDA, That Would Not Shield Them from Antitrust Liability ................................... 37

    F.    PLAINTIFFS ALLEGE ANTITRUST INJURY AND STANDING ................ 39

    G.    *NOERR-PENNINGTON* DOES NOT REQUIRE DISMISSAL OF THE COMPLAINT ........................................................................ 40

**TABLE OF CONTENTS**
(continued)

1. A Voluntary Recall Does Not Constitute Petitioning Activity ............... 41

2. Plaintiffs Have Alleged the Voluntary Recalls Were Shams ................... 43

H. NONE OF DEFENDANTS' OTHER ARGUMENTS WARRANT DISMISSING THE COMPLAINT ........................................................ 44

1. Plaintiffs' Allegations Are Sufficiently Detailed .................................... 44

2. Plaintiffs Are Not Required to Allege That Defendants Specifically Colluded As to Price ............................................................................... 45

3. Plaintiffs Are Not Required to Allege an Enforcement Mechanism ....... 46

4. The Excuses Proffered by Defendants Fail to Explain the Continuing IV Saline Solution Shortage .................................................. 47

5. Sources Cited in the Complaint Do Not Contradict Plaintiffs' Allegations of Collusion ......................................................................... 48

IV. PLAINTIFFS REQUEST LEAVE TO FILE AN AMENDED COMPLAINT IF DEFENDANTS' MOTION IS GRANTED .................................................... 50

V. CONCLUSION ...................................................................................... 51

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alioto v. Town of Lisbon*,
  651 F.3d 715 (7th Cir. 2011) ...................................................50

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012)......................................................32

*Anicich v. Home Depot U.S.A., Inc.*,
  No. 16-1693, 2017 WL 1101090 (7th Cir. Mar. 24, 2017)........................50

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................8

*Associated General Contractors v. California State Council of Carpenters*,
  459 U.S. 519 (1983)................................................................40

*In re Auto. Parts Antitrust Litig.*,
  29 F. Supp.3d 982 (E.D. Mich. 2014)............................................33

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007).......................................................... *passim*

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979)....................................................20, 37

*Bonte v. U.S. Bank, N.A.*,
  624 F.3d 461 (7th Cir. 2010) .....................................................8

*Brunswick Corp. v. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)...............................................................39, 40

*In re Buspirone Patent Litig.*,
  185 F. Supp. 2d 363 (S.D.N.Y. 2002)...........................................41

*California Dental Ass'n v. F.T.C.*,
  526 U.S. 756 (1999)................................................................45

*Caraco Pharmaceutical Labs., Ltd. v. Novo Nordisk*,
  132 S. Ct. 1670 (2012)............................................................38

*Cont'l Ore Co. v. Union Carbide and Carbon Corp.*,
  370 U.S. 690 (1962)...............................................................23, 30

**Page(s)**

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2008)............................................................38

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
   733 F. Supp. 2d 1348 (N.D. Ga. 2010) .....................................20

*In re Domestic Airline Travel Antitrust Litig.*,
   MDL Dkt No. 2656, 2016 U.S. Dist. LEXIS 149608 (D.D.C. Oct. 28, 2016).................19, 32

*Evergreen Partnering Group, Inc. v. Pactiv Corp.*,
   720 F.3d 33 (1st Cir. 2013)......................................15, 30, 32, 49

*Fisher v. Aurora Health Care, Inc.*,
   558 Fed. App'x 653 (7th Cir. 2014) ...........................................40

*In re Flash Memory Antitrust Litig.*,
   643 F. Supp. 2d 1133 (N.D. Cal. 2009) .........................25, 29, 34

*FTC v. Ill. Cereal Mills, Inc.*,
   691 F. Supp. 1131 (N.D. Ill. 1988) ............................................26

*FTC v. OSF Healthcare Sys.*,
   852 F. Supp. 2d 1069 (N.D. Ill. 2012) .......................................26

*Haley Paint Co. v. E.I. Dupont De Nemours & Co.*,
   804 F. Supp.2d 419 (D. Md. 2011) .............................................32

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002) ............................................ *passim*

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
   No. 11 C 07834, 2014 U.S. Dist. LEXIS 167887 (N.D. Ill. Mar. 7, 2013)
   (Tharp, J.).................................................................................44

*Illinois Brick Co. v. Illinois*,
   431 U.S. 720 (1977)...................................................................40

*In Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961)...................................................................40

*Jung v. Ass'n of Am. Med. Colleges*,
   300 F. Supp. 2d 119 (D.D.C. 2004)..........................................24

*Kleen Products, LLC v. Packaging Corp. of America*,
   775 F. Supp. 2d 1071 (N.D. Ill. 2011) .............................. *passim*

**Page(s)**

*Kottle v. Northwest Kidney Ctrs.*,
  146 F.3d 1056 (9th Cir. 1998) ...........................................................................43

*United States ex rel. Lisitza v. PAR Pharm. Cos.*,
  No. 06 C 06131, 2013 U.S. Dist. LEXIS 31224 (N.D. Ill. Mar. 7, 2013)
  (Tharp, J.)..........................................................................................................44

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*,
  700 F.2d 785 (2d Cir. 1983).........................................................................41, 42

*Lugo v. Int'l Bhd. of Elec. Workers Local #134*,
  175 F. Supp. 3d 1026 (N.D. Ill. 2016) (Tharp, J.) .............................................50

*Mainline Info. Sys. v. Benkendorf*,
  No. 10 C 1264, 2010 U.S. Dist. LEXIS 50541 (N.D. Ill. May 20, 2010) ..............44

*Mayor & City Council of Baltimore v. Citigroup, Inc.*,
  709 F.3d 129 (2d Cir. 2013).................................................................................45

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
  708 F.2d 1081 (7th Cir. 1983) .............................................................................42

*Mercatus Grp., LLC v. Lake Forest Hosp.*,
  641 F.3d 834 (7th Cir. 2011) ..................................................................8, 30, 43

*In re Musical Instruments & Equip. Antitrust Litigation*,
  798 F.3d 1186 (9th Cir. 2015) .......................................................................31, 45

*Norfolk Cty. Ret. Sys. v. Ustian*,
  No. 07 C 7014, 2009 U.S. Dist. LEXIS 65731 (N.D. Ill. July 28, 2009) ..............24

*Oliver v. SD-3C LLC*,
  No. 11-CV-01260-JSW, 2016 U.S. Dist. LEXIS 146427 (N.D. Cal. Sept. 30,
  2016) ...................................................................................................................40

*In re Plasma-Derivative Protein Therapies Antitrust Litig.*,
  764 F. Supp. 2d 991 (N.D. Ill. 2011) ..........................................................*passim*

*In re Potash Antitrust Litig.*,
  667 F. Supp. 2d 907 (N.D. Ill. 2009) ..........................................................*passim*

*In re Remeron Antitrust Litig.*,
  335 F. Supp. 2d 522 (D.N.J. 2004) .....................................................................36

*Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*,
  786 F.3d 510 (7th Cir. 2015) ...............................................................................50

**Page(s)**

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   801 F.3d 412 (4th Cir. 2015) ........................................................................8, 16

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
   No. 14-1746, 2015 U.S. App. LEXIS 18834 (4th Cir. Oct. 29, 2015) ....................................29

*Serfecz v. Jewel Food Stores*,
   67 F.3d 591 (7th Cir. 1995) ........................................................................40

*Std. Iron Works v. ArcelorMittal*,
   639 F. Supp. 2d 877 (N.D. Ill. 2009) ...................................................8, 24, 29

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
   782 F. Supp. 2d 1059 (E.D. Cal. 2011)...........................................................45

*Starr v. Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010).........................................................................32

*In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*,
   64 F. Supp. 3d 665 (E.D. Pa. 2014) ...........................................................38

*In re Sulfuric Acid Antitrust Litig.*,
   743 F. Supp. 2d 827 (N.D. Ill. 2010) .....................................................45, 46

*Swanson v. Citibank, N.A.*,
   614 F.3d 400 (7th Cir. 2010) (Wood, J.) .................................................7, 9, 32

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) (Posner, J.) .................................................. *passim*

*In re Travel Agent Comm'n Antitrust Litig.*,
   583 F.3d 896 (6th Cir. 2009) .....................................................................31

*Tucker v. Charles Schwab Bank*,
   No. 12 C 03399, 2014 U.S. Dist. LEXIS 68098 (N.D. Ill. May 19, 2014)...........................46

*U.S. v. Socony–Vacuum Oil Co.*,
   310 U.S. 150 (1940)..................................................................................46

*United Mine Workers v. Pennington*,
   381 U.S. 657 (1965)..................................................................................40

*United States v. Andreas*,
   216 F.3d 645 (7th Cir. 2000) .............................................................17, 21, 33

*United States v. Dentsply Int'l, Inc.*,
   399 F.3d 181 (3d Cir. 2005)..............................................................20, 37

**Page(s)**

*Weddle v. Smith & Nephew, Inc.*,
    No. 14 C 09549, 2016 U.S. Dist. LEXIS 48512 (N.D. Ill. Apr. 11, 2016) ............................ 50

*In re Wheat Rail Freight Rate Antitrust Litig.*,
    579 F. Supp. 517 (N.D. Ill. 1984) ........................................................................................ 42

**Other Authorities**

21 C.F.R. § 7.40 ........................................................................................................ 35, 36, 37, 42

21 C.F.R. § 7.41 .................................................................................................................... 37, 43

21 C.F.R. § 7.42 ................................................................................................................ *passim*

21 C.F.R. § 314.81 ................................................................................................................ 20, 21

Plaintiffs Washington County Healthcare Authority, Inc. d/b/a Washington County Hospital & Nursing Home; César Castillo, Inc.; Warren General Hospital; and Erie County Medical Center Corporation (collectively "Plaintiffs"), respectfully submit this memorandum in opposition to (a) Hospira's Motion to Dismiss the Consolidated Antitrust Class Action Complaint,[1] and (b) Baxter's Motion to Dismiss Plaintiffs' Consolidated Antitrust Class Action Complaint for Failure to State a Claim.[2]

## I.    PRELIMINARY STATEMENT

This case is about an unlawful conspiracy to pursue corporate profits by restraining supply and fixing the price of IV Saline Solution, thereby creating a public health crisis that denied medical providers and others the IV Saline Solution necessary to treat vulnerable members of our society: the hospitalized and those needing emergency medical attention. In prosecuting this conspiracy, Plaintiffs allege facts that more than adequately satisfy the pleading standard under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ("*Twombly*").

A defendant moving to dismiss a complaint under Rule 12(b)(6) faces a formidable burden, which Defendants do not come close to satisfying here. Their primary tactic is to dismember Plaintiffs' detailed allegations of collusive conduct, so as to argue that each allegation, standing alone, does not give rise to a plausible inference of conspiracy. But that tactic has long been discredited: it is contrary to Supreme Court precedent dating back over 50 years and accordingly has been rejected by the Seventh Circuit and other courts, which unanimously require that antitrust conspiracy allegations be viewed holistically.  Defendants further rely on self-serving, exculpatory and alternative interpretations of Plaintiffs' allegations,

---

[1] ECF Nos. 57-58.

[2] ECF Nos. 59-61.

and claim that "plus factors" cannot support a reasonable inference of collusion, despite volumes of case law to the contrary. For these and the other reasons set forth below, Defendants' motions should be denied.

Plaintiffs are hospitals and other companies that purchased IV Saline Solution directly from one or both Defendants during the proposed Class Period. Consolidated Antitrust Class Action Complaint ("CAC") (ECF No. 35), ¶¶ 28-31. Defendants[3] are the largest manufacturers of IV Saline Solution in the United States, with each controlling approximately 45% of the IV Saline Solution market. CAC ¶ 43. IV Saline Solution (0.9% sodium chloride (salt) dissolved in water) is used to treat patients for countless medical conditions, including preventing or treating dehydration caused by illnesses or surgery; is also used to dilute IV medications; and is one of the most commonly used products in emergency medicine. CAC ¶¶ 39-40.

As early as November 2013, Defendant Baxter notified customers that there was a shortage of IV Saline Solution, shipments would be delayed, and non-contracted customers would receive the product on an allocation system. CAC ¶ 44. Defendants attributed the shortage to a harsher-than-expected flu season and an increase in demand. *Id.* In January 2014, the U.S. Food and Drug Administration (FDA) publicly recognized a shortage of IV Saline Solution and added it to the FDA's Drug Shortage List. CAC ¶ 45. Over three years later, the supply of IV Saline Solution in the United States has not been replenished and prices continue to rise. CAC ¶¶ 46-47. Defendants reportedly have represented that the shortage is expected to continue. CAC ¶ 48. *See* § III(A)(1), *infra.*

---

[3] Defendants are (a) Baxter International Inc. ("Baxter International") and its wholly-owned subsidiary Baxter Healthcare Corporation ("Baxter Healthcare") (together, "Baxter"), and (b) Hospira, Inc. and its wholly-owned subsidiary Hospira Worldwide, Inc. ("Hospira Worldwide") (together, "Hospira"). Defendants manufacture and sell IV Saline Solution throughout the United States. CAC ¶¶ 32-35.

Plaintiffs plausibly allege that the purported IV Saline shortage and the necessarily resulting higher prices came about as the result of collusion by Defendants. In particular, Defendants acted in concert to restrain supply and fix prices of IV Saline Solution through several methods:

(a)     Beginning in 2013, Defendants announced several nearly parallel recalls of IV Saline Solution (CAC ¶¶ 59-65) (*see* § III (A)-(B), *infra*);

(b)     Defendants signaled their output restrictions and price increases to each other through publicly available communications with customers and the FDA (CAC ¶¶ 66-75) (*see* § III(C), *infra*); and

(c)     Defendants pressured customers to abide by similar restrictive purchasing terms and artificially inflated prices (CAC ¶¶ 76-79) (*see* § III(A), *infra*).

As a result, Defendants effectively reduced the supply of IV Saline Solution, created panic in the market, and exploited the purported shortage by charging customers (including Plaintiffs) artificially inflated prices for IV Saline. CAC ¶¶ 59, 64, 81-83. A bipartisan group of United States Senators investigated the shortage and Defendants' conduct, concluding that price increases of 200 to 300 percent could not be accounted for by normal forces in a competitive market. CAC ¶¶ 55-56, 91. *See* § III(A)(1), *infra*.

Plaintiffs also allege several antitrust "plus factors" held by the Supreme Court and Seventh Circuit to support the plausibility of antitrust claims, including: (i) the relevant market is highly concentrated, with Defendants together having a 90 percent market share; (ii) there are significant regulatory and other barriers to entry; (iii) demand for IV Saline Solution is highly inelastic; (iv) IV Saline products are homogenized; (v) prices for IV Saline increased significantly despite stable or decreasing input costs; (vi) Defendants had ample  motives to

3

conspire, and opportunities to do so through trade association meetings and the geographic proximity of their corporate headquarters; and (vii) Baxter has a prior history of alleged antitrust violations of almost exactly the same kind that is charged here. CAC ¶¶ 95-132. *See* § III(D), *infra*.

The purported shortage and higher prices for IV Saline were most lucrative for Defendants. Their net sales (measured in dollars) increased substantially during the proposed Class Period. CAC ¶ 84. Defendants' senior executives repeatedly touted in earnings calls and other public statements their increased revenues, which they acknowledged were attributable to the sharp rise in prices for IV Saline Solution resulting from the shortage. CAC ¶¶ 85-90. *See* § III(A)(2), *infra*.

Plaintiffs allege that the IV Saline shortage is causing health care facilities to take extraordinary measures to conserve IV Saline Solution and to improvise with what they have on hand. CAC ¶¶ 49-53. Pharmacists have discussed bartering medical supplies and are spending unprecedented amounts of time tracking down supply, and at least one hospital reported running out of IV Saline Solution less than a week after receiving a delivery. CAC ¶¶ 52-53. It is estimated that U.S. health care facilities spend $216 million a year in labor costs associated with managing drug shortages. The current IV Saline Solution shortage is expected to be the most expensive drug shortage in history. CAC ¶ 54. *See* § III(A)(1), *infra*.

Defendants responded to these allegations by contending that none of them, standing alone, gives rise to a reasonable inference of collusion. But Plaintiffs' claim is not based on merely one of these allegations. Defendants also offer alternative interpretations of the facts alleged by Plaintiffs. But the law does not permit courts to make factual determinations at the pleading stage—all well pleaded allegations must be accepted as true for purposes of Rule

12(b)(6). In any event, Defendants' alternative explanations of their actions fail on their own merits.

Defendants' primary arguments in support of their motions, and the reasons why those contentions are insufficient, are as follows:

(a) Defendants contend that the allegations of pretextual product recalls to create a panic in the market and the consequent IV Saline shortage are implausible, because:

   (i) Recalls are too prohibitively expensive to be a profitable method of triggering a shortage leading to higher prices.

      ▪ *But this is belied by Defendants' own public statements about their sharp rise in earnings resulting from the product shortage. See § III(A), infra.*

   (ii) Reputational and other business and regulatory risks make it implausible that a manufacturer would recall products unless required to do so by FDA regulations, and Plaintiffs fail to allege that any of the recalls engineered by Defendants here "was not required by law."

      ▪ *But the reasons given by Defendants for the recalls involved only technical defects (e.g., "potential for leakage," "potential for punctures," or "missing closures"), which present no significant business or reputational risks.*

      ▪ *Defendants suffered none of the dire consequences they claim may generally be triggered by recalls (manufacturing inspections by the FDA, shareholder lawsuits, product liability lawsuits).*

      ▪ *Moreover, whether the recalls were "required by law" would require a detailed factual investigation and is not suitable for determination at the pleading stage. See §§ III(B), (E), infra.*

(b) Defendants contend that the allegations they signaled their output restrictions and price increases through publicly available communications with customers and the FDA are implausible, because:

   (i) They posted notices on the FDA website, not to signal supply restrictions, but because they are legally required to notify the FDA of anticipated shortages.

      ▪ *But the fact that signaling is cloaked within a federally regulated communication does not immunize that communication from antitrust liability. See §§ III(C), (E), infra.*

5

- ▪ *That a communication is required by law is no defense for alleged anti-competitive conduct; such communication may serve both an anticompetitive purpose and fulfill a reporting obligation under federal law. See* § III(C), *infra.*

    (ii)    It was within the FDA's discretion to post the notices on its website, making the notices an implausible vehicle for signaling.

- ▪ *But the FDA regulations and practices cut the other way: An affirmative act by the FDA is required for a notice submitted by a supplier <u>not</u> to be posted, meaning that such notices may be abused for signaling purposes.* See § III(C), infra.

    (iii)    The notices are ineffective for price signaling because they are silent as to price.

- ▪ *But in an oligopolistic market, signaling about expected product shortages is identical to signaling about expected higher prices. See* §§ III(C), (E), *infra.*

(c)    Defendants contend that Plaintiffs do not allege antitrust injury and standing, because they would have paid the same higher prices for IV Saline regardless of whether the shortage was attributable to Defendants' collusion or independent factors.

- ▪ *This fails as a matter of simple logic; but for Defendants' conspiracy, there would have been no shortage of IV Saline and thus no higher prices.*

- ▪ *This is also frivolous, where Plaintiffs plausibly allege that IV Saline prices, including prices paid by Plaintiffs, increased 200%-300% because of Defendants' collusive conduct; Plaintiffs have no option but to purchase IV Saline Solution regardless of price; and Plaintiffs were injured as a result of having paid higher prices for IV Saline Solution than they would have paid in the absence of Defendants' conspiracy.*

- ▪ *It is equally frivolous to contend that Plaintiffs lack standing, where Plaintiffs are direct purchasers of IV Saline from Defendants and thus are prototypical antitrust plaintiffs. See* § III(F), *infra.*

(d)    Defendants contend that in submitting the product recall notices to the FDA, they petitioned the government and thus the *Noerr-Pennington* doctrine requires that the complaint be dismissed.

- ▪ *But submitting product recall notices is a purely ministerial activity that is not protected under* Noerr-Pennington.

6

> - *Even if submitting recall notices were protected, Plaintiffs allege that the notices were pretextual, a sham, and thus beyond the scope of* Noerr-Pennington *protection. See* § III(G), *infra.*

(e) Defendants also contend that: (i) the complaint allegations are insufficiently detailed; (ii) Plaintiffs do not allege that Defendants specifically colluded as to price; (iii) Plaintiffs do not allege an enforcement mechanism for the conspiracy; (iv) factors other than collusion caused the IV Saline shortage; and (v) sources cited in the complaint contradict the allegations of collusion.

> - *These contentions are transparently devoid of any basis in fact or law. See* § III(H)*, infra.*

In sum, Defendants' arguments are without merit and Plaintiffs respectfully submit that the Court should deny the motions to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II.    LEGAL STANDARD

A motion to dismiss must be denied if the complaint alleges "enough facts to state a claim [for] relief that is plausible on its face." *Twombly*, 550 U.S. at 570. As the Supreme Court held, pleading antitrust violations with sufficient plausibility "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556. "[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts alleged is improbable, and that a recovery is very remote and unlikely." *Id.* (internal quotations omitted). At the pleading stage, the Court should not weigh competing theories and dismiss an antitrust complaint by choosing among plausible alternatives. *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010) (Wood, J.).

Absent direct evidence of a conspiratorial agreement, a plausible antitrust conspiracy may be alleged based on circumstantial evidence that includes "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See*

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556); *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) (Posner, J.). In assessing conspiracy allegations, a court must "accept all facts in the complaint as true, view them in the light most favorable to the [plaintiffs], and draw all reasonable inferences in their favor." *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 463 (7th Cir. 2010). The allegations must be analyzed as a whole and in their entirety, rather than viewed in isolation. *Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 839 (7th Cir. 2011) (stating that "a plaintiff 'should be given the full benefit of [its] proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each'") (quoting *Cont'l Ore Co. v. Union Carbide and Carbon Corp.*, 370 U.S. 690, 699 (1962)); *Std. Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 902 (N.D. Ill. 2009) ("'[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts.'") (quoting *Cont'l Ore Co.*, 370 U.S. at 699; *In re Potash Antitrust Litig.*, 667 F. Supp. 2d 907, 934 (N.D. Ill. 2009) ("[i]n determining whether the complaint satisfies the plausibility threshold required by *Twombly*, the allegations must be evaluated as a whole").

On a Rule 12(b)(6) motion, the Court should not determine whether the allegations "'show an agreement,'" but rather "whether the allegations 'plausibly suggest[ed]' such an agreement." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 426 (4th Cir. 2015) ("*SD3*"). Courts should "not decide whether the circumstantial evidence … is sufficient to *compel* an inference of conspiracy; the case is just at the complaint stage and the test for whether to dismiss a case at that stage turns on the complaint's 'plausibility.'" *Text Messaging*, 630 F.3d at 629 (emphasis in original). Moreover, "'[p]lausibility' in this context does not imply that the district court should decide whose version to believe, or which version is more likely than not. …

8

For cases governed only by Rule 8, it is not necessary to stack up inferences side by side and allow the case to go forward only if the plaintiff's inferences seem more compelling than the opposing inferences." *Swanson*, 614 F.3d at 404.

## III.  ARGUMENT

### A.  PLAINTIFFS ALLEGE A PLAUSIBLE CONSPIRACY

#### 1.  Plaintiffs Plausibly Allege That Defendants Colluded to Restrain Supply and Raise Prices in the IV Saline Solution Market

Plaintiffs satisfy the *Twombly* standard by alleging a plausible conspiracy to restrain supply and fix prices of IV Saline Solution.  The detailed allegations in the CAC describe how Defendants implemented their anticompetitive scheme beginning in 2013 by announcing several nearly parallel recalls of IV Saline Solution (CAC ¶¶ 61-65), signaling their output restrictions and price increases to each other through publicly available communications with customers and the FDA (CAC ¶¶ 66-75), and pressuring customers to abide by similarly restrictive purchasing terms and artificially inflated prices (CAC ¶¶ 76-79).  As a result, Defendants effectively reduced the supply of IV Saline Solution, created and exploited a purported shortage and caused panic in the market, and charged customers (including Plaintiffs) artificially inflated prices for IV Saline Solution. CAC ¶¶ 58-59, 80-84.

Defendants' coordinated recalls of IV Saline Solution began in May/June 2013. CAC ¶ 61. In November 2013, Baxter notified customers that there was a shortage of IV Saline Solution, shipments would be delayed, and non-contracted customers would receive the product on an allocation system.  CAC ¶ 44.  In January 2014, as a consequence of Defendants' conduct, the FDA publicly recognized a shortage of IV Saline Solution and added it to the FDA's Drug Shortage List. CAC ¶ 45.

9

Defendants' collusive recalls had a substantial impact on the available supply of IV Saline Solution in the U.S. market. CAC ¶ 62. One recall by Hospira of approximately 16.5 million bags in October 2014 alone removed approximately 82.5% of IV Saline Solution from the U.S. market for that month. CAC ¶¶ 61-62. During the fourth quarter of 2014, recalls by Baxter and Hospira collectively removed approximately 28.5% of IV Saline Solution bags from the U.S. market. *Id.* Predictably, the shortage led to massive price increases. The U.S. Centers for Medicare and Medicaid Services reported that prices of IV Saline Solution sold to the U.S. government rose approximately 36% between the fourth quarters of 2014 and 2015. CAC ¶ 64. According to a bipartisan group of U.S. Senators investigating Defendants' conduct in connection with the IV Saline shortage, prices of IV Saline Solution for private customers (including Plaintiffs and members of the proposed Class) increased by 200-300% since the purported shortage began, a conclusion that was confirmed by other sources. CAC ¶¶ 64, 5 n.2, 6 n.3, 53 n.13.

Baxter concedes, as it must, that a restraint on output serves to raise prices. *See* Baxter Mem. at 14,[4] (citing *United States v. Andreas*, 216 F.3d 645, 667 (7th Cir. 2000) ("A prototypical output restriction raises prices by reducing supply below demand")). Nevertheless, Baxter contends that product recalls are not prototypical restraints and it is implausible that a supplier would use them to create a shortage: "a product recall—*unlike* a restriction on future output—involves offering refunds to undo previous sales of a unit that the supplier has already paid to produce." Baxter Mem. at 14 (emphasis in original). But this is a distinction without a difference, and is an example of Defendants improperly viewing Plaintiffs' individual allegations in isolation. In this case, Defendants reduced their customers' on-hand supply below demand by

---

[4] "Baxter Mem." refers to Baxter's Memorandum in Support of Its Motion to Dismiss Plaintiffs' Consolidated Antitrust Class Action Complaint for Failure to State a Claim (ECF No. 60).

repeatedly removing IV Saline from their customers' inventories—which created a panic that led to a shortage, which gave Defendants a pretext to raise their prices. In fact, reducing supply via recalls may be a more immediate and efficient means to create a shortage than reducing by restraining future output.

Hospira claims that "recalls of 500,000 bags of saline in an industry that produces somewhere between 240 million and 1 billion bags a year … are hardly significant." Hospira Mem. at 10 n.10, 11.[5] But it is inventories, rather than production, that determine the immediate effect of a recall on supplies. Those recalls of 500,000 bags took place in late 2014 and early 2015. *See* CAC ¶¶61(c), (d). The American Society of Health System Pharmacists had determined months earlier that "[c]ritical shortages of i.v. saline solutions [we]re affecting more than 75 percent of U.S. hospitals and other health care settings." CAC ¶ 71. The removal of 500,000 bags from class members' inventories in that context *is* "significant."

Moreover, Defendants' arguments that their coordinated product recalls were too small to significantly affect the IV Saline Solution market are belied by the facts alleged in the CAC. Plaintiffs allege that the IV Saline shortage has had potentially dangerous consequences. The FDA describes the current IV Saline Solution shortage as a "critical shortage, which poses a serious threat to patients." CAC ¶ 49.[6]

Health care facilities have attempted to cope with the purported IV Saline Solution shortage by conserving supplies.  The American Society of Health-System Pharmacists ("ASHP") issued guidance in March 2014 advising clinicians to conserve IV Saline Solution by "using oral hydration whenever possible" and to "consider flushing central venous access

---

[5] "Hospira Mem." refers to Hospira's Memorandum of Law in Support of Its Motion to Dismiss the Consolidated Antitrust Class Action Complaint (ECF No. 58).

[6] CAC ¶ 49 n.9 (citing *FDA updates on saline drug shortage*, FDA, http://www.fda.gov/Drugs/DrugSafety/ucm382255.htm).

devices 1-3 times per week rather than daily." The Veterans Health Administration, the largest healthcare system in the country, stated that the IV Saline Solution shortage is a "serious concern" and that it has been required to implement operational changes to manage care in light of the limited supply. CAC ¶¶ 50-51.[7]

A scramble to find supplies during a shortage can cause a delay in patients' treatment "and in the emergency room … [a] few minutes in these situations can be crucial."[8] The purported IV Saline Solution shortage is causing health care facilities to "improvise with what they've got."  Pharmacists have discussed "bartering medical supplies among one another, and spending an unprecedented number of hours tracking down supply and scrambling together substitutes."[9]  CAC ¶ 52

According to David Jaspan, RPh, director of pharmacy and materials management at Union Hospital in Elkton, Maryland, who spends part of his time locating alternatives to IV Saline Solution, "we find ourselves struggling to manage with what we have."  Jaspan described how the hospital ran out of its supply of IV Saline Solution less than a week after receiving a delivery of IV Saline Solution and other IV fluids.  CAC ¶ 53[10]

Drug shortages have a significant financial impact on health care facilities.  It is estimated that U.S. health care facilities spend $216 million a year in labor costs associated with

---

[7] CAC ¶¶ 50 n.10, 51 (citing Erika Fry, "There's a national shortage of saline solution. Yeah, we're talking salt water. Huh?" FORTUNE (Feb. 5, 2015), http://fortune.com/2015/02/05/theres-a-national-shortage-of-saline/) (Baxter Mem. Ex. 4.) ("Baxter Mem. Ex. __" refers to the exhibits appended to Baxter's memorandum of law in support of the motion.)

[8] CAC ¶ 52 n.11 (citing Lena J. Weiner, "Basic Emergency Department Meds in Short Supply," HEALTHLEADERS MEDIA , (June 12, 2015), http://www.healthleadersmedia.com/quality/basic-emergency-department-meds-short-supply) (Baxter Mem. Ex. 9).

[9] CAC ¶ 52 n.12 (citing Baxter Mem. Ex. 4).

[10] CAC ¶ 53 n.13 (citing Lena J. Weiner, "IV Fluids Shortage Continues in Hospitals," HEALTHLEADERS MEDIA, (Sept. 25, 2014), http://www.healthleadersmedia.com/quality/iv-fluids-shortage-continues-hospitals) (Baxter Mem. Ex. 11).

managing drug shortages. The current IV Saline Solution shortage is expected to be the most expensive drug shortage in history. CAC ¶ 54[11]

### 2. Plaintiffs Plausibly Allege That Defendants Profited from Their Conspiracy

Contrary to Baxter's assertion that Defendants would have been deterred from instigating pretextual product recalls by the cost of "refunds to undo previous sales of a unit that the supplier has already paid to produce," the IV Saline shortage has been very lucrative for Defendants. Baxter Mem. at 14. As reflected in Figure 3 in the CAC, their net sales[12] increased substantially during the Class Period as they collusively engaged in their unlawful anticompetitive scheme:



CAC ¶ 84.

---

[11] CAC ¶ 54 n.14 (citing April Dembosky, KQED, "Saline shortages create troubles for U.S. hospitals," PBS NEWSHOUR, (Jun. 25, 2014), http://www.pbs.org/newshour/rundown/saline-shortages-create-troubles-u-s-hospitals/) (Baxter Mem. Ex. 3).

[12] "Net sales" is an accounting term that means total sales revenues, less such items as chargebacks and rebates. *See* Hospira's 2014 10-K annual report, at 68, http://www.hospirainvestor.com/phoenix.zhtml?c=175550&p=irol-reportsannual_pf; Baxter's 2014 10-K annual report, at 45, http://investor.baxter.com/phoenix.zhtml?c=86121&p=irol-reportsannual

Defendants touted their price increases for IV Saline Solution. For example, the Chairman and CEO of Baxter stated during a July 2014 earnings call that he perceived IV Saline Solution to be undervalued and therefore saw a business opportunity for increasing prices and margins because of the "recent IV shortage in the U.S." CAC ¶¶ 85-86. At the same time, media outlets reported that Hospira was about to double or triple its prices for IV Saline Solution. CAC ¶ 87.

Defendants attributed the rise in their net sales revenues to their price increases for IV Saline during the shortage. Baxter, in its earnings call for the second quarter of 2014, stated that a sales increase of 8% in its Fluid Systems franchise (which includes IV Saline Solution) was driven in part by "pricing for IV solutions." CAC ¶ 88. In the third quarter of 2014, Baxter attributed a 4% net sales growth in Fluid Systems to "price improvements" for IV therapies (which include IV Saline Solution). *Id.*

Similarly, in the first quarter of 2014, Hospira reported "an uptick in IV solutions prices" and a 19% increase in net sales in its business unit that includes IV Saline Solution. CAC ¶ 89. In the third quarter of 2014, Hospira reported a significant 43% increase in the same business unit compared to the same quarter for 2013. *Id.* Hospira's CEO stated that this increase was "primarily driven by the strong performance from our solutions products, which benefitted from the continued strong demand from protracted market shortages." *Id.* During a May 2015 investor conference, Baxter's CEO indicated that, even though overall business was "slower … we've been actually increasing prices in the U.S. on IV solutions." CAC ¶ 90.[13]

---

[13] Plaintiffs also allege that Defendants collusively exploited their market power and the purported IV Saline shortage by pressuring customers to purchase more products than IV Saline Solution alone. According to the bi-partisan group of Senators in their letter to the FTC, suppliers of IV Saline Solution, such as Defendants, informed hospital customers that they "would not be able to purchase any saline at any price unless the hospital also purchased additional products." CAC ¶ 76. The Senators described reports from hospitals that Defendants "are imposing even greater price increases on customers who do

In short, Defendants cannot credibly claim that any cost they may have incurred in connection with their product recalls exceeded the revenues they earned by doubling or tripling IV Saline prices during the Class Period, in light of their own executives' repeated statements to the contrary.[14]

## B. PLAINTIFFS PLAUSIBLY ALLEGE PARALLEL CONDUCT

Relying primarily on price-fixing cases in which plaintiffs failed to show parallel pricing, Defendants claim that their recalls were insufficiently parallel to support Plaintiffs' allegations of collusion. But where Plaintiffs allege only that Defendants' recalls were a means to facilitate their collusive price increases, any purported lack of "parallelism" in those recalls has no bearing on the sufficiency of Plaintiffs' antitrust claims. In *Kleen Products, LLC v. Packaging Corp. of America*, 775 F. Supp. 2d 1071, 1077 (N.D. Ill. 2011), the court held as much in response to substantially identical arguments:

---

not also purchase additional non-saline products," such as pumps, tubing and catheters through which IV Saline Solution is delivered to patients. CAC ¶ 77. The Senators also recognized that Defendants were able to "lock their customers into long term contracts." *Id.*

In a competitive market, it would be in the independent self-interest of each IV Saline Solution supplier to lower its prices for IV Saline Solution and sell IV Saline Solution separately from other products, in order to maximize market share. By collectively imposing price increases on IV Saline Solution customers and pressuring customers to abide by similar restrictive purchasing terms for other products, Defendants acted contrary to their individual economic self-interests, conduct that is highly suggestive of a price-fixing conspiracy in the IV Saline Solution market. *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1000 (N.D. Ill. 2011) ("In a perfectly competitive market, supply reductions by one firm would presumably lead to other competitors filling in the gaps and prices remaining lower.").

[14] Baxter contends that the Court should give no weight to Plaintiffs' allegations regarding Defendants' public statements to investors. According to Baxter, "[p]ublic statements to investors regarding opportunities to raise prices 'in response to an excess of demand' are entirely consistent with competitive market behavior" (Baxter Mem. at 20), as if these public statements were Plaintiffs' only basis for the alleged conspiracy. But "[i]t is not for the court to decide, at the pleading stage, which inferences are more plausible than other competing inferences, since those questions are properly left to the factfinder." *Evergreen Partnering Group, Inc. v. Pactiv Corp.,* 720 F.3d 33, 45 (1st Cir. 2013). Moreover, "it is not necessary that the factual allegations tend to exclude the alternative explanation offered by defendants. … [P]laintiffs need only allege a conspiracy which is plausible in light of the competing explanations." *Plasma*, 764 F. Supp. 2d at 1002.

> [Defendants] argue that their capacity reductions were not truly parallel. More
> specifically, they suggest that they made only modest capacity reductions, that the
> reductions were made in varying amounts and not all at the same time, and that
> they did not follow each other's reductions. Those contentions are unconvincing
> for a number of reasons.

Defendants here argue that their recalls were not truly parallel, suggest that the recalls were only modest, that they were made in varying amounts, not all at the same time, and that they did not follow each other's recalls. Those contentions fail, for reasons similar to the reasons they failed in *Kleen Products*.

First, "[v]ariations in the size of capacity reductions do not disprove the existence of a conspiracy, just as '[e]ven a single act may be sufficient to draw a defendant within the ambit of a conspiracy.'" *Id.* at 1077 n.8 (quoting *United States v. Consol. Packaging Corp.*, 575 F.2d 117, 126 (7th Cir. 1978)); *see also Potash*, 667 F. Supp. 2d at 934 (denying motion to dismiss where one defendant removed from the market ten times more capacity than another defendant). The same is true of variations in the size of recalls. Likewise, "[c]apacity reductions need not be simultaneous" to constitute parallel conduct. *Kleen Prods*, 775 F. Supp. 2d at 1077 n.9; s*ee also Plasma*, 764 F. Supp. 2d at 1000; *Black & Decker*, 801 F.3d at 428–29 (dissent's claim that parallel conduct exists "only when defendants move in relative lockstep, achieving their common anticompetitive ends… only by substantially identical means … finds no support in any existing authority").[15]

_____

[15] The cases that Hospira cites for the proposition that the CAC fails to allege parallel conduct are easily distinguished. *See* Hospira Mem. at 6 (citing *In re Baby Food Antitrust Litig*., 166 F.3d 112, 128-32 (3d Cir. 1999) (finding price increases were not parallel where there was direct evidence of defendants' individual pricing plans); *Zoslaw v. MCA Distrib. Corp*., 693 F.2d 870, 884-85 (9th Cir. 1982) (finding lack of parallel conduct where there was failure to disprove "good faith business judgment" and there was "absence of common motivation"); *RxUSA Wholesale, Inc. v. Alcon Labs*., Inc., 661 F. Supp. 2d 218, 231 (E.D.N.Y. 2009) (dismissing complaint where, unlike in instant case, "[c]omplaint contains no allegations as to when the alleged conspiracy began, where it occurred, or what statements the Manufacturing Defendants made to one another"); *Harlem River Consumers Coop., Inc. v. Associated Grocers of Harlem, Inc.*, 408 F. Supp. 1251, 1277-78 (S.D.N.Y. 1976) (finding lack of "true parallelism" where, among other things, defendants were not aware of one another's responses to outside stimuli, and there

16

Finally, Baxter objects to Plaintiffs' purported failure to plead any causal connection between Defendants' recalls and any price or output activity. Baxter Mem. at 13. As to the latter, Plaintiffs have already demonstrated that Defendants' removal of existing supply from the market is the functional and legal equivalent of a reduction of output. *See supra* § III(A). Moreover, Plaintiffs need not specifically allege a causal link between Defendants' conduct and prices because, as the Seventh Circuit stated in *Andreas*, 216 F.3d at 667:

> Functionally, an agreement to restrict output works in most cases to raise[] prices above a competitive level, *see General Leaseways, Inc. v. National Truck Leasing Ass'n*, 744 F.2d 588, 594 (7th Cir.1984), and for this reason, output restrictions have long been treated as per se violations. *See Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 107 L. Ed. 2d 851, 110 S. Ct. 768 (1990); *National Collegiate Athletic Ass'n v. Board of Regents*, 468 U.S. 85, 100, 82 L. Ed. 2d 70, 104 S. Ct. 2948 (1984); *Socony-Vacuum*, 310 U.S. 150, 223, 84 L. Ed. 1129, 60 S. Ct. 811.

Plaintiffs need not allege anything further.

## C. DEFENDANTS' SIGNALING ACTIVITIES SUPPORT THE INFERENCE OF COLLUSION

The FDA's publicly accessible Drug Shortage website includes information from manufacturers on the availability of certain drugs and medical products, the estimated duration of purported shortages, and when full production is expected to resume. CAC ¶ 67.  The website also identifies the claimed "shortage reason," which may include: requirements related to complying with good manufacturing practices; regulatory delay; shortage of an active ingredient; shortage of an inactive ingredient component; discontinuation of the manufacture of the drug; delay in shipping of the drug; demand increase for the drug; and others.

---

was no evidence of defendants' communication of any kind)).  *See also* Baxter Mem. at 13 (citing *Burch v. Milberg Factors, Inc*., 662 F.3d 212, 229 (3d Cir. 2011) (upholding dismissal where there was not a "scintilla of evidence of concerted, collusive conduct" (quoting *Jacob Blinder & Sons, Inc. v. Gerber Prods. Co*. (*In re Baby Food Antitrust Litig*.), 166 F.3d 112, 137 (3d Cir. 1999)).

Defendants used the Drug Shortage database to engage in signaling (*i.e.*, the intentional sharing of competitive information) to ensure that both Defendants restricted output and promoted higher prices. CAC ¶ 66. The Defendants each listed the purported reasons for their IV Saline Solution supply constraints (either "demand increase" or "other") and detailed their intentions to place customers on allocation. CAC ¶ 68.

On December 16, 2013, Baxter submitted the first relevant customer letter to the FDA, stating that it would temporarily suspend the manufacturing of 150 mL IV Saline Solution to meet higher demands for 250 mL IV Saline Solution. Thereafter, on January 17, 2014, Hospira and Baxter both submitted customer letters to the FDA concerning the purported IV Saline Solution shortage and indicating that customers would be put on allocation. Hospira's January 17, 2014 letter also contained additional Hospira IV solution products that it was placing on allocation, purportedly due to heavy demand from that year's flu season and industry supply constraints. CAC ¶¶ 69-71.

On February 11, 2014, following the publication of these letters, the American Society of Health System Pharmacists reported that it had recently determined that "[c]ritical shortages of i.v. saline solutions are affecting more than 75 percent of U.S. hospitals and other health care settings." The shortage affected a product "widely used in medical care, including treating dehydration, for patients receiving dialysis, and emergency care."[16] CAC ¶ 70.

On March 12, 2014, Baxter submitted another customer letter to the FDA regarding the purported shortage and its product allocation. In this letter, Baxter stated that it was expanding its list of allocated products to include certain of the same IV solution products that Hospira

---

[16] Press Release, "Shortages of I.V. Saline Affecting 76 Percent of U.S. Hospitals" (Feb. 11, 2014), http://www.ashp.org/menu/AboutUs/ForPress/PressReleases/PressRelease.aspx?id=792.

listed in its January 17, 2014 letter, including 5% Dextrose, 5% Dextrose and 0.45% Sodium Chloride, and Lactated Ringer's Solution. CAC ¶ 70.

On April 15, 2014, the FDA told the American Hospital Association that it was "actively pursuing options to secure additional supplies as soon as possible," but added that it lacked "authority to require a manufacturer to make a product or to direct a manufacturer's business decisions about manufacturing capacity."[17]

Baxter argues that the Court should disregard these allegations of Defendants using the FDA website to signal supply restrictions because (i) Defendants are legally required to notify the FDA of anticipated shortages; (ii) publicizing this information is subject to FDA discretion; and (iii) Defendants' notifications to the FDA do not discuss prices. Baxter Mem. at 16-17. Hospira argues similarly, but adds that the notifications were too distant in time from Defendants' voluntary recalls to make the alleged conspiracy plausible. Hospira Mem. at 15. None of Defendants' points serves to discredit Plaintiffs' specific and well-pled allegations of price signaling through the FDA's website.

First, the fact that the alleged signaling is cloaked within a federally regulated communication is legally irrelevant. In the same way that a corporate executive of a publicly traded company can plausibly and unlawfully signal price increases or supply shortages through disclosures regulated by the Securities & Exchange Commission, so too can Baxter and Hospira plausibly and unlawfully signal price increases or supply restrictions through notifications regulated by the FDA. *See, e.g., In re Domestic Airline Travel Antitrust Litig.*, MDL Dkt No. 2656, 2016 U.S. Dist. LEXIS 149608, *40-44 (D.D.C. Oct. 28, 2016) (denying defendants' motion to dismiss by relying in part on allegations of signaling via certain defendants' statements

---

[17] Letter, M. Hamburg to R. Pollack, April 15, 2014, http://www.aha.org/advocacy-issues/letter/2014/140415-hhslet-ivfluids.pdf.

made during quarterly, and other, shareholder earnings calls); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 733 F. Supp. 2d 1348, 1355-62 (N.D. Ga. 2010) (denying motion to dismiss relying, in part, on signaling allegations arising from disclosures made by defendant in shareholder earnings call). At bottom, even if Defendants' product shortage notices were submitted to comply with a federal regulation that does not shield the content of those communications from scrutiny. *See, e.g., United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005) (otherwise lawful conduct may establish antitrust liability where it occurs in the service of an antitrust violation); *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 274-75 (2d Cir. 1979) (same). To hold otherwise would be to place the form of a communication over its anticompetitive substance.

Second, Baxter's contention that because the FDA has certain discretion over publicizing Defendants' shortage notifications, these notifications therefore cannot be relied on to signal prices or output restrictions, is a red herring. Baxter Mem. at 17. Under the applicable regulations, the FDA's discretion is narrowly circumscribed to either situations of a public health risk, such as fears of customer hoarding, or the protection of trade secrets and commercial and financial information. *See* 21 C.F.R. § 314.81(c)(ix)(3)(iii)(2)(d)(2). In other words, Baxter's argument that it was the FDA that decided "whether and when Baxter's shortage reports [were] posted to [its website]" (Baxter Mem. at 17)—thereby implying that publication of the unlawful signals was too unpredictable to be effective—is disingenuous. Indeed, the reverse is more plausible: because Defendants knew that the scope of the FDA's discretion not to publish the information was narrow and inapplicable to the communications at issue here, Defendants could confidently proceed under the expectation that the FDA would publicize their notifications of

anticipated IV Saline shortages. That expectation makes the FDA's notification system a reliable medium for each Defendant to signal its intended output to the other.

Third, Baxter's argument that because Defendants' shortage notification letters do not technically mention prices, the letters do not support a suggestion of price collusion, is overly literal and unavailing. As Plaintiffs allege, these letters discuss supply reductions and product allocation (*see* CAC ¶¶ 69-70, 72), which, as a matter of law, directly cause price increases, especially for a homogenous product with highly inelastic demand such as IV Saline. *See* CAC ¶¶ 103-112. A court may infer that a market participant will recognize that announcements of supply reductions of a high-demand product will lead to increased prices for that product. *See, e.g., Andreas*, 216 F.3d at 667 ("[A]n agreement to restrict output works in most cases to raise[] prices above a competitive level …, and for this reason, output restrictions have long been treated as per se violations.") (internal citations omitted).

Fourth, Hospira argues that the FDA notifications could not be communicating price-colluding signals because they were too distant in time from the voluntary recalls. Hospira Mem. at 15. As authority for this point, Hospira cites *Kleen Products*, 775 F. Supp. 2d at 1080 where the court gave no weight to public statements that plaintiffs had not tied "temporally to price increases or capacity reduction." Here, by contrast, the complaint expressly ties the alleged signal temporally with the output reduction—indeed, Hospira even places Plaintiffs' allegations of the precise timeframes (to the day) in a chart in its brief. Hospira Mem. at 15. Further, Hospira's argument that the notice was not made "any time near a claimed recall" (noting "more than six months" from a recall) runs contrary to the governing federal regulations. *Id.* Under the regulations, reports to the FDA must be "[a]t least 6 months" in advance of an upcoming production interruption. *See* 21 C.F.R. § 314.81(b)(c)(ix)(3)(iii)(2)(b)(1). Hospira provides no

legal authority to disregard this explanation of the time lag and therefore its argument should be disregarded.

**D.**     **"PLUS FACTORS" SUPPORT THE EXISTENCE OF A PLAUSIBLE CONSPIRACY**

     **1.**     **It Is Settled Law That Well-Pleaded Antitrust Plus Factors Support an Inference of Conspiracy**

There is no merit to Defendants' contention that the Court should give no weight to Plaintiffs' well-pleaded allegations of "plus factors" in support of the antitrust claim—factors such as market structure, high market concentration, barriers to entry, inelastic demand, and product homogenization. *See* Baxter Mem. at 19-20; Hospira Mem. at 20-23. On a motion to dismiss, only the plausibility of the alleged conspiracy is before the Court, and plus factors such as those alleged in the CAC are highly relevant to that question. In *Text Messaging*, 630 F.at 629, Judge Posner, in affirming the district court's denial of defendants' motion to dismiss, held that "[w]e need not decide whether the circumstantial evidence that we have summarized [a mixture of parallel behaviors, details of industry structure, and industry practices that facilitated collusion] is sufficient to compel an inference of conspiracy; the case is just at the complaint stage and the test for whether to dismiss a case at that stage turns on the complaint's 'plausibility.'" Judge Posner further noted that "an industry structure that facilitates collusion constitutes supporting evidence of collusion" and that where "the four defendants sell 90 percent of U.S. text messaging services, [] it would not be difficult for such a small group to agree on prices and to be able to detect 'cheating' … without having to create elaborate mechanisms … that could not escape discovery by the antitrust authorities." *Id*. at 627-28. These are the types of plus factors that Plaintiffs have alleged here, and which Defendants improperly ask the Court to ignore.

In *Plasma*, 764 F. Supp. 2d at 1002, the court considered plaintiffs' allegations of plus factors, including "show[ing] that the plasma therapeutics industry was ripe for collusion and that defendants had ample opportunity to carry out their scheme." The court observed that, like here, "[t]he industry was highly consolidated, with only a handful of firms," that the product "is uniform across manufacturers, [] the demand for the product is highly inelastic," and that "[f]ixed costs in the industry are high, and the big players are vertically integrated." *Id.* The court further recognized that even while the "[d]efendants make a somewhat convincing case that all of plaintiffs' allegations can be explained as behavior perfectly in line with the firms' independent self-interest" the defendants (one of which was Baxter) misunderstood the appropriate standard for a motion to dismiss. *Id.* Denying defendants' motion, the court held that "[i]t is not necessary that the factual allegations tend to exclude the alternative explanation offered by defendants. That is the standard appropriate for a summary judgment motion. … [P]laintiffs need only allege a conspiracy which is plausible in light of the competing explanations." *Id.*

Defendants also err in treating each of Plaintiffs' allegations in isolation. Courts routinely reject this tactic. *See, e.g., Cont'l Ore*, 370 U.S. at 699 (in conspiracy anti-trust cases "plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each"). As the court held in *Kleen Products*, "Defendants' exclusive concentration on small details without refuting the bigger picture allegations forgets a basic tenet confirmed nearly a half century ago in *Cont'l Ore* …: '[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.'" 775 F. Supp.2d at 1077 (internal citations omitted); *see also Potash*, 667 F. Supp. 2d at 934 ("[i]n determining whether the

23

complaint satisfies the plausibility threshold required by *Twombly*, the allegations must be evaluated as a whole"); *Norfolk Cty. Ret. Sys. v. Ustian*, No. 07 C 7014, 2009 U.S. Dist. LEXIS 65731, *34 (N.D. Ill. July 28, 2009) (securities case observing that "[a]s in the context of an antitrust case even after [*Twombly*], the adequacy of a … complaint should not be judged by dismembering it and viewing its separate parts") (internal quotations omitted); *Std. Iron Works*, 639 F. Supp. 2d at 894 ("[p]laintiffs' allegations must also be evaluated as a whole" including in the context of the relevant industry).[18]

Baxter and Hospira likewise err in seeking to isolate Plaintiffs' allegation that Defendants colluded by jointly pressuring customers to buy other products in conjunction with their IV Saline purchases. Baxter Mem. at 18-19; Hospira Mem. at 16-17. Hospira also argues that tying arrangements can sometimes be procompetitive. *See* Hospira Mem. at 17 (citing *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984) and *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665 (7th Cir. 1985)). But Plaintiffs do not assert a stand-alone tying claim here. Plaintiffs' allegation—that both Defendants took advantage of the supply shortage in the market to use the same pricing model to pressure customers to buy other products so as to get a discount on their IV Saline purchases (CAC ¶¶ 76-79)—is simply an additional example of Defendants' coordinated conduct, to be considered alongside the rest of Plaintiffs' allegations in supporting a plausible inference of Defendants' price collusion.

Defendants insist, nonetheless, that none of the plus factors alleged by Plaintiffs "either individually or collectively" makes plausible the claim that Defendants conspired to reduce the supply and thus drive up the prices of IV Saline Solution. Hospira Mem. at 20. Applicable case law is to the contrary. *See, e.g., Twombly*, 550 U.S. at 556 n.4 (noting "complex and historically

---

[18] *See also Jung v. Ass'n of Am. Med. Colleges*, 300 F. Supp. 2d 119, 160 (D.D.C. 2004) ("[a]lthough *Continental Ore* was decided in the context of a motion for a directed verdict after trial, its maxim has been applied in a variety of contexts, including in consideration of motions to dismiss.").

unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason" would satisfy the *Twombly* standard); *Potash*, 667 F. Supp. 2d at 933 (denying (in part) motion to dismiss, based on allegations of concerted supply restraints plus allegations such as "that the potash market is generally conducive to a conspiracy and specifically, [and] that there was a high level of cooperation and opportunities to conspire amongst Defendants.") (internal quotations omitted); *Std. Iron Works*, 639 F. Supp. at 893-94 (in denying motion to dismiss, relying on unprecedented and coordinated declines in output plus factors such as that the "market structure was ripe for collusion," and that defendants had opportunities to meet and conspire).

2.      **The Structure of the IV Saline Industry Is Conducive to Conspiracy**

Plaintiffs plausibly allege that the structure and characteristics of the IV Saline Solution market make it conducive to collusion among the Defendants. Specifically, the relevant market: (i) is highly concentrated, with Defendants having a combined market share of approximately 90 percent (CAC ¶¶ 95-97); (ii) has high barriers to entry, including regulatory barriers (an FDA economist estimated it would take a prospective entrant three to five years to open a new IV Saline plant) (CAC ¶¶ 99-102); (iii) has highly inelastic demand—health care facilities simply have no adequate alternative for IV Saline Solution (CAC ¶¶ 103-08); and (iv) is highly homogenized, thereby facilitating coordination on price (CAC ¶¶ 109-12).

All of these are well recognized as plus factors that support the plausibility of collusion. Writing for the Seventh Circuit in *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 655 (7th Cir. 2002) ("*HFCS*"), Judge Posner stated that collusion may be inferred from evidence "that the structure of the market was such as to make secret price fixing feasible." The *HFCS* court found that the market structure was favorable to price fixing because, among other things, the market was highly concentrated (like here, defendants' combined market shares were 90

25

percent), the product was highly homogenized, and there were barriers to entry. *Id*. at 656-57; *see also In re Flash Memory Antitrust Litig*., 643 F. Supp. 2d 1133, 1144 (N.D. Cal. 2009); *Kleen Prods.*, 775 F. Supp. 2d at 1081.

The Herfindahl-Hirschman Index ("HHI") measures the competitive concentration of a particular industry; the higher the HHI, the less competitive the market. *See FTC v. Ill. Cereal Mills, Inc*., 691 F. Supp. 1131, 1137-38 (N.D. Ill. 1988) ("The HHI is premised upon the economic principle that both the distribution of market shares among the leading firms and the composition of the market outside of the leading firms are significant in assessing the likelihood of tacit collusion or interdependent, noncompetitive conduct in a market. The fewer the number of firms, the easier a collusive arrangement can be achieved.") Figure 5 in the CAC provides the ranges of HHI concentration levels used by the U.S. Department of Justice and FTC to classify markets as unconcentrated, moderately concentrated, and highly concentrated.

### Figure 5

**Concentration Levels**

| Level | HHI |
| --- | --- |
| Highly Concentrated | > 2,500 |
| Moderately Concentrated | 1,500 to 2,500 |
| Unconcentrated | < 1,500 |

CAC ¶ 97. Plaintiffs allege that the HHI for the IV Saline Solution market is 4150, well above the 2500 threshold at which the FTC and DOJ consider a market to be "highly concentrated," and thus conducive to price fixing. CAC ¶¶ 97-98. *See Ill. Cereal Mills*, 691 F. Supp. at 1137-38; *FTC v. OSF Healthcare Sys*., 852 F. Supp. 2d 1069, 1079 (N.D. Ill. 2012) (explaining that "increased concentration raises a likelihood of interdependent anticompetitive conduct . . . [based] upon the theory that, where rivals are few, firms will be able to coordinate their behavior,

26

either by overt collusion or implicit understanding, in order to restrict output and achieve profits above competitive levels") (internal citations omitted).

Defendants contend that Plaintiffs' market structure allegations merely indicate an oligopolistic market, and thus do not necessarily mean that there was a conspiracy. Hospira Mem. at 20-21 (citing *Brooke Group*, 509 U.S. 209 (1993); *In re Elevator Antitrust Litig.*, No. 04 CV 1178 (TPG), 2006 U.S. Dist. LEXIS 34517 (S.D.N.Y. May 26, 2006); *Superior Offshore Int'l, Inc. v. Bristow Group*, 738 F.Supp.2d 505 (D. Del. 2010); *In re LTL Shipping Servs. Antitrust Litig.*, No. 1:08-MD-01895-WSD, 2009 U.S. Dist. LEXIS 14276 (N.D. Ga. Jan. 29, 2009)); *see also* Baxter Mem. at 19. But the cases they cite simply state the proposition that parallel but non-collusive conduct is not unlawful. Plaintiffs however do not allege mere parallelism here; as discussed above, they plausibly allege detailed facts regarding Defendants' collusive scheme to use parallel product recalls as a mechanism to restrain supply and raise prices of IV Saline Solution. Plaintiffs' allegations regarding market structure are plus factors that, taken as a whole, further support the plausibility of Plaintiffs' claim. *See HFCS*, 295 F.3d at 656 (the question is whether, when "the evidence [is] considered as a whole, it [is] more likely that the defendants had conspired to fix prices than that they had not conspired to fix prices") (citing *In re Brand Name Prescription Drugs Antitrust Litigation*, 186 F.3d 781, 787 (7th Cir. 1999)).

Finally, Defendants say nothing specifically directed at the undisputed fact that demand for IV Saline is inelastic. Defendants vaguely contend that the inelasticity of demand is—along with certain other plus factors—strictly a result of their oligopoly in the market for IV Saline. *See* Baxter Mem. at 19; Hospira Mem. at 20. But Defendants cite no authority for that contention, because it is wrong—there is in fact no meaningful and direct connection between

27

the concentration of a market and the elasticity of demand for its product in general, and more so in this case, where the use of IV Saline is essential to multiple aspects of patient health care. Where oligopolists agree not to compete, that inelasticity of demand means that they can raise prices with impunity, without risking a meaningful reduction in demand. That is exactly what happened in this case.

### 3. Defendants Had Motives and Opportunities to Conspire, Reinforcing the Plausibility of Plaintiffs' Claim

Plaintiffs allege that each Defendant was economically motivated to collusively restrain output and increase prices of IV Saline Solution to supra-competitive levels. For example, because long-term contracts with certain customers were set to expire during the proposed Class Period, Defendants were motivated to restrict output in order to create panic among customers and thus to force them into long-term contracts with higher price terms. CAC ¶¶ 117-18. These contracts enabled Defendants to prolong the purported shortage and maintain their conspiracy while avoiding price competition and erosion of market share. *Id.* Moreover, as the bipartisan group of U.S. Senators recognized, Defendants' motivation to increase prices and restrict output "further exacerbates the [IV Saline Solution] shortage and results in consumer harm." CAC ¶ 119. Such motivation to act in a manner that would be contrary to each Defendant's economic self-interest in the absence of collusion is a plus factor that further supports Plaintiffs' claim. *See, e.g.*, *Plasma*, 764 F. Supp. 2d at 1000 ("The complaint in this case plausibly alleges interdependence because, despite rising demand, defendants allegedly reduced their production capacity in order to keep profits high. In a perfectly competitive market, supply reductions by one firm would presumably lead to other competitors filling in the gaps and prices remaining lower. But in a concentrated market … [participants] have a motive to avoid undercutting one another on price.").

28

Not only did Defendants have motivation to collude, they also had ample opportunities to meet and conspire. Baxter and Hospira are members of the Advanced Medical Technology Association ("AdvaMed"), a trade association that holds numerous conferences and workshops throughout the year. CAC ¶¶ 113-14. During the Class Period, both Defendants were also members of the Generic Pharmaceutical Association ("GPhA"), another trade association that holds workshops and conferences throughout the year for its members. CAC ¶ 115. Moreover, Baxter and Hospira are located in close proximity, providing them with ease of access to meet and conspire. Both are headquartered in Illinois, with their offices separated by less than 10 miles. CAC ¶ 116.

The opportunity to meet and conspire is also a "plus factor," recognized by the courts as supporting the plausibility of an antitrust conspiracy claim. *See SD3, LLC v. Black & Decker (U.S.) Inc.*, No. 14-1746, 2015 U.S. App. LEXIS 18834, at *38 (4th Cir. Oct. 29, 2015) ("Allegations of communications and meetings among conspirators can support an inference of agreement because they provide the means and opportunity to conspire."); *Std. Iron Works*, 639 F. Supp.2d at 894 (communications and meetings at trade associations are "a plus factor in support of the plausible inference that Defendants reached a meeting of the minds on industry-wide production cuts."); *see also Text Messaging*, 630 F.3d at 628; *Kleen Prods.*, 775 F. Supp. 2d at 1080; *Flash*, 643 F. Supp. 2d at 1148.

Baxter offers two responses to Plaintiffs' well-pled "motive and opportunity" allegations, both of which fail. First, Baxter proposes alternative explanations for Defendants' behavior (Baxter Mem. at 18, 20), which, as explained above, is not the question at the motion to dismiss phase. See *Plasma*, 764 F. Supp. 2d at 1002-03; *Std. Iron Works*, 639 F. Supp. at 895 ("[w]hile more innocent inferences can be drawn from the statements that Plaintiffs contend infer an

agreement to cut production, it is not Plaintiffs' burden to allege facts that cannot be squared with the possibility of unilateral action"); *see also HCFS*, 295 F.3d at 663 ("The evidence is not conclusive by any means—there are alternative interpretations of every bit of it—but it is highly suggestive of the existence of an explicit though of course covert agreement to fix prices.").

Baxter's second error is, yet again, to treat each of Plaintiffs' allegations in isolation. But as discussed above, courts routinely reject this tactic. *See, e.g.*, *Cont'l Ore Co.*, 370 U.S. at 699; *Mercatus Grp.*, 641 F.3d at 839; *Std. Iron Works*, 639 F. Supp. 2d at 902. Therefore, Baxter's argument that *"[m]erely* belonging to the same trade guild as one's competitors does not suggest a conspiracy" (Baxter Mem. at 20) (brackets and quotations omitted) (emphasis added) misapprehends the import of the allegation. Plaintiffs do not "merely" allege Defendants' membership in the same trade association; that allegation is part of a larger body of allegations set forth throughout the CAC that support a plausible inference of an unlawful conspiracy. And membership in the same trade association, when considered within a larger body of conspiracy allegations, is relevant in supporting the plausibility of that conspiracy. *See Text Messaging*, 630 F.3d at 628 (allegations that defendants belonged to a trade association and exchanged information directly "identifies a practice, not illegal in itself, that facilitates price fixing that would be difficult for the authorities to detect"); *Evergreen*, 720 F.3d at 49 (communications amongst trade association members "may serve as practices facilitating collusion as they provide a basis for notifying alleged members of the conspiracy of the agreed-upon refusal to deal as well as to keep tabs on members"); *Kleen Prods.*, 775 F. Supp.2d at 1080 (belonging to a trade association or attending industry events not illegal in itself, but may facilitate price fixing).

Similarly, Hospira responds to Plaintiffs' allegations simply by citing cases for the proposition that mere participation in trade association activities is not forbidden by the antitrust

laws. *See* Hospira Mem. at 21 (citing *Moore v. Boating Indus. Ass'n*, 819 F.2d 693, 712 (7th Cir. 1987); *In re Musical Instruments & Equip. Antitrust Litig.,*798 F.3d 1190, 1196 (9th Cir. 2015)). But Plaintiffs never asserted that trade association membership is inherently unlawful; rather, Plaintiffs point to the opportunities to meet and conspire that such activities provided to Defendants here *within the context of their overall anticompetitive scheme*. CAC ¶¶ 113-20. Hospira's reliance on *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 910-11 (6th Cir. 2009) is equally misplaced. *See* Hospira Mem. at 21. In that case, unlike here, the plaintiffs did not plausibly allege collusion in the first place and thus participation in trade association meetings "standing alone" did not support an inference of collusion. *Travel Agent*, 583 F.3d at 908, 910-11.

### 4. Stable or Declining Input Costs Make Plaintiffs' Claim Plausible

Plaintiffs allege that the costs of the primary inputs for IV Saline Solution (such as plastics and resins) were stable or declined during the Class Period and thus Defendants' increased prices cannot be explained by rising costs. CAC ¶¶ 94; 121-25. As reflected in Figure 6 in the CAC, prior to and during the proposed Class Period, the Producer Price Index for plastic remained stable and even dropped sharply during the last quarter of 2014.

#### Figure 6



31

CAC ¶ 123. Moreover, according to an industry report, increased vertical integration in the IV Saline Solution industry as a result of mergers and acquisitions by Defendants safeguarded their profits against any rising costs associated with plastic prices. CAC ¶ 124.

That Defendants' input costs remained stable or declined during the Class Period, while prices for IV Saline Solution increased drastically, is highly indicative of price-fixing and thus is another "plus factor" that supports an inference of collusion.[19] *See In re Domestic Airline Travel Antitrust Litig*., 2016 U.S. Dist. LEXIS 149608, at *50 (finding that an increase in fares despite a decline in fuel costs "support[ed] Plaintiffs' claim that this trend was the result of" collusion); *Haley Paint Co. v. E.I. Dupont De Nemours & Co*., 804 F. Supp.2d 419, 426 (D. Md. 2011) (allegation that prices increased while costs of inputs declined supported plausibility of conspiracy); *see also Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 324 (2d Cir. 2010) (quoting Richard A. Posner, ANTITRUST LAW 88 (2d ed. 2001) ("Simultaneous price increases … unexplained by any increases in cost may therefore be good evidence of the initiation of a price-fixing scheme.").

Hospira contends that the costs of inputs other than plastics and resins *could have* increased and that this *could have* led to the increased prices for IV Saline Solution. Hospira Mem. at 22. But in stating a plausible antitrust claim under *Twombly*, Plaintiffs are not required to identify all possible alternative explanations for the price effects of Defendants' conduct. *See Swanson*, 614 F.3d at 404; *HFCS*, 295 F.3d at 660-61; *Evergreen*, 720 F.3d at 43-47. At the pleading stage, Plaintiffs need only allege sufficient facts that, considered on the whole, support a plausible antitrust claim. *See Twombly*, 550 U.S. at 556; *Swanson*, 614 F.3d at 404; *Anderson News, L.L.C. v. Am. Media, Inc*., 680 F.3d 162, 189-190 (2d Cir. 2012).

---

[19] This is further reinforced by the fact that IV Saline Solution prices increased during a period when Defendants' economies of scale improved, a factor that should have led to lower prices in a competitive market. CAC ¶ 124.

### 5. Baxter's Prior History of Antitrust Violations Supports an Inference of Collusion

This is not the first time that Baxter has been accused of creating a supply shortage of a medical product and using it as a pretext for an unlawful price increase. In 2009, while evaluating the anticompetitive effects of a proposed merger between two manufacturers of blood plasma derivatives, the FTC uncovered evidence regarding "troubling signs of coordinated behavior" among the "tight oligopoly" of firms in the plasma derivatives industry, including Baxter. CAC ¶¶ 130-31. Direct and indirect purchasers of plasma derivatives brought class actions against Baxter and another supplier, alleging that between 2003 and 2009, Baxter and its competitors exploited a supply shortage, restricted output, and increased prices. *See generally Plasma*, 764 F. Supp. 2d 991. Baxter also allegedly engaged in price signaling by using meetings called by the FDA as a means to communicate with its competitors regarding supply levels and distribution of blood plasma. Baxter settled the class actions for $64 million in 2014. CAC ¶ 132.

Defendants respond that the fact that Baxter previously faced antitrust claims is not probative of a conspiracy. Hospira Mem. at 23. But the parallels between the conduct with which Baxter was charged in the prior litigation—conspiring with competitors to restrain output and increase prices, and using FDA processes for price signaling—is strikingly similar to the conduct alleged here. The Seventh Circuit and other courts have made it clear that such prior anticompetitive conduct is a plus factor that supports an inference of conspiracy in a subsequent case. *See HFCS*, 295 F.3d at 661 (defendants' previous participation in a price fixing scheme made it plausible that defendants later conspired to fix prices of a different product); *Andreas*, 216 F.3d at 665 (same); *In re Auto. Parts Antitrust Litig.*, 29 F. Supp.3d 982, 995 (E.D. Mich. 2014) ("Conduct beyond that specific to the Fuel Sender investigation is relevant to support the

33

existence of the Fuel Sender conspiracy."); *Flash*, 643 F. Supp.2d at 1149 (N.D. Cal. 2009) (discussing how involvement in a previous conspiracy can create an inference of a later conspiracy).

### E. DEFENDANTS' CONTENTIONS REGARDING FDA PROCEDURES FAIL TO UNDERMINE THE PLAUSIBILITY OF PLAINTIFFS' CLAIMS

#### 1. Plaintiffs Plausibly Allege That Defendants' Recalls Were Pretextual

Defendants contend that the allegation that Defendants used coordinated product recalls to engineer an IV Saline shortage is implausible because: (i) reputational and other business risks make it unlikely that a manufacturer would recall products unless absolutely required to do so by FDA regulations, and Plaintiffs fail to allege that any of the recalls engineered by Defendants here "was not required by law"; and (ii) an antitrust violator would be unlikely to initiate a recall because to do so would "invite the federal government to investigate the very means by which it was implementing a conspiracy." Hospira Mem. at 9-10, 12. Both of those arguments are contrary to the facts alleged in the CAC (which the Court must accept as true for purposes of this motion to dismiss), and wrong as to the law.

The CAC alleges that before 2012, voluntary recalls of IV Saline Solution were infrequent, sporadic, and primarily issued by a single supplier, Hospira. CAC ¶ 60. Beginning in 2013, however, both Baxter and Hospira began frequently and voluntarily to recall IV Saline Solution within weeks or days of each other, and gave similar reasons for doing so. CAC ¶ 61. *See* § III(A)(1), *supra*. According to Defendants, Plaintiffs' allegation that these recalls were pretextual is implausible because the risks of misleading the FDA and the public are too great. Hospira contends, for example, that recalls can disrupt a manufacturer's operations and damage its reputation in the marketplace, and can trigger current good manufacturing practices

("cGMP") investigations by the FDA as well as product liability and securities lawsuits. Hospira Mem. at 11-14.

This court rejected an almost identical argument by the defendants in *Plasma*, 764 F.Supp.2d at 996. As in this case, Baxter was one of two manufacturer defendants in *Plasma* charged with "attempt[ing] to hide the[ir] conspiracy by falsely reporting supply data to the government," among other things. Despite the defendants' arguments that such allegations were implausible, the court denied defendants' motions to dismiss in their entirety. *Id.* at 999, 1004. Defendants' contention here that no manufacturer might conceivably mislead the FDA or other government agencies for anticompetitive purposes should carry no weight.

Moreover, the stated reasons for Defendants' recalls concerned only technical defects (*e.g.*, "potential for leakage," "potential for punctures," or "missing closures"), CAC ¶ 61, which present no significant risk of the adverse publicity that Defendants assert they were at risk of suffering. None of Defendants' recalls implicated any "extreme risk" (*e.g.*, bacteria or fungi contaminants) that could be characterized under FDA regulations as an "urgent situation[]" that necessitated direct FDA action and required public warnings. *See* 21 CFR § 7.40(a)-(b) ("Recall is a voluntary action that takes place because manufacturers and distributors carry out their responsibility to protect the public health and well-being from products that present a risk of injury or gross deception or are otherwise defective. ... A request by the [FDA] that a firm recall a product is reserved for *urgent situations*") (emphasis added); *id*. § 7.42(b)(2) (public warnings "reserved for urgent situations"); *see also* October 2013 FDA Strategic Plan for Preventing and Mitigating Drug Shortages, at 14, 19[20] (FDA may "exercise regulatory flexibility" in shortage situations involving technical defects, including remediable inorganic "particulate"

---

[20] *Available at* https://www.fda.gov/downloads/drugs/drugsafety/drugshortages/UCM372566.pdf.

contaminants, but has no power to mitigate "more extreme risk" defects as would be presented by bacteria or fungi contaminants). The inconsequential nature of the reasons that Defendants proffered to the FDA for the recalls undermines the claim that the recalls exposed Defendants to reputational or business risk, and supports the plausible conclusion that the real purpose of the recalls was anticompetitive.

That is why Baxter's invocation of the alleged possibility of its "debarment" is hyperbole. *See* Baxter Mem. at 14. In fact, the FDA website shows that not a single firm is currently debarred, much less debarred for alleged product issues as trivial as those offered by Defendants as reason for their recalls of IV Saline Solution.[21] The other dire consequences that purportedly await suppliers who recall products have no basis in fact either. Defendants do not assert that they were subject to cGMP inspections by the FDA, despite having initiated numerous recalls during 2013 to 2015. Nor has either Baxter or Hospira been subjected to product liability or securities litigation as a result of these recalls. *Cf.* Hospira Mem. at 1.

There is similarly no merit to Defendants' speculative assertion that an antitrust violator would be unlikely to initiate a recall because it would "invite the federal government to investigate the very means by which it was implementing a conspiracy." Hospira Mem. at 12. The voluntary recall procedures do not give rise to any such "invitation." In the course of a voluntary recall, the manufacturer is responsible for devising and implementing the recall plan, regardless of whether it is formally approved by the FDA. 21 CFR § 7.42(a)(1)-(2) ("A recalling firm should conduct the recall … but need not delay initiation of a recall pending review of its recall strategy."). The recall itself is also undertaken entirely by the manufacturer. *Id*. § 7.40(a)-(b). The FDA's role in a voluntary recall is limited to (i) an ad hoc "evaluation of the health

---

[21] *See* https://www.fda.gov/ICECI/EnforcementActions/FDADebarmentList/ucm2005408.htm.

hazard presented by a product being recalled or considered for recall," (ii) its assignment to the recall/potential recall of one of three classifications that "indicate the relative degree of health hazard" posed, and (iii) an ongoing assessment of "the progress of the recall" based on required manufacturer-prepared periodic reports. *Id.* §§ 7.41(a)-(b) and 7.53(a). Other than its basic assessment (relying on information provided by the manufacturer) that a recall is technically warranted and its oversight to ensure that recall procedures are adequate, the FDA has very limited involvement in a manufacturer-initiated recall. Where, as in this case, the "health hazard" purportedly posed by a recalled product is inconsequential, that oversight is presumptively minimal. And there is no evidence in the record at this stage as to the content of any of Defendants' manufacturer-prepared periodic reports.

Finally, Hospira asserts that Plaintiffs "fail[ed] to allege that any recall was unwarranted." Hospira Mem. at 10. That assertion is flatly at odds with the facts alleged in the CAC, which: (1) describes Defendants' recalls as "collusive" (¶ 65); (2) characterizes their purpose as "Creat[ing] And Maintain[ing] [Defendants'] Output Control Conspiracy" (¶ 60); (3) uses the words "purported" or "purportedly" in referencing the alleged reasons for every one of the recalls (¶ 61(a)-(e)); and (4) equates the starting date of the conspiracy with the starting date of the recalls. *Compare* CAC ¶ 134 (Class Period begins January 1, 2013) *with* CAC ¶ 61 ("Starting in 2013," Defendants commenced series of recalls).

### 2. Even If Defendants' Recalls Were Required by the FDA, That Would Not Shield Them from Antitrust Liability

Even if Defendants' product recalls were mandated under FDA regulations, however, that would not by itself spare them from antitrust liability. Otherwise lawful conduct may establish antitrust liability where it occurs in the service of an antitrust violation. *See, e.g., Dentsply*, 399 F.3d at 187; *Berkey Photo*, 603 F.2d at 275. And other courts have repeatedly found that

defendants' facially valid actions in dealing with the FDA were indicative of antitrust liability.[22] Hospira asks why Defendants would "conspire to do something that is mandated by law in any event?" Hospira Mem. at 10. The answer is simple—because regardless of whether Defendants' concerted, parallel product recalls technically complied with FDA regulations, they were designed to create a supply shortage that duopolistic Defendants could (and did) unlawfully exploit to raise prices to supra-competitive levels.

In any event, the question of whether Defendants' recalls were in fact specifically "mandated by law" is one that, contrary to Defendants' claims, has not been (and cannot appropriately be) answered at the pleading stage of this lawsuit. *See Plasma*, 764 F.Supp.2d at 1002 n.10 ("[T]he Supreme Court has [] recognized that Congress drafted the antitrust laws with the express purpose of encouraging private enforcement. If private plaintiffs, who do not have access to inside information, are to pursue violations of the law, the pleading standard must take into account the fact that a complaint will ordinarily be limited to allegations pieced together from publicly available data." (citations omitted)). [23]

---

[22] *See, e.g.*, *Caraco Pharmaceutical Labs., Ltd. v. Novo Nordisk*, 132 S. Ct. 1670, 1687 (2012) (brand-name pharmaceutical manufacturers may abuse FDA patent-information submission rules to improperly delay generic competition); *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 694 (2d Cir. 2008) (reversing dismissal of antitrust claims based in part on defendant's alleged abuse of FDA's citizen petition process); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, 64 F. Supp. 3d 665, 690-91 (E.D. Pa. 2014) (denying motion to dismiss where abuse of FDA citizen petition process "caused antitrust injury by delaying Generic entry"); *In re Remeron Antitrust Litig.*, 335 F. Supp. 2d 522, 532 (D.N.J. 2004) (denying motion to dismiss because "if a patent-holder's actions…use a lawful patent to manipulate the [FDA's] ANDA process, such actions could lead to anticompetitive effects").

[23] At this time, Plaintiffs are, of course, unable to prove either that Defendants' recalls were unnecessary or what they cost Defendants. Nor are Plaintiffs required to prove anything of the sort at the pleading stage. Nonetheless, Plaintiffs have issued a FOIA request to the FDA regarding those recalls, with the expectation that the materials produced by the FDA will show the circumstances surrounding Defendants' recalls were far less dire than what they posited in their motion papers.

F.       PLAINTIFFS ALLEGE ANTITRUST INJURY AND STANDING

Defendants contend that the CAC should be dismissed because it fails to plead "antitrust injury caused by the conspiracy and antitrust standing to challenge it."  Baxter Mem. at 21. According to Defendants, Plaintiffs would have paid the same prices for IV Saline Solution regardless of whether the shortage was attributable to collusion or to independent factors, and thus Plaintiffs cannot plead causation and antitrust injury. *Id*. But if Defendants had not conspired to restrain output of IV Saline Solution, there would have been *no shortage* and thus no inflated prices. Defendants' argument is frivolous, and Plaintiffs have properly alleged antitrust injury and standing.

A plaintiff claiming damages in an antitrust case must allege "antitrust injury," that is, "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  Plaintiffs easily satisfy the *Brunswick* standard here.  Plaintiffs plausibly allege that Defendants colluded to restrain output of IV Saline Solution (CAC ¶¶ 58-79), that Defendants' collusive scheme had the purpose and effect of raising prices of IV Saline Solution to supra-competitive levels (CAC ¶¶ 80-92), and that Plaintiffs and the members of the Class paid higher prices for IV Saline Solution than they would have paid in the absence of Defendants' conspiracy (CAC ¶¶ 142-45). Plaintiffs specifically allege that: IV Saline prices, including prices paid by Plaintiffs, increased 200-300% because of the shortage (CAC ¶¶ 56, 83); prices began increasing in mid-2013 and continue to rise today (CAC ¶ 81); Defendants publicly touted those price increases and their effects on Defendants' profits (CAC ¶¶ 85-90); Plaintiffs have no option but to purchase IV Saline Solution regardless of price (CAC ¶¶ 105-08); and Plaintiffs were injured as a result of having paid higher prices for IV Saline Solution than they would have paid in the absence of Defendants' collusion (CAC ¶ 145).

39

Equally frivolous is Defendants' contention that Plaintiffs lack standing to pursue their antitrust claims. Plaintiffs clearly allege that they purchased IV Saline Solution at unlawfully inflated prices directly from Defendants (CAC ¶¶ 28-31), and thus their standing to prosecute their claims cannot be disputed. *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519, 537-44 (1983) (holding that only those directly injured by defendants' unlawful conduct may recover antitrust damages); *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 734-35 (1977) ("[T]he antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers").

None of the cases cited by Defendants is to the contrary. *See Brunswick*, 429 U.S. at 488-89 (no standing where small-business plaintiffs lost business to competitors that were acquired by large corporate defendant); *Fisher v. Aurora Health Care, Inc.*, 558 Fed. App'x 653, 655-56 (7th Cir. 2014) (dismissing physician's claim where alleged injury attributable to hospital's staffing decision was remote); *Serfecz v. Jewel Food Stores*, 67 F.3d 591 (7th Cir. 1995) (commercial landlord lacked standing to prosecute antitrust claim against company that competed with landlord's potential tenants); *Oliver v. SD-3C LLC*, No. 11-CV-01260-JSW, 2016 U.S. Dist. LEXIS 146427, at *29-32 (N.D. Cal. Sept. 30, 2016) (denying standing where indirect purchaser plaintiffs could not allege causal link between their alleged injury and defendants' conduct); *Potash*, 667 F. Supp.2d at 940-41 (denying standing where indirect purchaser plaintiffs could not allege that direct purchasers had passed on an overcharge).

## G.   *NOERR-PENNINGTON* DOES NOT REQUIRE DISMISSAL OF THE COMPLAINT

*In Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136-37 (1961), the Supreme Court held that lobbying legislative officials is immune from antitrust scrutiny. In *United Mine Workers v. Pennington*, 381 U.S. 657, 669 (1965), the Court

40

acknowledged that similar immunity extended to lobbying administrative agencies. Defendants'
contention that Plaintiffs' claims must be dismissed under the *Noerr-Pennington* doctrine (*see*
Baxter Mem. at 26-28) fails for two principal reasons. First, *Noerr-Pennington* does not apply at
all because a voluntary recall does not constitute petitioning. Second, even if a voluntary recall
were generally petitioning activity, Defendants' activity is outside the scope of *Noerr-
Pennington* protection because they knowingly made material and false representations to the
government. Plaintiffs have plausibly alleged that the recalls were pretextual vehicles for supply
restrictions directed at justifying anticompetitive saline prices (CAC ¶¶ 59-65), and that
Defendants used recall-related communications with the FDA as means of signaling to one
another about their implementation of the conspiracy, CAC¶¶ 66-75. Therefore, there are no
grounds for dismissing the complaint under *Noerr-Pennington*.

### 1. A Voluntary Recall Does Not Constitute Petitioning Activity

The *Noerr-Pennington* doctrine applies only to petitioning activity—that is, activity
undertaken with the goal of persuading the government to make a particular decision following
its "independent review of the merits." *In re Buspirone Patent Litig.*, 185 F. Supp. 2d 363, 369
(S.D.N.Y. 2002). It does not apply where, as here, the government does not conduct an
"independent review of the validity of the [private party's] statements, does not make or issue
any intervening judgment and instead acts in direct reliance on the private party's
representations." *Id.* at 370.

Thus, compliance with a "mere *incident* of regulation," such as making certain
administrative filings as a prerequisite for implementing a previously made business decision, is
not petitioning activity immunized under *Noerr-Pennington*. *Litton Sys., Inc. v. Am. Tel. & Tel.
Co.*, 700 F.2d 785, 807 (2d Cir. 1983) (emphasis added). In *Litton*, the Second Circuit held that
a firm's decision to implement a tariff, and its subsequent filing of that tariff with the appropriate

agency, did not constitute a petition for government action and thus did not confer *Noerr-Pennington* immunity. *Id*. at 807-08. There, "[t]he decision to impose and maintain the interface tariff was made in the AT&T boardroom, not at the FCC," and its anticompetitive effect "resulted not from the FCC's regulatory authority but from AT&T's" own actions and status in the marketplace. *Id*. at 807. That was true even though the federal agency could (and after a decade of proceedings, ultimately did) set aside the tariff: the mere act of filing did not "transform AT&T's independent decisions as to how it will conduct its business into a 'request' for governmental action or an 'expression' of political opinion." *Id*.; *accord MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1155 n.113 (7th Cir. 1983); *In re Wheat Rail Freight Rate Antitrust Litig.*, 579 F. Supp. 517, 537 (N.D. Ill. 1984).

As in *Litton*, Defendants' regulatory filings here did not constitute requests for FDA action or expressions of political opinion regarding recalls, and their conduct therefore is not immunized under *Noerr-Pennington*. The Complaint alleges that Defendants made business decisions to implement a series of voluntary recalls to create artificial shortages of IV Saline Solution, thereby permitting Defendants to inflate prices. CAC ¶¶ 61-65. Under the applicable federal regulations, a "[r]ecall may be undertaken voluntarily and at any time by manufacturers and distributors" or by request of the FDA. 21 C.F.R. § 7.40(b). In the case of a voluntary recall, the initiating firms draft their own recall strategy. 21 C.F.R. § 7.42(a). Although the FDA reviews a firm's recall strategy, the firm "need not delay initiation of a recall pending review of its recall strategy." 21 C.F.R. § 7.42(a)(2). In other words, the FDA does not undertake an independent review of the merits or veracity of the voluntary recall and thus there is no petitioning within the meaning of *Noerr-Pennington*.

42

Defendants contend in a conclusory manner that "[t]he recall and shortage notifications the CAC describes clearly were designed to influence administrative action …." Baxter Mem. at 27. But Defendants do not illuminate what sort of independent evaluation FDA might have made as a result of a Defendant's decision to institute a voluntary recall. Indeed, Defendants did not request any particular FDA action by initiating their own voluntary recalls. On the contrary, they took private business decisions, made the regulatory filings required to implement those business decisions, and proceeded to implement those business decisions without any obligation to await FDA review, evaluation, or oversight. Because Defendants cannot credibly claim that they were petitioning the FDA by implementing their voluntary recalls, their conduct is not exempt from antitrust scrutiny under *Noerr-Pennington*.

### 2. Plaintiffs Have Alleged the Voluntary Recalls Were Shams

Even if the Court were to conclude that Defendants' voluntary recalls somehow constituted petitioning activity, Defendants still are not protected under *Noerr-Pennington*. Had the FDA reviewed Defendants' voluntary recalls, any such review would have been adjudicative, based upon the record submitted by Defendants and the applicable regulatory standards. *See, e.g.*, 21 C.F.R. § 7.41 (assignment of recall classification, *i.e.*, Class I, Class II, or Class III); § 7.42 (considerations to be addressed in a recall strategy); *and see generally Mercatus Grp.,* 641 F.3d at 845-46 (describing hallmarks of adjudicative proceedings). Intentional, material misrepresentations made in adjudicative proceedings cause the notification to be a sham and therefore not immunized under *Noerr-Pennington*. *Mercatus Grp.*, 641 F.3d at 843-44; *accord Kottle v. Northwest Kidney Ctrs.*, 146 F.3d 1056, 1060 (9th Cir. 1998). Plaintiffs have alleged that Defendants' voluntary recalls were the result of collusion and not based on legitimate public health needs, CAC ¶¶ 59-65, and that Defendants used their recall-related communications with the FDA as a means of signaling each other about the conspiracy, CAC ¶¶ 66-75. Because this

43

Court must accept those allegations as true for purposes of deciding Defendants' motion, Defendants cannot establish that they are entitled to *Noerr-Pennington* immunity.

### H. NONE OF DEFENDANTS' OTHER ARGUMENTS WARRANT DISMISSING THE COMPLAINT

#### 1. Plaintiffs' Allegations Are Sufficiently Detailed

Hospira summarily claims that Plaintiffs' allegations are "purely conclusory," on the premise that the complaint "furnishes no clue how the conspiracy was supposed to have worked." Hospira Mem. at 18-19. But the CAC sets out in detail how the conspiracy was supposed to work (and did work). Moreover, the detail Hospira demands is at odds with its acknowledgement (in which Baxter joins) that Plaintiffs may rely strictly on circumstantial evidence to properly allege Defendants' conspiracy. *See* Hospira Mem. at 3-4; Baxter Mem. at 9-10. In any event, Plaintiffs' allegations are more than sufficient to "set forth the general scope of the conspiracy and the role of each Defendant in the conspiracy." *Mainline Info. Sys. v. Benkendorf*, No. 10 C 1264, 2010 U.S. Dist. LEXIS 50541, at *10 (N.D. Ill. May 20, 2010); *see also Plasma*, 764 F. Supp. 2d at 999 ("The Court did not establish a heightened pleading requirement for antitrust cases. Rule 8 applies in this context, and it requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" (internal citations omitted)).[24]

---

[24] Baxter relies on *United States ex rel. Lisitza v. PAR Pharm. Cos.*, No. 06 C 06131, 2013 U.S. Dist. LEXIS 31224 (N.D. Ill. Mar. 7, 2013) (Tharp, J.), in which this Court dismissed the complaint because plaintiff had not satisfied the applicable Rule 9(b) pleading standard. The CAC here need only satisfy the requirements of Rule 8.

Baxter also relies throughout its opposition on *House of Brides, Inc. v. Alfred Angelo, Inc.*, No. 11 C 07834, 2014 U.S. Dist. LEXIS 167887 (N.D. Ill. Mar. 7, 2013) (Tharp, J.), in which this Court granted a motion to dismiss in an antitrust case. *See* Baxter Mem. at 11, 12, 20, 22, 23, 26. *House of Brides* is readily distinguishable from this case, because the plaintiff there failed to allege a plausible relevant product market, it conceded that it needed discovery to support its claims, it failed to allege that the defendant participated in either a vertical or horizontal boycott, and (with respect to its Robinson-Patman Act claim) failed to allege that defendant had sold its products to other purchasers at lower prices.

The sufficiency of Plaintiffs' factual allegations is even underlined by the cases upon which Hospira relies in this context. *See* Hospira Mem. at 18-19. In *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d 129, 139-40 (2d Cir. 2013), the court upheld dismissal where plaintiffs primarily alleged only scattered communications *within* a defendant company, rather than the signaling and concerted action *between* defendants that Plaintiffs allege here. In *Musical Instruments*, 798 F.3d 1186, the Ninth Circuit held that mere allegations of parallel conduct, without more, were insufficient to survive a motion to dismiss. The complaint in *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1075 (E.D. Cal. 2011), was so lacking in specifics that the allegations did "not put Defendants on notice with enough sufficiency to form the basis for a response." *Id.* at 1075. Hospira cannot claim any such deficiency in this case.

### 2. Plaintiffs Are Not Required to Allege That Defendants Specifically Colluded As to Price

Baxter tries to make much of the fact that Plaintiffs do not allege a specific agreement between the Defendants to fix prices. Baxter Mem. at 10. But the Supreme Court has held that "[a]n agreement on output also equates to a price-fixing agreement. . . . [R]aising price, reducing output, and dividing markets have the same anticompetitive effects." *California Dental Ass'n v. F.T.C.*, 526 U.S. 756, 777 (1999) (quoting *General Leaseways, Inc. v. National Truck Leasing Assn.*, 744 F.2d 588, 594-595 (7th Cir. 1984) (Posner, J.)). *See also Kleen Prods.*, 775 F. Supp. 2d at 1077 n.6 ("Plaintiffs can prove relevant parallel activity by showing either direct price-fixing or by showing output-restriction alone.") (citing *General Leaseways*, 744 F.2d at 594-95).

More recently, the court in *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 867 (N.D. Ill. 2010), held that "[a]n agreement among competitors to restrict the production of a certain good equates to a price-fixing agreement, because conspiracies to limit output are

designed to raise, stabilize, or otherwise fix the price of goods." And the fact that Defendants reduced supply via unnecessary recalls rather than restricting their output is again of no moment. As the *Sulfuric Acid* court noted, the Supreme Court, in the seminal case of *U.S. v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 190-91 (1940), held defendants liable for price-fixing where they "bought up surplus gasoline to remove it from the market." *Sulfuric Acid*, 743 F. Supp. 2d at 870.

Baxter fares no better as to the facts regarding its prices. Baxter alleges that Plaintiffs "plucked" the fact that Defendants doubled or tripled their prices from a single source. *See* Baxter Mem. at 11. But the articles cited in the CAC[25] are replete with evidence to similar effect. One doctor observed that "[t]he price [of IV Saline] went way up—it was five, maybe six times what we were accustomed to paying per bag."[26] A Novation purchaser said in June 2014 that he expected IV Saline "could double and triple in some aspects."[27] Another group purchasing organization ("GPO") related that its supplier proposed a "300% increase in price."[28] Baxter does not—and cannot—proffer evidence to the contrary at this stage.

### 3. Plaintiffs Are Not Required to Allege an Enforcement Mechanism

Citing no authority from this Circuit, no case law addressing Rule 12 standards, no federal case law within the last twenty years, and no case law from the last decade, Hospira

---

[25] *Tucker v. Charles Schwab Bank*, No. 12 C 03399, 2014 U.S. Dist. LEXIS 68098, at *3 (N.D. Ill. May 19, 2014) (Tharp, J.) ("In deciding a motion to dismiss, 'a court may consider, in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice'").

[26] *See* CAC ¶6 n.3 (citing Lena J. Weiner, "Basic Emergency Department Meds in Short Supply," HEALTHLEADERS MEDIA, (June 12, 2015), http://www.healthleadersmedia.com/quality/basic-emergency-department-meds-short-supply).

[27] *See* CAC ¶5 n.2 (citing April Dembosky, KQED, "Saline shortages create troubles for U.S. hospitals," PBS NEWSHOUR, (Jun. 25, 2014), http://www.pbs.org/newshour/rundown/saline-shortages-create-troubles-u-s-hospitals/).

[28] *See* CAC ¶53 n.13 (citing Lena J. Weiner, "IV Fluids Shortage Continues in Hospitals," HEALTHLEADERS MEDIA, (Sept. 25, 2014), http://www.healthleadersmedia.com/quality/iv-fluids-shortage-continues-hospitals).

contends that "[e]ssential to any antitrust conspiracy is a mechanism to detect and punish cheating." Hospira Mem. at 19. But there is no requirement that, to state a plausible claim under *Twombly*, a plaintiff must expressly allege the existence of a mechanism for the conspirators "to detect and punish cheating." *See Text Messaging*, 630 F.3d at 627-28 (stating that where there is "an industry structure that facilitates collusion" and where defendants control 90 percent of the market, "it would not be difficult for such a small group to agree on prices and to be able to detect 'cheating' … without having to create elaborate mechanisms … that could not escape discovery by the antitrust authorities"); *Potash*, 667 F. Supp. 2d at 937 ("Plaintiffs need only assert 'plausible grounds to infer' that an illegal agreement was made") (citing *Twombly*, 550 U.S. at 556).

### 4. The Excuses Proffered by Defendants Fail to Explain the Continuing IV Saline Solution Shortage

Defendants' alternative explanations and pretexts for the IV Saline Solution shortages do not justify the shortages or the resulting price increases. The bipartisan group of Senators recognized that, although "prices tend to increase during a shortage," the price increases for IV Saline Solution "appear to be outside the bound of natural market forces." CAC ¶ 91. An economist at the Kellogg School of Business at Northwestern University agreed, stating that "[s]aline shortages are something that shouldn't happen, they baffle economists." CAC ¶ 92.[29] The Senators further told the FTC that "[t]he ongoing shortage, the fact that the shortage has not cleared even with significant price increases, and the behavior reported by hospitals raises questions about potential coordination between the saline suppliers." CAC ¶ 91.

---

[29] Valerie Lapointe, "Hospital Drug Shortages: What is Really Causing Them?," MEDILL REPORTS CHICAGO (May 26, 2016), http://news.medill.northwestern.edu/chicago/hospital-drug-shortages-what-is-really-causing-them/ (cited in CAC ¶92 n.19) (Baxter Mem. Ex. 2).

Nor can a purportedly harsh flu season in 2013-14 justify the extended IV Saline Solution shortage that continues through today, and the consequent and sustained 200%-300% price increases. The U.S. Centers for Disease Control and Prevention estimated that 200,000 people on average were hospitalized from seasonal influenza-related complications each year between 1979 and 2001. CAC ¶¶ 127-28. During earlier major flu outbreaks, however, there was no corresponding nationwide shortage of, or significant increase in prices for, IV Saline Solution. CAC ¶ 127. For example, during the notable 2009 to 2010 global pandemic of the swine flu, or H1N1 virus, it was estimated that over 274,000 people in the United States were hospitalized due to the swine flu, in addition to those hospitalized for the regular flu season. CAC ¶ 128. Yet there was no shortage of, or substantial price increase for, IV Saline Solution during that time. *Id.* The continuing shortage of, and sustained price increases for, IV Saline—for which Defendants offer no explanation—are unprecedented. *See Text Messaging*, 630 F.3d at 628 (noting that "'complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason' would support a plausible inference of conspiracy" (citing *Twombly*, 550 U.S. at 557 n.4)); *Std. Iron Works*, 639 F. Supp.2d at 886 ("massive and unprecedented production cuts" supported a plausible inference of conspiracy).

### 5. Sources Cited in the Complaint Do Not Contradict Plaintiffs' Allegations of Collusion

Baxter contends that certain articles cited in the CAC contradict Plaintiffs' allegations of a price-fixing conspiracy because GPOs offer hospitals and other purchasers long term contracts and therefore "protracted periods of price protection." Baxter Mem. at 7, 22. Baxter then changes course apparently to blame GPOs for the IV Saline shortages that underlie Plaintiffs' price-fixing claims. Baxter Mem. at 22-23. Referring to articles cited in the CAC, Baxter

contends that the shortages here are attributable to the fact that GPOs purportedly pay suppliers "just enough to cover production, and not enough to reinvest into maintaining facilities, or replacing aging equipment,"[30] and that the "'five biggest GPOs have outsize control over the drug supply" and use it to 'erod[e] [manufacturers'] ability to invest' in production operations."[31] Baxter Mem. at 23. But Baxter does not—and cannot—proffer any evidence tending to suggest that the alleged influence of GPOs grew concurrent with the Class Period, in such a way as to force Defendants to double or triple their prices. Moreover, contrary to Baxter's characterization, neither article (nor any other sources that Plaintiffs cite) blames GPOs for the IV Saline shortages.

Baxter's claim in this context is yet another example of its improperly creating factual disputes at the pleading stage. *See, e.g.*, *Evergreen*, 720 F.3d at 45 ("At these early stages in the litigation, the court has no substantiated basis in the record to credit a defendant's counterallegations. Instead, we may at this early stage only accept as true all factual allegations contained in a complaint, make all reasonable inferences in favor of the plaintiff, and properly refrain from any conjecture as to whether conspiracy allegations may prove deficient at the summary judgment or later stages."). Plaintiffs allege detailed facts reflecting that the IV Saline shortage and resulting massive price increases were the result of Defendants' collusive conduct, allegations that the Court is required to accept as true for purposes of this motion to dismiss. CAC ¶¶ 58-92. That is the only thing that matters at this stage of the case.

---

[30] (Quoting Baxter Mem. Ex. 2 (cited in CAC ¶11 n.5)).

[31] (Quoting Baxter Mem. Ex. 4, Erika Fry, "There's a national shortage of saline solution. Yeah, we're talking salt water. Huh?" FORTUNE (Feb. 5, 2015), http://fortune.com/2015/02/05/theres-a-national-shortage-of-saline/ (cited in CAC ¶42 n.7)).

**IV.     PLAINTIFFS REQUEST LEAVE TO FILE AN AMENDED COMPLAINT IF DEFENDANTS' MOTION IS GRANTED**

For these reasons, Plaintiffs believe that Defendants' motions to dismiss Plaintiffs' CAC should be denied in their entirety. If, however, the Court grants the motions, Plaintiffs request leave to file an amended complaint. This Court has repeatedly cited the Seventh Circuit's holding in *Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 519 (7th Cir. 2015), for the rule that "a plaintiff whose original complaint has been dismissed under Rule 12(b)(6) should be given at least one opportunity to try to amend her complaint before the entire action is dismissed." *See Lugo v. Int'l Bhd. of Elec. Workers Local #134*, 175 F. Supp. 3d 1026, 1041 (N.D. Ill. 2016) (Tharp, J.); *Weddle v. Smith & Nephew, Inc.*, No. 14 C 09549, 2016 U.S. Dist. LEXIS 48512, at *20-21 (N.D. Ill. Apr. 11, 2016) (Tharp, J.). The Seventh Circuit reiterated that rule in recent weeks. *See Anicich v. Home Depot U.S.A., Inc.*, No. 16-1693, 2017 WL 1101090, at *3 (7th Cir. Mar. 24, 2017) (citing *Runnion*). *See also Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011) ("[A] motion to dismiss under Rule 12(b)(6) is not a responsive pleading and so, if an answer has not been filed, a plaintiff ordinarily retains the ability to amend his complaint once as a matter of right, even after a court grants a motion to dismiss."), *cited in Lugo* and *Weddle*. There is no reason why this case should be an exception to that rule.

## V.     CONCLUSION

For the reasons set forth in this memorandum, Defendants' motions to dismiss the CAC should be denied.


Dated: April 7, 2017                     Respectfully Submitted,

By: */s/ Robert J. Wozniak*
Steven A. Kanner
William H. London
Douglas A. Millen
Robert J. Wozniak
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile: (224) 632-4521
skanner@fklmlaw.com
wlondon@fklmlaw.com
dmillen@fklmlaw.com
rwozniak@fklmlaw.com

*Interim Liaison Counsel for Plaintiffs and the Putative Class*

Hollis Salzman
Eamon O'Kelly
Meegan Hollywood
ROBINS KAPLAN LLP
399 Park Avenue
Suite 3600
New York, NY 10022
(212) 980-7400
hsalzman@robinskaplan.com
eokelly@robinskaplan.com
mhollywood@robinskaplan.com

51

W. Joseph Bruckner
Heidi M. Silton
Brian D. Clark
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900
wjbruckner@locklaw.com
hmsilton@locklaw.com
bdclark@locklaw.com

Linda P. Nussbaum
Bart D. Cohen
Hugh D. Sandler
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
(917) 438-9189
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com
hsandler@nussbaumpc.com

*Interim Co-Lead Counsel for Plaintiffs and the Putative Class*