UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WASHINGTON COUNTY HEALTH CARE AUTHORITY, INC., et al., | Case No. 1:16-cv-10324 |
| Plaintiffs, | Hon. John J. Tharp, Jr. |
| v. | |
| BAXTER INTERNATIONAL INC., et al., | **JOINT LETTER BRIEF REGARDING ESI PROTOCOL AND PROTECTIVE ORDER (ECF NO. 97)** |
| Defendants. | |

<u>**JOINT LETTER BRIEF REGARDING ESI PROTOCOL**</u>
<u>**AND PROTECTIVE ORDER (ECF NO. 97)**</u>

Pursuant to the Court's Order on May 12, 2017 (ECF No. 97), the parties submit this joint letter brief regarding their agreed upon and disputed provisions for the ESI Protocol and Protective Order.

## I.  ESI PROTOCOL

The parties have met and conferred several times and exchanged numerous emails over the past few months in an effort to narrow differences regarding the ESI Protocol.  As a result, the attached Exhibit A reflects substantial agreement by the parties.  For those provisions of the ESI Protocol on which the parties have been unable to reach agreement, there are bracketed placeholders included in Exhibit A and the parties' corresponding proposals are provided in Exhibit B to facilitate efficient resolution of the issue by the Court.  The parties' positions regarding the disputed provisions in Exhibit B are addressed below.

### A.  <u>**Plaintiffs' Position**</u>

The primary remaining ESI Protocol disputes between the parties concern transparency and efficiency. Plaintiffs seek to inject greater transparency into the search and production process to ensure that all appropriate materials are gathered and produced. Defendants' proposals generally render the process more opaque.  Plaintiffs also seek to ensure discovery proceeds efficiently without delays for technical ESI issues the parties are in a position to anticipate and resolve right now.

#### <u>**§ II(G) (Non-Responsive Attachments, Ex. B at p. 1)**</u>

Defendants propose they be permitted, without any clear limits or parameters, to withhold purportedly "non-responsive" attachments to otherwise responsive emails.  Federal Rule of Civil Procedure 34(b) and Federal Rule of Evidence 106 require a party to produce emails and

attachments together where one portion of the "family" of documents is responsive to a document request. Fed. R. Civ. P. 34(b) (requiring production of documents "as they are kept in the usual course of business"); Fed. R. Evid. 106 (stating that if a part of a document is used as evidence, the party offering it must produce the entire document if it "ought in fairness" be considered as a whole.).  It is not burdensome or unreasonable for Defendants to do so here, as Defendants of course store emails and attachments together in their email systems, and in fact it takes *additional* effort and expense to remove them from production.  Further, even if a document contains sensitive or confidential information, the agreed-upon provisions of the protective order offers the parties adequate protection.

The immediate effect of Defendants' request is it will slow down the production of documents as Defendants segregate and withhold certain documents from otherwise responsive document families and may well lead to inefficient motion practice.  Withholding email attachments first, then requiring Plaintiffs to object piecemeal as they review documents, is inefficient and illogical.  The Court should reject Defendants' request to permit the withholding on relevancy grounds of email attachments that are part of a responsive family of documents.

To the extent any party can concretely identify certain categories of non-responsive attachments, Plaintiffs remain open to negotiating language that allows such documents to be excluded from production.  For example, if there are categories of weekly reports sent via email to a group of business managers, but one category is entirely non-responsive because it relates to an irrelevant drug or product, then the parties could agree to permit the withholding of such documents.  However, even in this instance, the devil is in the details, as an email attachment regarding a purportedly irrelevant drug would be highly relevant if it described other

conspiratorial conduct between Baxter or Hospira relating to a different drug, as this would give context and help explain the alleged conspiracy concerning intravenous saline products.

### § III(B) (Local Time Zone, Ex. B. at p. 2)

Baxter and Plaintiffs both plan to standardize the time zone reflected in emails and other ESI to Central Time Zone, which is where this case is proceeding and both Defendants are headquartered. Hospira seeks to standardize all time zones to Coordinated Universal Time ("UTC"), which will result in emails not accurately reflecting the time (and in some cases, day) they were actually sent. UTC also does not always switch to daylight savings time on the same day (or even week) as Central Time Zone, resulting in a range of five to seven hour differences between Central Time Zone and UTC, which makes Plaintiffs' task of correlating emails with potentially conspiratorial phone calls and other communications extremely difficult if not impossible. For example, in Plaintiffs' experience, deposition witnesses are confused when shown an email that was sent at 8:00 p.m. Central on a Friday evening, but due to UTC standardization, indicates on the face of the printed email that it was sent at 2:00 a.m. on a Saturday morning. Nevertheless, Plaintiffs are willing to accept Hospira's proposal so long as Hospira includes a metadata field showing the original time zone from which an email was sent. There is no technical barrier to doing so since Hospira's ESI vendor will use the very same metadata field to standardize time to UTC.

### § IV(B)(1) (Search Process Parameters, Ex. B at pp. 2-4)

The primary difference between the parties' search process provisions is that Plaintiffs' proposal addresses a number of known technical issues that are important to address early in litigation. The most important issue relates to the use of Technology Assisted Review ("TAR") to cull ESI document sets. Plaintiffs have agreed that as an alternative to keyword searching, a

party may use TAR—in other words, a party may choose to use either keywords or TAR to cull document sets *in lieu* of manually reviewing all potentially relevant documents. But Defendants' proposal permits a party to double-cull document sets subject to TAR—i.e., they propose a party cull document sets with keyword search terms and then cull document sets *again* using TAR—all before an attorney assesses whether specific documents are appropriate to exclude from production as non-responsive. This approach magnifies the errors inherent in keyword searching while limiting the ability of TAR to locate responsive documents in the full set of documents a producing party identifies as potentially relevant. Further, it is inherently inefficient because it requires months of additional negotiations for both keyword search terms and a TAR process. Defendants' suggestion of pre-culling document sets with keywords before using TAR could lead to gamesmanship and an inefficient double-negotiation of search parameters—namely, a producing party can engage the requesting party in lengthy negotiations concerning keyword search terms, then turn around at the end of the process and declare that it will now also use TAR to further limit the already narrowed document set, requiring a further negotiation of search methodology.

Defendants' proposal ignores the inherent trade-off associated with implementing TAR. Defendants are benefitted by the substantial savings in terms of time and money that would otherwise be expended in manually reviewing documents for responsiveness. In return, Plaintiffs are entitled to have this significantly more efficient methodology, which is better able to identify coded language and semantically similar words, deployed on the complete set of potentially responsive documents. *See Progressive Casualty Ins. Co. v. Delaney*, 2014 WL 3563467, *8 (D. Nev. July 18, 2014) ("the traditional ways lawyers have culled the universe of potentially responsive documents for production—manual human review, or keyword searches—

5

are ineffective tools to cull responsive ESI in discovery."). There is no technological or cost justification for subjecting the TAR data set to pre-culling with keyword search terms. All or nearly all modern document review systems load a complete document set to a review platform for purposes of applying keyword searches or TAR. Further, any concerns Defendants may have regarding data hosting costs would be mitigated by a schedule that sets a deadline for substantial completion of document production.

The Honorable Magistrate Judge Peck, a leading authority on e-discovery issues, has criticized the use of keywords to pre-cull a document set before implementing TAR. *See Rio Tinto PLC v. Vale S.A. (Rio Tinto II)*, 2015 WL 4367250, *2 (S.D.N.Y. July 15, 2015) ("The Court itself felt bound by the parties' protocol, such as to allow keyword culling before running TAR, even though such pre-culling should not occur in a perfect world."). Moreover, this approach has been outright rejected by courts where a party unilaterally seeks to do so without the consent of the requesting party. *See Progressive Casualty Ins. Co. v. Delaney,* 2014 WL 3563467, at *10 (rejecting defendant's proposal to apply TAR to a "to a small subset of the universe of ESI collected"). Similarly, experts in the area of TAR do not agree that it is appropriate to pre-cull documents sets before using TAR. *See Rio Tinto*, 2015 WL 4367250, n.1 (Magistrate Judge Peck noting that "the Court is aware from Ms. Grossman's published writings, and from panels we have done together, that on the issue of keyword culling before using TAR, [ESI expert] Ms. Grossman's views are not supportive of [the producing party's] position in this case."); Speros, J. William, *Predictive Coding's Erroneous Zones Are Emerging Junk Science*,[1] e-discoveryteam.com blog (Apr. 28, 2013) ("excluding responsive documents from the predictive coding [(aka, TAR)] space stunts its intelligence. . . . By improperly withholding

---

[1] https://e-discoveryteam.com/2013/04/28/predictive-codings-erroneous-zones-are-emerging-junk-science/?shareadraft=517d80048f827

6

responsive documents from predictive coding engine's analysis, attorneys are not only denying the likelihood that responsive documents will ever be produced but dumbing-down the predictive coding intelligence and, thereby, driving-down its value.").

Plaintiffs ask that the Court adopt Plaintiffs' proposed ¶ IV(B)(1), which prohibits double-culling of document sets subject to TAR and provides a general framework for the parties to negotiate a search methodology in this case.

### § IV (C) (Custodial Cellphone & Personal Communications Data, Ex. B at p. 4)

Nearly every adult in the United States uses a cellular phone and many also have one or more social media accounts. Defendants' employees who use such devices and accounts will have generated a large amount of ESI potentially relevant to the matters in this case. Accordingly, the ESI Protocol must address how the parties should produce relevant information from document custodians' cellphones and social media accounts. Additionally, in an antitrust conspiracy such as this, inter-Defendant contacts are critical, so Plaintiffs propose a provision that specifies how document custodians' contacts (i.e., names, phone numbers, and other information) will be produced.

Defendants' argument that an ESI Protocol should not address cellphone data boils down to this: their employees could not have used cellphones to communicate regarding their work because one Defendant, Baxter, had a written policy said they should not do so, assumes a level of policy compliance that virtually no workplace could ensure. The argument is no different than when a company cites its antitrust compliance policy as proof it could not have violated the antitrust laws, which if true, would mean there would be no antitrust conspires because nearly every large company has such an antitrust compliance policy. Not only does Defendants' argument that cellphones will not be a relevant data source here defy logic, but it also defies the

experience of other litigation involving Defendants' competitors in the pharmaceutical industry, whose employees used cellular telephone calls and text messages to facilitate illegal agreements to fix the price of generic drugs.[2]

These issues should be addressed now in the ESI Protocol and Plaintiffs respectfully request that the Court adopt Plaintiffs' proposal.

### § VI(F) (Legal Hold Release, Ex. B at p. 6)

Defendants propose that they be permitted to delete data they have preserved in connection with this lawsuit after the completion of discovery. Frankly, there are simply too many unknowns before discovery has even commenced to know whether certain data should be preserved after the completion of discovery. Moreover, Defendants' proposal runs counter to established law requiring preservation of relevant data through appeals of any dispositive rulings. Plaintiffs are willing to discuss the lifting of a litigation hold before the running of any applicable appeals in this case, but it is simply not feasible or necessary to do so now.

### B. Defendants' Position

At the March 14, 2017 status conference in this matter, the Court ruled that in light of the Defendants pending motions to dismiss and the nature of the case, discovery would not proceed at this time because "there is a legitimate need to make sure that there is a viable complaint that can go forward" before discovery begins. (Ex. F, 3/14/17 Tr. at 6:7-8.) Instead, the Court directed the parties to negotiate on an ESI protocol and protective order.

---

[2] *See* http://www.chicagotribune.com/business/ct-states-sue-generic-drugs-conspiracy-20161216-story.html (December 16, 2016, article describing a lawsuit brought by 20 state attorneys general against six pharmaceutical companies that were accused of facilitating an antitrust conspiracy, in part, through telephone calls and text messages).

To that end, the parties have spent two and half months negotiating in good faith, including numerous meet and confers and exchanging several draft documents, to establish a reasonable ESI protocol and protective order. However, there remain areas of disagreement.

Defendants' primary concern with Plaintiffs' disputed ESI protocol proposals is that they prematurely (and unnecessarily) dictate how to deal with matters that cannot be adequately addressed until the Parties proceed further into discovery and undertake the investigations and negotiations that discovery requires. Plaintiffs are demanding specificity about processes that depend on the substantive scope of discovery, including appropriate custodians and data sources, which can only be resolved once the Parties know what claims remain in the case (if any) and discovery actually begins – a process that will require substantial expenditure of effort. Plaintiffs seek in this pre-discovery ESI protocol to restrict precisely how the parties—especially producing parties—will be *permitted* to negotiate collection and search plans based on the appropriate scope of discovery. Plaintiffs prescribe a rigid structure and sequence of obligations related to negotiating search terms and Technology-Assisted Review ("TAR," or "predictive coding"), when no party has yet even expressed any intent to use TAR. Plaintiffs also want to preemptively require producing parties to undertake onerous diligence and disclosure obligations regarding their as-yet undetermined custodians' mobile devices and social media activity, all on as-yet undetermined topics of discovery.

Defendants will meet and confer with Plaintiffs in good faith about search parameters when (and if) the time comes (just as Defendants have done to date). But it is inappropriate for an ESI protocol at this stage to preemptively dictate the mechanisms of negotiation. This is particularly so where it is plain that these ostensibly technical proposals would put a finger on the scale in favor of a broader scope of collection and search.

By contrast, Defendants have proposed a simple, flexible, and neutral framework for ESI search plan negotiations that is more in keeping with the Federal Rules. Defendants' proposed provisions acknowledge the parties expect they might use "advanced search and retrieval technologies," and the parties will be required to meet and confer on a search plan covering both "[m]ethods of searching and, if applicable, words, terms, and phrases to be searched," and "[c]ustodians and other sources from which ESI will be collected and searched." (Ex. B, § IV(B)(1), Defendants' Proposed Provision.) The parties would agree to involve their e-discovery liaisons and keep the goals of the Federal Rules in mind.

### § II(G): Non-Responsive Attachments

In order to save time for all Parties and also avoid the unnecessary disclosure of competitively sensitive information that is not relevant to this case, Defendants propose that the Parties be permitted to withhold non-responsive attachments. This proposal will not prejudice Plaintiffs in any way, because they will be notified when an attachment is withheld on the basis of non-responsiveness and can object if they believe a document has been wrongly withheld.

To be clear, Defendants are only proposing that the Parties be permitted to withhold *non-responsive* attachments – documents that would never be produced except for the fact that they are attached to another document that is responsive. *See* Fed. R. Civ. P. 26(b)(1) (parties are only permitted discovery of "any nonprivileged matter that is *relevant* to any party's claim or defense.") (emphasis added). Withholding these documents will significantly reduce the volume of materials produced in the case, saving substantial time for all involved. Among other reasons, Defendants manufacture a range of products that have nothing to do with the allegations in this case, and there likely will be a large number of documents in Defendants' files that relate to such irrelevant products. For instance, a custodian might send an email attaching ten different

presentations, only one of which relates to the product at issue here.  Plaintiffs have no need to see the nine irrelevant attachments, and having to produce such documents likely will impose significant burdens and costs on the Defendants.  If, for example, a non-responsive attachment contains privileged material, Defendants will have to take the time to redact those documents.  Defendants also will have to process the irrelevant documents for production.  For their part, Plaintiffs will have to spend untold hours reviewing non-responsive materials, potentially slowing discovery unnecessarily.

Particularly where, as here, Plaintiffs have the ability to challenge whether any document was properly withheld, there is simply no reason to burden the Parties by requiring production of non-responsive documents.  Numerous courts have recognized this reality by ordering that parties do not have to produce non-responsive attachments, both over objection and by party agreement.  *See, e.g.*, Order re: Format of Production of Hardcopy Documents and ESI at 10, *Skaggs v. Astrazeneca Pharms., LP*, No. 17-cv-00132-DRH (S.D. Ill. May 9, 2017), ECF No. 60 ("[N]on-relevant attachments may be excluded from production."); Order at 3, *In re Celebrex (Celecoxib) Antitrust Litig.*, No. 14-cv-361 (E.D. Va. April 6, 2016), ECF No. 86 ("The Parties do not need to produce non-responsive attachments."); Order at ¶ C.7., *In re Domestic Drywall Antitrust Litig.*, No. 13-md-2437 (E.D. Pa. Aug. 5, 2013), ECF No. 54 ("[N]on-responsive attachments to responsive parent documents need not be produced.").[3]

Plaintiffs' proposal that Defendants "identif[y] [a] category of purportedly non-responsive attachments" is neither efficient nor effective.  It is impossible to know what categories of documents exist before document review begins, and even if the Parties had such

_____

[3] *See also* Order Governing Protocol for Discovery of ESI and Hard Copy Documents at ¶ E.3.m., *In re Aggrenox Antitrust Litig.*, No. 14-md-2516 (D. Conn. Mar. 25, 2015), ECF No. 235 ("N]on-responsive attachments to responsive parent documents need not be produced."); *Nieman v. Grange Mut. Ins. Co.*, No. 11-cv-3404, 2012 U.S. Dist. LEXIS 149006, at *23 (C.D. Ill. Oct. 17, 2012) (denying motion to compel production of non-responsive documents attached to responsive email).

knowledge, it would be difficult to adequately define what categories of documents can be withheld and cumbersome to apply those categories during review. The much simpler solution is to permit Parties to withhold any non-responsive attachment while preserving Plaintiffs' right to object to the withholding of particular documents.

### § III(B): Local Time Zone[4]

When producing documents in litigation, it is an industry-standard best practice – recognized by the Sedona Conference as well as other authorities – to use Universal Coordinated Time ("UTC") to standardize the dates and times of ESI. *See* Sedona Conference Glossary, *E-Discovery and Digital Information Management*, 8, 31 (4th Ed. Apr. 2014), https://thesedonaconference.org/download-pub/3757 (standardizing with UTC permits advanced processing of ESI); Tom Groom, *UTC, GMT, ESI and eDiscovery: It's About Time*, D4Discovery, http://d4discovery.com/discover-more/its-about-time-utc-gmt-esi-and-ediscovery#sthash.yKAkm0Qm.dpbs (Feb. 24, 2016) ("Follow best practice and keep ESI in UTC throughout all phases of discovery and production."); Rene Laurens, *Processing 101 for Attorneys (and Anyone Else Who's Curious)*, Relativity (Sept. 6, 2016), http://blog.kcura.com/relativity/blog/processing-101-for-attorneys-and-anyone-else-whos-curious (best practice is to "make a universal decision to process all of the data in the UTC time zone . . . ."). Indeed, UTC is used world-wide where standardized times are needed. *See United States v. Michael*, 664 Fed. Appx. 32, 36 (2d Cir. 2016) (UTC "is the primary time standard by which the world regulates clocks and time"); *In re Greenwood Air Crash*, 873 F. Supp. 1257, 1260 n.2 (S.D. Ind. 1995) ("UTC is the time used worldwide for air traffic control purposes").

For these reasons, it has been Hospira's practice for years to standardize its litigation

---

[4] Plaintiffs have agreed to Baxter's proposal to provide documents standardized to the Central time zone, so the time zone argument here applies only to Hospira.

productions using UTC. Hospira has produced documents in multiple litigations across many jurisdictions, and it has never had a controversy over its use of UTC. To accommodate Plaintiffs' request, Hospira would have to change a practice that opposing parties have found perfectly adequate.

Plaintiffs are demanding that Hospira depart from this normal best practice and either standardize its production to Central Time or create an entirely new metadata field to provide a second time zone for its documents. Plaintiffs' sole basis for this demand is the hypothetical concern that the use of UTC will create "confusion." But there is no reason to believe that this case will involve a significant number of documents where the precise time on the document is important to understanding the document, let alone where the time zone is itself critical. Moreover, if during discovery Plaintiffs determine that there are documents that are causing confusion because they are standardized to UTC, Hospira has offered to meet and confer with Plaintiffs to discuss how to deal with those specific documents.

In short, Plaintiffs are seeking to impose unnecessary burden on Hospira to resolve a speculative concern that can be more easily resolved through other means. Nothing in this matter warrants a departure from Hospira's standard practice of using UTC.

### § IV(B)(1): Search Process Parameters

Plaintiffs' proposed ESI protocol provisions on Search Parameters reflect their insistence that the ESI protocol should specify precisely *how* the parties may negotiate with each other on search and culling procedures, as well as what specific details they *must* disclose to each other during that process, and in what sequence. Plaintiffs also demand strictures on how and when TAR could ever be used in the case, and what specific hurdles a producing party must get over in order to justify its use. These proposals are premature and inflexible. They ignore that an

appropriate ESI search plan will depend on information not yet known, such as the parties' future positions on the appropriate substantive scope of document discovery and what custodians and data sources are covered.

For example, Plaintiffs prescribe specific steps and disclosures that are necessary for any use of TAR in this case. (Ex. B, § IV(B)(1), Plaintiffs' Proposed Provision at (c).) But neither Defendant has yet decided whether it would be appropriate or cost-effective to use TAR in this case, and if so, in what context and for what purpose. Thus, it is premature for Plaintiffs to dictate how TAR can be used. Again, the parties need the flexibility to make informed decisions on TAR (and other search issues) with reference to their respective positions after discovery begins on the substantive scope of document discovery, custodians, and data sources.

As another example, Plaintiffs demand that the parties negotiate whether a producing party should be permitted to use optical character recognition ("OCR") to search hard copy documents, rather than engage in a full linear review. (*Id.*, § IV(B)(1), Plaintiffs' Proposed Provision at (d).) But such negotiations are premature when it is unknown whether there will even be significant hard copy search and production in this case. It is certainly not known how well OCR text generation will work on the documents that might be subject to discovery. There is simply no present need to mandate negotiations on this issue.

Particularly concerning is Plaintiffs' prohibition of any use of so-called "double-culling" with TAR. (*See id.* at (c)(2)(iii).) Before processing a massive body of data to be loaded into a TAR tool, it can be appropriate and cost-effective to first exclude clearly irrelevant "garbage," using a combination of text search limitations, custodian limitations, source limitations, file type limitations, sender domain name limitations, or other limitations. Indeed, such limitations are practically inevitable, as it is hardly feasible or reasonable to collect and process every file on a

company's systems. Yet Plaintiffs ask this Court to preemptively forbid the use of search terms to keep "garbage" out of the population of documents processed for TAR.

This proposed prohibition is misguided. Courts have approved of the use of threshold search terms before TAR as appropriate in certain circumstances. *See, e.g.*, *Bridgestone Americas, Inc. v. Int'l Bus. Machines Corp.*, No. 3:13-1196, 2014 WL 4923014 (M.D. Tenn. July 22, 2014); *In re Biomet M2a Magnum Hip Implant Prod. Liab. Litig.*, No. 3:12-MD-2391, 2013 WL 1729682 (N.D. Ind. Apr. 18, 2013). In any event, the prohibition is premature. Whether or not a combined use of search terms and TAR (or any TAR, for that matter) will be appropriate or necessary here is simply not a ripe issue. It would depend on the parties' subsequent negotiations on the substantive scope of document requests, and the appropriate custodians and sources for search. Thus the Court should reject the prohibition of so-called "double-culling."

Because Plaintiffs' Search Process Parameters impose overly restrictive and premature requirements, the Court should reject them and enter Defendants' provisions, which provide flexibility that is more consistent with the Federal Rules and guidance from federal courts.

### § IV(C): Custodial Cellphone & Personal Communications Data

Plaintiffs propose a lengthy and onerous provision regarding the collection and search of mobile device and personal communications data, without any indication that these particular procedures are remotely proportional to the needs of the case under Rule 26(b).

While Defendants will certainly meet and confer with Plaintiffs about how to produce ESI from cellphones should such production be necessary, it is impossible to know at this point whether there is responsive information residing on unidentified custodians' cellphones or social media, let alone whether such information is available from more easily accessible sources. Again, the Parties have not yet held any negotiations on custodians or the scope of discovery.

15

Yet Plaintiffs would have this Court preemptively order producing parties to "take reasonable steps to identify whether any unique responsive communications are located on any cellphones in the possession, custody, or control of the producing party" for as-yet-undetermined custodians. (*See* Ex. B, IV(C), Plaintiffs' Proposed Provision at (1).)

Plaintiffs have left the term "reasonable steps" unelaborated upon, and it is not readily apparent what it would mean with regard to cellphones. Would it require discussions with the custodian? Or actual collection and analysis of data from each cellphone without any particular basis for believing it contained unique responsive content in the first place? This suggests that satellite disputes would quickly arise—perhaps by design—about whether the "reasonable steps" obligations were satisfied. The parties would also have to:

- collect any accessible social media data for any custodian who has ever used social media for business purposes;

- make onerous disclosures with details about individual custodians' cellphones, including disclosures related to the specific apps present on which phone;

- review entire phone logs and "all text messages" on custodians' cellphones; and

- produce every single one of every custodian's "contacts," relevant or not, including but not limited to on the cellphone.

(*See id.* at IV(C), Plaintiffs' Proposed Provision at (1)-(3).)

Incredibly, Plaintiffs even prescribe mandatory contact-list-specific meet and confers that would require "explanations" from the producing party if it wishes to redact irrelevant personal contacts from a custodian's cellphone. (*Id.* at IV(C), Plaintiffs' Proposed Provision at (2).)

By no stretch of the imagination does Plaintiffs' cellphone and communications provision belong in an ESI protocol. It will necessarily expand the substantive scope of discovery that is permitted with regard to cellphones, without any basis at this early stage for doing so. There is certainly no basis at this point to believe these detailed procedures will be proportionate to the

needs of the case as Rule 26(b) requires. To the contrary, once they are part of a mandatory Court order, these provisions could too easily be used as leverage to make overreaching and unreasonable demands.

Plaintiffs can hardly argue that Defendants are seeking to "hide" cellphone data or to rule out any search of any such data. To the contrary, Defendants have repeatedly made clear, both in correspondence and during meet and confers, that they are taking reasonable steps to preserve data that would include mobile device data. For instance, even before ESI protocol negotiations had begun in earnest, Baxter informed Plaintiffs as follows:

> [Baxter's preservation] measures include suspending automatic deletion of emails for legal hold custodians, preserving their Baxter computers and file shares, and directing custodians to preserve potentially relevant information including information stored in email, calendar, and contact information from mobile and other devices that are synched to the Baxter network. With regard to data that is not synched to Baxter's network, Baxter policies prohibit personnel from storing any work-related material on personal or mobile devices. Baxter provides a cloud storage system for mobile use, which is subject to retention and litigation hold procedures. With respect to instant messaging, Baxter expressly prohibits personnel from using such messaging or other transient communication technologies to create or preserve Baxter business records, and to the extent relevant personnel may have copies or records of such communications potentially relevant to this litigation, they would be subject to Baxter's litigation hold procedures.

(Ex. H, February 24, 2017 Letter from E. Papez to B. Clark.)

In sum, Defendants have repeatedly affirmed their commitment to conferring with Plaintiffs on issues including cellphone data if and when the legitimate need arises.[5] There is no

---

[5] Plaintiffs assert that Defendants have taken the position that their employees could never use cellphones for work. That is simply wrong, as underscored by Defendants' stated willingness to negotiate with Plaintiffs with respect to cellphone data.

need for Plaintiffs' detailed Custodial Cellphone & Personal Communications Data provision at this point, and the Court should exclude it from the ESI Protocol it enters.

### § VI(F): Legal Hold Release

Defendants have already taken reasonable steps to put in place the appropriate litigation holds related to this case. Thus Defendants seek to include a provision in the ESI protocol clarifying that "[t]he parties will continue to maintain until the litigation is resolved the documents and data that have been collected for purposes of the litigation," but that "any litigation hold that the parties have put in place for this case need not extend past the close of discovery" except to the extent the parties have agreed on a set of documents or data that should still be preserved. (*See* Ex. B, § VI(F).)

A litigation hold is a necessary component of litigation, but is undoubtedly also an expensive one. *See, e.g.*, *McCarn v. HSBC USA, Inc.*, No. 1:12-CV-00375-LJO, 2012 WL 1232334, at *3 (E.D. Cal. Apr. 12, 2012) (granting relief from stay of litigation to proceed with motion to dismiss, in part because delay in disposition of the motion to dismiss would force movants to proceed with "expensive … litigation hold practices"). Defendants' proposed provision would (a) provide clarity and certainty for the parties with respect to their ESI hold obligations and the attendant expense; (b) encourage diligence by the parties to timely seek discovery of all relevant materials proportionate to the needs of the case; and (c) prevent parties who are holding less data from demanding an expensive continuation of the other parties' legal holds as a bargaining chip in unrelated disputes.

Plaintiffs would suffer no prejudice from this provision, because it gives Plaintiffs an opportunity to request that the lift not be released as to particular materials. Plaintiffs have suggested that a legal hold release provision is premature. But the provision is necessary now

for the reasons noted above, most importantly giving parties clarity about the duration and cost of their hold obligations. In any event, unlike many of Plaintiffs' proposals, Defendants' proposal sets no strictures as to how negotiations may proceed and prescribes no particular result, but addresses a current need for certainty about document retention expense that has already begun to accrue. For all the above reasons, this Court should include Defendants' litigation hold release provision in the ESI protocol entered in the case.

## II.    PROTECTIVE ORDER

The parties have reached an agreement on all but one of the provisions for the Protective Order. Attached as Exhibit C are the agreed-upon provisions of the parties' proposed Protective Order, and attached as Exhibit D is the single disputed provision relating to the appropriate clawback provision governing the inadvertent production of potentially privileged documents. Finally, attached as Exhibit E is a redlined version of the model confidentiality order showing the differences between the model order and the parties' proposed order.

### A.  **Plaintiffs' Position**

Plaintiffs propose that the Protective Order permit two different types of clawbacks: (1) a Fed. R. Evid. ("Rule") 502(d)  provision where a producing party provides notice that it will only be using an electronic screen for privilege, but not a document-by-document review and (2) a Rule 502(b) provision where a producing party elects to make a document-by-document review for privilege, but can claw back inadvertently produced documents. Under the first scenario, production of some potentially privileged materials is assumed, but the parties agree to a more liberal clawback of potentially privileged documents not reliant on whether or not production was inadvertent. In exchange for the more liberal clawback provision under Rule 502(d), the requesting party would not wait months for a full privilege review of every document or would

receive a broader set of documents due to forgoing full linear review, but instead the producing party would forgo a full privilege review, produce documents earlier in the process, and the requesting party can move forward with its review of documents more quickly with the knowledge that there will be some documents clawed back during the review. In the second scenario, a party who elects to review every document for privilege prior to production is choosing to expend substantial financial resources to withhold every possible potentially privileged document, which inevitably slows down the document production process. In exchange for the delay, the requesting party should be able to have greater confidence in the privilege review absent some indication of inadvertent production.

Defendants' proposal eliminates the requirement that production of privileged information be *inadvertent* as required by Rule 502(b) by adding the phrase "or otherwise" to the parameters for clawing-back a document. Defendants' concerns below about how a single case from the District of New Mexico interpreted the term "inadvertent" is misplaced, and in any event, Plaintiffs included language in their proposed provision to specifically address Defendants' concerns by stating that review by contract document review attorneys is not sufficient by itself to qualify a production of privileged information as intentional and therefore not subject to the protections of Rule 502(b). The practical effect of Defendants' proposal would be that a party could wait to claw back purportedly privileged documents until they are introduced at a deposition, interrupting the deposition and leading to motion practice disputing the status of the document as actually privileged.

Finally, Plaintiffs propose following Rule 26(b)(5)(B) with respect to the procedure for a clawback, including permitting a party to sequester, rather than immediately destroy, a document proposed to be clawed back and present that document under seal for the Court to make a

determination on the appropriateness of the clawback and the legitimacy of the privilege or work product claim. Under certain circumstances, such as discussion of a document during a deposition followed by a clawback, it can be entirely appropriate to discuss the contents of a clawed back document in a motion determining whether the clawback is appropriate. *Kleen Prods.*, No. 10 C 5711, Dkt. 531, Text Order & Transcript (N.D. Ill. Oct. 17, 2013) (Leinenweber, J.) (attached hereto as Ex. G) (holding that clawback was not proper after considering briefing by parties on substance of documents party attempted to claw back after their use at a deposition); *Woodard v. Victory Records, Inc.*, No. 11 CV 7594, 2013 WL 4501455, at *2 (N.D. Ill. Aug. 22, 2013) ("Rule 26(b)(5)(B) also allows the receiving party to keep the information so that it "'may promptly present the information to the Court under seal for determination of the claim.'").

## B. **Defendants' Position**

Particularly in complex litigations that involve large-scale document productions, "it is difficult if not impossible, even with the best processes and technology, to prevent the unintentional production of privileged materials." *See* The Sedona Conference Commentary on Protection of Privileged ESI, 17 Sedona Conf. J. 95 (2016). Accordingly, Defendants propose that the Court order that a Party does not waive its privileges or protections if it produces privileged or protected documents either "inadvertent[ly] or otherwise."

Defendants' proposal is consistent with Rule 502(d) of the Federal Rules of Evidence, which imposes no limit on a court's ability to order that disclosure of privileged or protected material does not waive that privilege or protection.[6] Indeed, under the broad Rule 502(d) order

---

[6] Note that entry of a Rule 502(d) order does not require agreement of the parties. *See* Rule 502(d) Advisory Committee Notes (2008) ("Under the rule, a confidentiality order is enforceable whether or not it memorializes an agreement among the parties to the litigation.").

proposed by the Seventh Circuit Electronic Discovery Committee, a party does not waive its privilege as a result of any production of a document, regardless of the reason for the production. *See* Pilot Project Case Management Order No. 2, § 2.1.[7]  Similarly, U.S. Magistrate Judge Andrew Peck has a standing Rule 502(d) order that provides the same protection that Defendants' are requesting, covering productions that are "inadvertent or otherwise."  *See* Rule 502(d) Order of M.J. Andrew J. Peck.[8]

The addition of "or otherwise" is important, because recently there have been disputes about whether a document that is produced after it has been reviewed qualifies as inadvertently produced.[9]  *See* Second Report and Recommendation at 9-12, *New Mexico Oncology and Hematology Consultants, Ltd. v. Presbyterian Healthcare Servs.*, Civ. No. 12-526 (D.N.M. Feb. 27, 2017), Dkt. No. 609.  While Defendants dispute whether "inadvertent" can be read as narrowly as some have argued, Plaintiffs' refusal to agree to Defendants' proposal – which would remove any doubt about the scope of what is protected – suggests that they hope to capitalize on the mistaken production of privileged material.  While meeting and conferring on this issue, Plaintiffs' only proffered justification for restricting Defendants' ability to preserve their privileges was to claim that Defendants might *strategically produce privileged material* in order to disrupt Plaintiffs' preparation for depositions by clawing back the privileged material the night before the deposition.  That claim is meritless, and it is not a sufficient basis to reject Defendants' proposal.

Moreover, Defendants' proposal would promote judicial economy and eliminate

---

[7] *Available at* http://discoverypilot.com/sites/default/files/7th%20Cir%20Elec%20Discovery%20Pilot%20Pgm%20Model%20Privilege%20CMO_0.doc.

[8] *Available at* http://www.nysd.uscourts.gov/cases/show.php?db=judge_info&id=928.

[9] Plaintiffs' insistence that Defendants forgo their right to conduct a privilege review in exchange for broader protection of their privileges is not a reasonable compromise.

unnecessary litigation and costs. In particular, adopting Plaintiffs' more limited proposal likely will result in motion practice seeking the return of documents and debating the meaning of inadvertent. *See Rajala v. McGuire Woods, LLP*, No. 08-2638, 2010 U.S. Dist. LEXIS 73564, at *22 (D. Kan. July 22, 2010) (Rule 502(d) order entered *sua sponte* to avoid time and costs incurred to dispute inadvertent disclosure). For these reasons, the Court should enter Defendants' proposed language for the Agreed Confidentiality Order.

Respectfully submitted,

Dated: June 2, 2017

By: /s/ James F. Herbison

Elizabeth P. Papez
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
(202) 282-5000
EPapez@winston.com

James F. Herbison
Brook R. Long
WINSTON & STRAWN LLP
35 West Wacker Drive
Chicago, Illinois 60601
(312) 558-5600
JHerbison@winston.com
BLong@winston.com

*Counsel for Defendants Baxter International Inc. and Baxter Healthcare Corporation*

By: /s/ David H. Suggs

Robert A. Milne
Brendan G. Woodard
David H. Suggs
Kathryn Swisher
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200
rmilne@whitecase.com
bwoodard@whitecase.com
rgandesha@whitecase.com
dsuggs@whitecase.com
swisher@whitecase.com

*Counsel for Defendants Hospira, Inc., and
Hospira Worldwide, Inc.*

By:  /s/ Robert J. Wozniak

Steven A. Kanner
William H. London
Douglas A. Millen
Robert J. Wozniak
FREED KANNER LONDON & MILLEN
LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile: (224) 632-4521
rwozniak@fklmlaw.com
skanner@fklmlaw.com
wlondon@fklmlaw.com
dmillen@fklmlaw.com

*Interim Liaison Counsel for Plaintiffs and
the Putative Class*

Hollis Salzman
Eamon O'Kelly
Meegan Hollywood
ROBINS KAPLAN LLP
601 Lexington Avenue
Suite 3400
New York, NY 10022
(212) 980-7400
hsalzman@robinskaplan.com
eokelly@robinskaplan.com
mhollywood@robinskaplan.com

W. Joseph Bruckner
Heidi M. Silton
Brian D. Clark
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900
wjbruckner@locklaw.com
hmsilton@locklaw.com
bdclark@locklaw.com

Linda P. Nussbaum
Bart D. Cohen
Hugh D. Sandler
NUSSBAUM LAW GROUP, P.C.
1211 Avenue of the Americas, 40th Floor

New York, NY 10036
(917) 438-9189
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com
hsandler@nussbaumpc.com

*Interim Co-Lead Counsel for Plaintiffs and
the Putative Class*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on June 2, 2017, the foregoing JOINT LETTER BRIEF REGARDING ESI PROTOCOL AND PROTECTIVE ORDER (ECF NO. 97) was filed electronically with the Clerk of Court using the CM/ECF system. Copies of the document will be served on all counsel of record automatically by operation of the Court's CM/ECF filing system.

Dated: June 2, 2017

/s/ James F. Herbison
James F. Herbison