**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| WASHINGTON COUNTY HEALTH CARE AUTHORITY, INC. d/b/a WASHINGTON COUNTY HOSPITAL & NURSING HOME; CÉSAR CASTILLO, INC.; WARREN GENERAL HOSPITAL; and ERIE COUNTY MEDICAL CENTER CORPORATION on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>BAXTER INTERNATIONAL INC.; BAXTER HEALTHCARE CORPORATION; HOSPIRA, INC.; HOSPIRA WORLDWIDE, INC.; and ICU MEDICAL, INC.,<br><br>    Defendants. | Civil Action No. 1:16-cv-10324<br><br>HON. JOHN J. THARP<br><br>SECOND CONSOLIDATED AMENDED ANTITRUST CLASS ACTION COMPLAINT<br><br><u>JURY TRIAL DEMANDED</u> |

# TABLE OF CONTENTS

**Page**

NATURE OF ACTION ................................................................................................ 1

JURISDICTION AND VENUE ................................................................................... 9

PARTIES ................................................................................................................... 11

    A.    Plaintiffs ......................................................................................... 11

    B.    Defendants ...................................................................................... 12

AGENTS AND CO-CONSPIRATORS ...................................................................... 13

FACTUAL ALLEGATIONS ...................................................................................... 14

    A.    The IV Saline Solution Industry .................................................... 14

    B.    The Purported IV Saline Solution Shortage .................................. 15

    C.    Congress Urges The FTC To Investigate Defendants For Conspiring To Restrict Output And Increase Prices of IV Saline Solution ................................. 18

    D.    The U.S. Department Of Justice And New York Attorney General Investigate Defendants' Practices In The IV Saline Solution Market ................ 18

    E.    Defendants Unlawfully Stifled Competition By Colluding To Restrict Output And Increase Prices For IV Saline Solution ........................................... 19

        1.    Defendants Issued A Series Of Voluntary Product Recalls In Response To Concerns About The Safety Of Their IV Saline Solution Products ................................ 20

        2.    Defendants Conspired To Prolong And Aggravate The Shortage By Destroying Saleable IV Saline Solution ............................................. 21

        3.    Defendants Exploited Their Market Power And The Purported IV Saline Solution Shortage By Collusively Pressuring Customers To Abide By Restrictive Purchasing Terms ................................. 22

    F.    Defendants' Conspiracy Had The Purpose And Effect Of Raising Prices For IV Saline Solution In The United States During The Class Period .............. 23

    G.    Defendants' Actions Would Be Irrational, Absent A Conspiracy ...................... 27

    H.    The IV Saline Solution Market Structure And Characteristics  Support The Existence Of A Conspiracy ................................................................. 28

1. The Market For IV Saline Solution Is Highly Concentrated .................. 29

2. The Market For IV Saline Solution Has High Barriers To Entry ............ 30

3. The Demand For IV Saline Solution Is Inelastic ..................................... 31

4. IV Saline Solution Is A Highly Homogeneous Product ......................... 33

5. Defendants Had Ample Opportunities To Meet And Conspire .............. 33

6. Defendants Had Motives To Conspire ..................................................... 37

7. IV Saline Solution Prices Rose Despite Falling Raw Material Prices And Defendants' Increased Economies Of Scale ......................... 39

8. Similar Supply Shortages And Price Increases For IV Saline Solution Did Not Occur During Other Flu Outbreaks ............................. 41

9. Defendant Baxter Is A Recidivist Violator Of The Antitrust Laws......... 41

CLASS ACTION ALLEGATIONS ................................................................ 42

PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY .................................. 44

Plaintiffs Washington County Health Care Authority, Inc. d/b/a Washington County Hospital & Nursing Home, César Castillo, Inc., Warren General Hospital, and Erie County Medical Center Corporation ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Class," as defined below), upon personal knowledge as to the facts pertaining to themselves and upon information and belief as to all other matters, and based on the investigation of counsel, bring this class action for damages, injunctive relief and other relief pursuant to federal antitrust laws, demand a trial by jury, and allege as follows:

## NATURE OF ACTION

1.     This lawsuit involves a conspiracy among the major U.S. manufacturers of a critical medical product, intravenous ("IV") saline solution ("IV Saline Solution"), to restrict output and artificially fix, raise, maintain and/or stabilize the prices of IV Saline Solution sold throughout the United States, under the pretext of a supply shortage, in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

2.     Plaintiffs seek to represent themselves and a Class consisting of all persons and entities in the United States who purchased IV Saline Solution directly from Defendants Baxter International Inc. and Baxter Healthcare Corporation (together, "Baxter"), Hospira, Inc. and Hospira Worldwide, Inc. (together, "Hospira"), and ICU Medical, Inc. ("ICU Medical") (collectively, "Defendants"), or any current or former agent, subsidiary or affiliate thereof, or any co-conspirator during the period from and including January 1, 2013 through such time as the anticompetitive effects of Defendants' unlawful conduct cease (the "Class Period").

3.     The first complaint in this consolidated action was filed by Washington County Health Care Authority, Inc. on November 3, 2016. Other complaints containing substantially

1

similar claims followed, and a Consolidated Amended Complaint ("CAC") was filed on January 6, 2017.[1] This Court granted Defendants' motion to dismiss the CAC on July 5, 2018.

4.     Since the filing of the CAC and briefing of Defendants' motion to dismiss, there have been several developments that reinforce Plaintiffs' claims and make it clear that Defendants' conspiracy continues to harm hospitals and other health care providers, as well as patients throughout the United States.

5.     First, the shortage of IV Saline Solution that Defendants attribute to a harsher-than-usual flu season in the winter of 2013-14 is still ongoing. Despite efforts by the U.S. Food and Drug Administration ("FDA") to increase supply of this critical product by, for instance, easing restrictions on foreign imports of IV Saline Solution, the FDA website continues to classify IV Saline Solution as "Currently in Shortage" nearly five years later.

6.     Moreover, immediately after Defendants' motion to dismiss the CAC was fully briefed, it became known that the U.S. Department of Justice ("DOJ") had initiated a grand jury investigation into potentially criminal misconduct by the Defendants, arising out of the same operative facts as those alleged here.[2]  The DOJ investigation and a parallel investigation by the New York Attorney General remain open and active. As of August 9, 2018, the former parent company of Defendant Hospira admitted publicly that Hospira and Defendant ICU Medical are producing documents in connection with those ongoing investigations.

---

[1] Attached as Exhibit A hereto is a redline comparing this Second Consolidated Amended Antitrust Class Action Complaint to the original CAC filed on January 6, 2017.

[2] The Court took judicial notice of these investigations in its order dismissing the Consolidated Amended Complaint.

7.     In addition, a former employee of one of the Defendants has confirmed to Plaintiffs' counsel that the IV Saline Solution shortage was deliberately engineered by Defendants. Specifically, a former production line employee of Defendant Hospira has admitted that he and his co-workers had standing instructions from Hospira supervisors to limit the daily output of IV Saline Solution to a certain level and to discard any IV Saline Solution that was produced above that limit.  Although Plaintiffs have not yet identified any direct evidence of a corresponding policy by Defendant Baxter, Hospira's practice of limiting production and discarding saleable IV Saline Solution that exceeded a daily quota, during a time of shortages and record high prices, would be economically irrational unless Hospira had an assurance that Baxter was doing likewise.

8.     Defendants dominate and collectively control approximately almost 80% of the $1.7 billion per year IV Saline Solution market in the United States.

9.     IV Saline Solution is used for a countless variety of medical treatments, including preventing dehydration and diluting IV medications.  IV Saline Solution is also one of the most commonly used products in emergency medicine.  Over one billion units of IV Saline Solution are used in the United States every year.

10.     As recognized by Defendant Baxter's spokesman John O'Malley, "IV solutions are critical medications and fundamental to the delivery of patient care."[3]  In hospitals, "IV fluids impact almost every single patient and every single floor."[4]

---

[3] *IV Shortage Tests Providers and Suppliers,* REPERTOIRE (June 2014), http://www.repertoiremag.com/iv-shortage-tests-providers-and-suppliers.html.

11.    A shortage of IV Saline Solution has created a continuing health care crisis. According to Carol A. Cunningham, MD of the Akron General Medical Center, when faced with a shortage of IV Saline Solution: "It became really scary when we didn't have saline.  I felt like we were practicing medicine in a third-world country.  There was just no way of giving fluid resuscitation or treating dehydration intravenously."[5]

12.    In August 2015, the New York Attorney General issued subpoenas to Defendants Baxter and Hospira requesting that the companies provide information regarding business practices in the IV Saline Solution market.[6]  That investigation remains active and open.

13.    On October 26, 2015, a bipartisan group of U.S. Senators urged the Federal Trade Commission ("FTC") to investigate Defendants for illegal collusion in violation of the antitrust laws in connection with the sale of IV Saline Solution.  According to the Senators, Defendants publicly asserted that there was a shortage of IV Saline Solution and, based on the purported

---

*(continued)*

[4] April Dembosky, KQED, *Saline Shortages Create Troubles for U.S. Hospitals*, PBS NEWSHOUR (June 25, 2014), http://www.pbs.org/newshour/rundown/saline-shortages-create-troubles-u-s-hospitals/.

[5] Lena J. Weiner, *Basic Emergency Department Meds in Short Supply*, HEALTHLEADERS MEDIA (June 12, 2015), http://www.healthleadersmedia.com/quality/basic-emergency-department-meds-short-supply.

[6] Baxter International Inc. Form 10-K (Feb. 23, 2018), https://www.sec.gov/Archives/edgar/data/10456/000156459018002954/bax-10k_20171231.htm; ICU Medical, Inc. Form 10-K (Mar. 16, 2018), https://www.sec.gov/Archives/edgar/data/883984/000088398418000010/icui1231201710-k.htm.

shortage, which ostensibly began in 2013, Defendants increased their IV Saline Solution prices by 200-300%.[7]

14.     The Senators estimated that these price increases have had a devastating economic impact on hospitals, which cannot properly function without IV Saline Solution, by increasing their individual annual costs in the range of hundreds of thousands to millions of dollars.  As recognized by the Senators, the claimed IV Saline Solution shortage is estimated to be the most expensive drug shortage in history.

15.     In April 2017, Defendants Baxter and ICU Medical (Defendant Hospira's parent company) received grand jury subpoenas in the United States District Court for the Eastern District of Pennsylvania relating to a criminal investigation by the U.S. Department of Justice, Antitrust Division. These subpoenas sought the production of documents and testimony regarding the manufacturing, selling, pricing and shortages of IV Saline Solution, and communications with Defendants' competitors regarding the same.[8]

16.     In August 2018, Pfizer Inc., Defendant Hospira's former parent company, confirmed that the investigations by the U.S. Department of Justice and the New York Attorney

---

[7] Press Release, U.S. Senator Orrin Hatch, "Blumenthal, Lee, Klobuchar, Hatch Urge FTC to Investigate Antitrust Violations Connected to IV Solution Shortages, Increasing Costs of Hospital Operations and Patient Care" (Oct. 26, 2015) ("Press Release"), http://www.hatch.senate.gov/public/index.cfm/2015/10/blumenthal-lee-klobuchar-hatch-urge-ftc-to-investigate-antitrust-violations-connected-to-iv-solution-shortages-increasing-costs-of-hospital-operations-and-patient-care.

[8] Baxter and ICU Medical Form 10-Ks, n.6 *supra*.

General are ongoing, and that Hospira and ICU Medical are producing documents in connection with those investigations.[9]

17.     The purported IV Saline Solution shortage dates as far back as November 2013, when Defendants began to notify their health care facility customers that they might experience delays in IV Saline Solution deliveries. By January 2014, the FDA publicly acknowledged a shortage of IV Saline Solution in the United States.

18.     The shortage may have been exacerbated by a series of voluntary recalls by Defendants that collectively removed almost twenty million container bags of IV Saline Solution from the market.  Following these recalls, Defendants conspired to worsen the existing shortage for their own ends.

19.     Defendants publicly blamed the shortage on a nationwide spike in IV Saline Solution consumption that occurred as a result of announcements by Defendants in late 2013 regarding expected delivery delays and an allegedly harsher-than-expected 2013 to 2014 flu season.  However, as recognized by the bipartisan group of Senators in their October 2015 letter to the FTC, "the shortage is still ongoing . . . raising questions about the incentives of the saline suppliers to solve this problem and about possible coordination among them."  Indeed, one economist and professor stated that "[s]aline shortages are something that shouldn't happen, they baffle economists."[10] Phillip Zweig, executive director for Physicians Against Drug Shortages

---

[9] "Pfizer's Greenstone Subpoenaed by DOJ; Hospira Working to Produce Documents," MLEX MARKET INSIGHT (Aug. 9, 2018).

[10] Valerie Lapointe, *Hospital Drug Shortages: What is Really Causing Them?* MEDILL REPORTS CHI. (May 26, 2016), http://news.medill.northwestern.edu/chicago/hospital-drug-shortages-what-is-really-causing-them/

likewise questioned the reasons for the shortage: "Shortages simply do not occur like this in a market economy without resulting from natural disasters, external political shocks, or trade embargos."[11]

20.     In fact, the purported IV Saline Solution shortage was part of an unlawful, anticompetitive, and collusive output restriction and price-fixing scheme orchestrated by Defendants.  Beginning sometime in 2013, upon information and belief, Defendants began to coordinate supply restrictions with one another so as to prolong the shortage and perpetuate their supracompetitive profits.

21.     Prior to 2013, there were only sporadic product recalls by multiple IV Saline Solution manufacturers.  However, starting in 2013, Defendants Baxter and Hospira, who at that time controlled an estimated 90% of the U.S. IV Saline Solution market, implemented numerous voluntary recalls of their IV Saline Solution that, whether legitimate or otherwise, contributed to a sharp decrease in the available supply.  In October 2014 alone, Defendant Hospira's voluntary recall removed approximately 82.5% of the average estimated monthly supply of IV Saline Solution bags from the U.S. market.

22.     Contemporaneous with or shortly following these recalls, Defendants took concrete steps to effectuate a price-fixing conspiracy, artificially constraining supply of IV Saline Solution and thereby worsening a public health crisis to further their unlawful and anticompetitive aims.  For example, upon information and belief, Defendants instructed their employees at IV Saline Solution manufacturing plants to restrict production to specified levels and to discard useable product beyond those artificial production levels.

---

[11] *Id.*

23.     To make matters worse, both Defendant Baxter and at least one other IV Saline Solution supplier, B. Braun Medical Inc. ("B. Braun"), indicated that they would not take on any new customers, or might only do so on a case-by-case basis.  As a result, health care facilities' ability to seek lower prices from ostensibly competing manufacturers has been, and continues to be, restrained.

24.     Almost incredibly, the IV Saline Solution shortage persists today—almost five years after it was purportedly triggered by an unexpectedly harsh flu season—even though Defendants claim to be operating at full capacity.[12] Sodium chloride 0.9% products still appear on the FDA's online list of drugs "Currently in Shortage."[13]

25.     Further, the purported IV Saline Solution shortage has not been resolved despite the fact that the FDA took steps to address the shortage by allowing foreign suppliers (including a subsidiary of Defendant Baxter) to sell imported IV Saline Solution in the United States.[14]

_____

[12] *See* Maryann Mazer-Amirshahi & Erin R. Fox, *Saline Shortages—Many Causes, No Simple Solution*, 378 NEW ENG. J. MED. 1472 (2018); American Pharmacists Association, *Grappling with National Saline and Opioid Shortages* (July 17, 2018), https://www.pharmacist.com/article/grappling-national-saline-and-opioid-shortages; Brian Krans, *Drug Shortages in ER Are More Common Than You Think*, FOX NEWS (July 22, 2018), http://www.foxnews.com/health/2018/07/22/drug-shortages-in-er-are-more-common-than-think.html.

[13] FDA Drug Shortages, https://www.accessdata.fda.gov/scripts/drugshortages/default.cfm.

[14] *See*, *e.g.*, "Grifols Announces New Agreement with Henry Schein to Distribute Normal Saline Solution in the U.S.," YAHOO! FIN. (Mar. 5, 2018), https://finance.yahoo.com/news/grifols-announces-agreement-henry-schein-140000722.html; Julie Steenhuysen, "Baxter to Import IV Saline Bags from Mexico to Ease U.S. Shortage," REUTERS (Jan. 24, 2018), https://www.reuters.com/article/us-baxter-intl-saline/baxter-to-import-iv-saline-bags-from-mexico-to-ease-u-s-shortage-idUSKBN1FD36W.

26.     Defendants' purported justifications for the IV Saline Solution shortage are a pretext for their collusive anticompetitive conduct.  A harsher-than-expected flu season nearly five years ago cannot justify or explain escalating IV Saline Solution prices today.  During earlier major flu outbreaks, there was no corresponding product shortage or sharp price increases for IV Saline Solution.

27.     Further, prices of raw materials needed to produce IV Saline Solution cannot justify the rising prices.  The cost of plastic, a main component of IV Saline Solution, remained stable between 2013 and 2014, and dropped sharply in the last quarter of 2014.

28.     Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the IV Saline Solution market by agreeing to restrict output and artificially fix, raise, stabilize and/or maintain the prices of IV Saline Solution sold in the United States.  The combination and conspiracy engaged in by Defendants and their co-conspirators constitutes an unreasonable restraint of trade in violation of the Sherman Act (15 U.S.C. § 1).

29.     As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiffs and the Class paid artificially inflated prices for IV Saline Solution during the Class Period.  Plaintiffs and the Class thereby suffered, and continue to suffer, antitrust injury to their business or property.

## **JURISDICTION AND VENUE**

30.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover damages suffered by Plaintiffs and the Class and to secure equitable and injunctive relief against Defendants for violating Section 1 of the Sherman Act (15 U.S.C. § 1). Plaintiffs and the Class also seek attorneys' fees, costs, and other expenses under federal law.

31.     This Court has jurisdiction over the subject matter of this action pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), Section 1 of the Sherman Act (15 U.S.C. § 1), and 28 U.S.C. §§ 1331 and 1337.

32.     Venue is proper in this District pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22), and 28 U.S.C. §§ 1391 (b), (c), and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

33.     This Court has *in personam* jurisdiction over Defendants because each, either directly or through the ownership and/or control of its subsidiaries, *inter alia*: (a) transacted business in the United States, including in this District; (b) sold or marketed IV Saline Solution throughout the United States, including in this District; (c) had substantial aggregate contacts with the United States as a whole, including in this District; or (d) were engaged in an illegal price-fixing conspiracy that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business throughout the United States, including in this District. Defendants also conduct business throughout the United States, including in this District, and they purposefully availed themselves of the laws of the United States.

34.     By reason of the unlawful activities alleged herein, Defendants substantially affected commerce throughout the United States, causing injury to Plaintiffs and members of the Class. Defendants, directly and through their agents, engaged in activities affecting all states, to restrict output and fix, raise, maintain and/or stabilize prices in the United States for IV Saline

Solution, which conspiracy unreasonably restrained trade and adversely affected the market for IV Saline Solution.

35. Defendants' conspiracy and unlawful conduct described herein adversely affected persons and entities in the United States who directly purchased IV Saline Solution manufactured by Defendants, including Plaintiffs and the members of the Class.

**PARTIES**

A. **Plaintiffs**

36. Plaintiff Washington County Health Care Authority, Inc. d/b/a Washington County Hospital & Nursing Home is a health care facility located in Chatom, Alabama. During the Class Period, Plaintiff purchased IV Saline Solution directly from one or more Defendants. Plaintiff paid artificially inflated prices for IV Saline Solution and was thereby damaged as a result of Defendants' unlawful conduct.

37. Plaintiff César Castillo, Inc. is a corporation organized under the laws of and located in the Commonwealth of Puerto Rico. During the Class Period, Plaintiff purchased IV Saline Solution directly from one or more Defendants. Plaintiff paid artificially inflated prices for IV Saline Solution and was thereby damaged as a result of Defendants' unlawful conduct.

38. Plaintiff Warren General Hospital is a health care facility located in Warren, Pennsylvania. During the Class Period, Plaintiff purchased IV Saline Solution directly from one or more Defendants. Plaintiff paid artificially inflated prices for IV Saline Solution and was thereby damaged as a result of Defendants' unlawful conduct.

39. Plaintiff Erie County Medical Center Corporation is a hospital located in Buffalo, New York. During the Class Period, Plaintiff purchased IV Saline Solution directly from one or more Defendants. Plaintiff paid artificially inflated prices for IV Saline Solution and was thereby damaged as a result of Defendants' unlawful conduct.

B.     **Defendants**

40.     Defendant Baxter International Inc. ("Baxter International") is a publicly traded Delaware corporation headquartered in Deerfield, Illinois.  Baxter International manufactures and sells IV Saline Solution throughout the United States.

41.     Defendant Baxter Healthcare Corporation ("Baxter Healthcare") is a Delaware corporation with its headquarters in Deerfield, Illinois.  Baxter Healthcare operates as a wholly-owned subsidiary of Baxter International.  Baxter Healthcare manufactures and sells IV Saline Solution throughout the United States.   Baxter International and Baxter Healthcare are collectively referred to herein as "Baxter."

42.     Defendant Hospira, Inc. and Defendant Hospira Worldwide, Inc. ("Hospira Worldwide") were Delaware corporations headquartered in Lake Forest, Illinois.  Hospira, Inc. manufactured and sold IV Saline Solution throughout the United States. On September 3, 2015, Hospira, Inc. and Hospira Worldwide were acquired by Pfizer,[15] which subsequently sold them off to ICU Medical.

43.     ICU Medical is a Delaware corporation headquartered in San Clemente, California. On October 6, 2016, ICU Medical acquired the medical devices portion of Hospira from Pfizer.[16] On February 6, 2017, ICU Medical announced that it had completed its acquisition

---

[15] Press Release, "Pfizer Completes Acquisition of Hospira" (Sept. 3, 2015), https://www.pfizer.com/news/press-release/press-release-detail/pfizer_completes_acquisition_of_hospira.

[16] Press Release, "ICU Medical Inc. to Acquire the Hospira Infusion Systems Business from Pfizer Inc. for $1 Billion in Cash and Stock" (Oct. 6, 2016), http://www.icumed.com/about-us/news-events/news-articles/icu-medical-inc-to-acquire-the-hospira-infusion-systems-business-from-pfizer-inc-for-$1-billion-in-cash-and-stock.aspx.

of the Hospira Infusion Systems ("HIS") business,[17] including IV pumps, solutions, and devices that, when combined with ICU Medical's preexisting businesses, made ICU Medical one of the world's leading pure-play infusion therapy companies. Now, as part of ICU Medical's existing business, the HIS acquisition creates a company with a complete IV therapy product portfolio from solutions to pumps to non-dedicated infusion sets.[18]

## AGENTS AND CO-CONSPIRATORS

44.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

45.     Various persons, partnerships, sole proprietors, firms, corporations, agents and individuals not named as Defendants in this lawsuit, and individuals, the identities of which are presently unknown, participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.  There is a finite number of co-conspirators and Plaintiffs believe that their identities can be ascertained through Defendants' own records.

46.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity's business or affairs.

---

[17] Press Release, "ICU Medical Completes the Acquisition of Hospira Infusion Systems from Pfizer" (Feb. 6, 2017), http://www.icumed.com/about-us/news-events/news-articles/icu-medical-completes-the-acquisition-of-hospira-infusion-systems-from-pfizer.aspx.

[18] *Id.*

## FACTUAL ALLEGATIONS

### A. The IV Saline Solution Industry

47.     IV Saline Solution comprises 0.9% sodium chloride (salt) dissolved in water and is packaged in plastic bags, plastic bottles or glass.  IV Saline Solution is also referred to in the industry as "normal saline."

48.     IV Saline Solution is used to treat patients with a countless number of medical conditions, including preventing or treating dehydration caused by illnesses or surgery, and is also used to dilute IV medications.  IV Saline Solution is one of the most commonly used products in emergency medicine.

49.     IV Saline Solution must be kept sterile.  IV Saline Solution can become contaminated if the bag is punctured or contains particulates (*i.e.*, undissolved substances that are not intended to be present in the Solution), which can be generated during production or caused by the breakdown of coating or packaging materials.  Particulate matter may lead to adverse health consequences, such as vein irritation, inflammation, aggravation of preexisting infections, allergic reactions, and systemic embolization.  IV Saline Solution may be recalled if its sterility is compromised or if it is damaged, which may cause inadequate or inconsistent dosing.

50.     Hospitals are the largest purchasers of IV Saline Solution.  It is necessary for hospitals to stock large quantities and wide varieties of IV Saline Solution to treat the various symptoms encountered by patients on a daily basis.  According to Baxter, 740 units of IV Saline Solution and other sterile solutions are used each minute across the United States.[19]

---

[19] Erika Fry, *There's a National Shortage of Saline Solution. Yeah, We're Talking Salt Water. Huh?* FORTUNE (Feb. 5, 2015), http://fortune.com/2015/02/05/theres-a-national-shortage-of-saline/.

51.     Defendants are the largest manufacturers of IV Saline Solution in the United States. At the beginning of the damage period, upon information and belief, Defendants between them controlled approximately 90% of the U.S. of the IV Saline Solution market. Today, even after the FDA's efforts to facilitate IV Saline Solution imports in order to alleviate the artificial shortage created by Defendants, they still control almost 80% of the market.

**B.      The Purported IV Saline Solution Shortage**

52.     As early as November 2013, Defendant Baxter notified customers that a shortage for IV Saline Solution existed, that shipments would be delayed and non-contracted customers would receive the product on an allocation system.  Defendants attributed the shortage to a harsher-than-expected 2013 to 2014 flu season and an increase in demand.

53.     In January 2014, the FDA publicly recognized a shortage of IV Saline Solution and added it to the FDA's Drug Shortage List.

54.     To ease the burden on the health care system due to the shortage, the FDA facilitated imports of IV Saline Solution from European plants that were not previously approved to ship IV Saline Solution into the United States.  The plants included Defendant Baxter's plant in Spain, a plant owned by a German affiliate of B. Braun, and Fresenius Kabi USA, LLC's plant in Norway.

55.     Despite these efforts to increase the supply of IV Saline Solution, the FDA recognized that imports "will not resolve the current shortage."[20]  Indeed, the supply of IV Saline

---

[20] FDA, *FDA Updates on Saline Drug Shortage* (Apr. 28, 2014), http://www.fda.gov/Drugs/DrugSafety/ucm382255.htm.

Solution in the United States has not been replenished to previous levels, even with imported IV Saline Solution, and prices remain close to an all-time high.

56.     According to one customer, Defendants have represented that the purported shortage is expected to continue.

57.     A shortage of IV Saline Solution has potentially dangerous consequences on patient care.  The FDA describes the current IV Saline Solution shortage as a "critical shortage, which poses a serious threat to patients."[21] A January 2018 update from the FDA Commissioner noted, "We're deeply concerned by this situation."[22]

58.     Health care facilities have attempted to cope with the purported IV Saline Solution shortage by conserving supplies.  The American Society of Health-System Pharmacists ("ASHP") issued guidance in March 2014 advising clinicians to conserve IV Saline Solution by "using oral hydration whenever possible" and to "consider flushing central venous access devices 1-3 times per week rather than daily."[23]

59.     The Veterans Health Administration, the largest healthcare system in the country, stated that the IV Saline Solution shortage is a "serious concern" and that it has been required to implement operational changes to manage care in light of the limited supply.

---

[21] *Id.*

[22] FDA, *FDA Commissioner Scott Gottlieb, M.D., Updates on Some Ongoing Shortages Related to IV Fluids* (Jan. 16, 2018),
https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm592617.htm.

[23] Fry, n.19 *supra*.

60.     A scramble to find supplies during a shortage can cause a delay in patients' treatment "and in the emergency room . . . [a] few minutes in these situations can be crucial."[24] The purported IV Saline Solution shortage is causing health care facilities to "improvise with what they've got."  Pharmacists have discussed "bartering medical supplies among one another, and spending an unprecedented number of hours tracking down supply and scrambling together substitutes."[25]

61.     According to David Jaspan, RPh, director of pharmacy and materials management at Union Hospital in Elkton, Maryland, who spends part of his time locating alternatives to IV Saline Solution, "we find ourselves struggling to manage with what we have."  Jaspan described how the hospital ran out of its supply of IV Saline Solution less than a week after receiving a delivery of IV Saline Solution and other IV fluids.[26]

62.     Drug shortages have a significant financial impact on health care facilities.  A 2011 study by the ASHP estimated that U.S. health care facilities spend $216 million a year in labor costs associated with managing drug shortages.[27]  The current IV Saline Solution shortage is expected to be the most expensive drug shortage in history.[28]

---

[24] Weiner, n.5 *supra*.

[25] Fry, n.19 *supra*.

[26] Lena J. Weiner, *IV Fluids Shortage Continues in Hospitals*, HEALTHLEADERS MEDIA (Sept. 25, 2014), http://www.healthleadersmedia.com/quality/iv-fluids-shortage-continues-hospitals.

[27] Press Release, "Drug Shortages Harming Patients, Increasing Costs to Hospitals" (July 12, 2011), https://www.uofmhealth.org/news/drug-shortage-0712.

[28] Dembosky, n.4 *supra*.

**C.    Congress Urges The FTC To Investigate Defendants For Conspiring
To Restrict Output And Increase Prices of IV Saline Solution**

63.    On October 26, 2015, a bipartisan group of Senators, including Mike Lee (R-Utah) and Amy Klobuchar (D-Minn.), who are the Chairman and ranking member, respectively, of the Judiciary Subcommittee on Antitrust, Competition Policy and Consumer Rights, along with Senators Richard Blumenthal (D-Conn.) and Orrin G. Hatch (R-Utah), wrote a letter to the FTC urging it to investigate Defendants for violations of the federal antitrust laws in connection with the manufacture and sale of IV Saline Solution.

64.    Specifically, the Senators contend that Defendants may have coordinated to create and maintain an artificial IV Saline Solution shortage to increase prices 200-300%.  They noted that, while price increases can help end shortages, the IV Saline Solution shortage was still ongoing after nearly two years, raising questions about Defendants' motivations for solving the shortage and "possible coordination among them."[29]

**D.    The U.S. Department Of Justice And New York Attorney General
Investigate Defendants' Practices In The IV Saline Solution Market**

65.    Defendant Baxter and ICU Medical, the parent company of Defendant Hospira, disclosed in their 2018 Form 10-Ks filed with the Securities and Exchange Commission that they had received subpoenas from the New York Attorney General and U.S. Department of Justice, Antitrust Division, in connection with investigations regarding the IV Saline Solution Market.

---

[29] Press Release, n.7 *supra*.

66.     Specifically, in August 2015, the New York Attorney General had subpoenaed Defendants Baxter and Hospira requesting that they provide information regarding their business practices in the IV Saline Solution Market.[30]

67.     Then, in April 2017, Defendant Baxter and ICU Medical received grand jury subpoenas in the United States District Court for the Eastern District of Pennsylvania relating to a criminal antitrust investigation by the U.S. Department of Justice. These subpoenas sought the production of documents and testimony regarding the manufacturing, selling, pricing and shortages of IV Saline Solution, and communications among Defendants and their other participants in the IV Saline Solution market with respect to the same issues.[31]

68.     On August 9, 2018, Pfizer Inc., Defendant Hospira's former parent company, confirmed that the investigations by the U.S. Department of Justice and the New York Attorney General are still active, and that Hospira and ICU Medical are producing documents in connection with those investigations.[32]

### E.     Defendants Unlawfully Stifled Competition By Colluding To Restrict Output And Increase Prices For IV Saline Solution

69.     Defendants engaged in a collusive scheme to control and reduce output and artificially fix the prices of IV Saline Solution during the Class Period. Defendants used the

---

[30] Baxter and ICU Medical Form 10-Ks, n.6 *supra*.

[31] *Id.  See also* "Justice Department Crackdown on Price Fixing Ensnares Baxter," CRAIN'S CHI. BUS. (Apr. 14, 2017), http://www.chicagobusiness.com/article/20170414/NEWS03/170419901/justice-department-crackdown-on-price-fixing-ensnares-baxter.

[32] "Pfizer's Greenstone Subpoenaed," n.9 *supra*.

purported shortage of IV Saline Solution—a shortage they created—as a pretext for unlawful and collusive price increases.

70.     Following Defendants' voluntary recalls and publicly available communications with customers and the FDA, Defendants instructed production line employees to adhere to artificially low production quotas. For example, employees of Defendant Hospira were given standing instructions to adhere to production quotas and to discard any IV Saline Solution that was produced once those targets had been reached.

71.     Thus, Defendants opted to worsen an already grave shortage of IV Saline Solution by acting in concert to restrain output, despite the urgent need for more saline. Had the Defendants not been acting in concert, they each would have had obvious economic incentives to increase production at a time of supply shortages, high demand and rising prices.

72.     Further, as a result of the crisis created by the shortage, each Defendant was able to pressure customers to abide by restrictive purchasing terms and artificially inflated prices which, in a competitive market, they would not have been able to do.  As a result, Defendants effectively reduced the supply of IV Saline Solution, created and exploited a purported shortage and panic in the market, and charged customers, including Plaintiffs and members of the Class, artificially inflated supracompetitive prices.

> **1.      Defendants Issued A Series Of Voluntary Product Recalls In Response To Concerns About The Safety Of Their IV Saline Solution Products**

73.     Between 2010 and 2012, voluntary recalls of IV Saline Solution were infrequent, sporadic, and primarily issued by a single manufacturer of IV Saline Solution, Defendant Hospira.

74.     Starting in 2013 and for two years thereafter, voluntary recalls by Defendants Baxter and Hospira of IV Saline Solution became more frequent due to purported concerns

about, *e.g.*, the products' potential for solution leaks, port defects, and particulate matter. Defendants' voluntary recalls between May 21, 2013 and July 17, 2015 collectively removed 19,958,180 container bags of IV Saline Solution from the U.S. market.

75.     Irrespective of whether there was a legitimate basis for these recalls, they had a substantial impact on the available supply.  As reported by the Journal of Healthcare Contracting, approximately 20 million bags of IV Saline Solution are used per month in the United States. By this estimate, Defendant Hospira's voluntary recall in October 2014 alone removed approximately 82.5% of IV Saline Solution bags from the U.S. market for that month.  During the fourth quarter of 2014, voluntary recalls by Defendants Baxter and Hospira collectively removed approximately 28.5% of IV Saline Solution bags from the U.S. market.

76.     Prices for IV Saline Solution rose as the recalls had a cumulative impact on the market.  The U.S. Centers for Medicare and Medicaid Services reported that prices of IV Saline Solution sold to the U.S. government rose approximately 36% between the fourth quarters of 2014 and 2015.  This price increase is undoubtedly larger for private customers who, according to the Senators, have paid price increases of 200-300% since the purported shortage began.

### 2.     Defendants Conspired To Prolong And Aggravate The Shortage By Destroying Saleable IV Saline Solution

77.     Sometime contemporaneous with or shortly following their 2013 voluntary recalls, Defendants began earning windfall profits as a result of the shortage of IV Saline Solution in the U.S. market, which was attributable at least in part to the recalls.  Thereafter, Defendants began to restrain output by implementing quotas at the production line level and discarding any IV Saline Solution that was produced once those targets had been reached.

78.     For example, a former production line employee of Defendant Hospira has stated that he and his co-workers had standing instructions from their supervisors not to produce IV

Saline Solution above a certain supply quota and to discard any IV Saline Solution that had been produced above that limit but not yet placed in container bags. Hospira supervisors instructed line employees systematically to destroy functional, saleable IV Saline Solution containers above the production quota, despite the unprecedented shortage that had rapidly become a public health crisis.

> **3.    Defendants Exploited Their Market Power And The Purported IV Saline Solution Shortage By Collusively Pressuring Customers To Abide By Restrictive Purchasing Terms**

79.    As a result of the crisis created by the shortage, Defendants were able collusively to exploit their market power and the purported IV Saline Solution shortage by pressuring customers to purchase more products than IV Saline Solution alone which, in a competitive market, they would not have been able to do. According to the bipartisan group of Senators in their letter to the FTC, suppliers of IV Saline Solution, such as Defendants, informed hospital customers that they "would not be able to purchase any saline at any price unless the hospital also purchased additional products."

80.    For instance, the Senators described reports from hospitals that Defendants "are imposing even greater price increases on customers who do not also purchase additional non-saline products," such as pumps, tubing and catheters through which IV Saline Solution is delivered to patients. The Senators also recognized that Defendants were able to "lock their customers into long term contracts."

81.    The Senators called the Defendants' actions "troubling" and stated that they "pose a potential risk to the wellbeing of patients by forcing hospitals to purchase products they may believe to be clinically inferior and add significant costs to our health care system."

82.    In a truly competitive market, it would be in the independent economic self-interest of each IV Saline Solution supplier to lower its prices for IV Saline Solution and sell IV

Saline Solution separately from other products. By collectively imposing price increases on IV Saline Solution customers and pressuring customers to abide by similar restrictive purchasing terms, Defendants acted contrary to their economic self-interests. Defendants' conduct is highly suggestive of a price-fixing conspiracy in the IV Saline Solution market.

### F. Defendants' Conspiracy Had The Purpose And Effect Of Raising Prices For IV Saline Solution In The United States During The Class Period

83. Defendants' scheme to collusively manipulate and control the supply of IV Saline Solution had the purpose and effect of raising prices of IV Saline Solution to supracompetitive levels.

84. Indeed, according to pricing information obtained from the U.S. Centers for Medicare and Medicaid Services, prices for IV Saline Solution began increasing in mid-2013 and have continued to soar. In 2018, prices hit levels that greatly exceeded even the high prices being charged when the first complaint was filed on this action in 2016. Figure 1 below reflects the price increases for 1000 mL containers of IV Saline Solution sold to the U.S. government.

### Figure 1



23

85.     Figure 2 below reflects the price increases for 250 mL and 500 mL containers of IV Saline Solution sold to the U.S. government, which similarly have continued to rise dramatically, and which also reached new highs in 2018.

**<u>Figure 2</u>**



86.     While Figures 1 and 2 relate to the average prices of IV Saline Solution charged to the U.S. government, according to the bipartisan group of Senators, prices paid by other purchasers of Defendants' IV Saline Solution, including Plaintiffs and members of the Class, have increased 200-300%.

87.     In March 2018, the *Financial Times* reported that "[t]he average wholesale price of a 250ml bag of saline made by Baxter more than doubled from $1.66 in May 2014 to $4.04 today."[33]

88.     Defendants touted their price increases of IV Saline Solution and the exploitation of their customers during the purported shortage.

89.     Robert L. Parkinson, Jr., then Chairman and Chief Executive Office ("CEO") of Defendant Baxter, stated during a July 2014 earnings call that he thought IV solutions, "which are essential to saving and sustaining lives," were "the best deal in healthcare" and priced lower "than a bottle of water at Seven-Eleven."  Given that Parkinson perceived IV solutions to be undervalued, he indicated that he saw a business opportunity in increasing prices of and margins on IV solutions during the "recent IV shortage in the U.S.," which he believed "has sensitized a lot of people to the value of these products."

90.     Also in July 2014, media outlets reported that Defendant Hospira was about to double or triple its prices for IV Saline Solution.

91.     Indeed, during the purported shortage, Defendants attributed their rise in net sales to their price increases for IV solutions.  For example, in its earnings call for the second quarter of 2014, Defendant Baxter stated that its 8% sales increase in its Fluid Systems franchise (which includes IV Saline Solution) was driven in part by "pricing for IV solutions."  Again, in Baxter's 10-Q for the third quarter of 2014, it stated that "price improvements" for IV therapies (which include IV Saline Solution) contributed to a 4% net sales growth in its Fluid Systems franchise.

---

[33] David Crow, *Saline Investigation Highlights the Cost of American Healthcare*, FIN. TIMES (Mar. 4, 2018), https://www.ft.com/content/4593b93e-1887-11e8-9376-4a6390addb44.

92.     Similarly, in the first quarter of 2014, Defendant Hospira reported during an earnings call that it was "seeing some uptick in IV solutions prices" and a 19% increase in net sales in its Other Pharma segment, which includes IV Saline Solution.  In the third quarter of 2014, Hospira reported a significant 43% increase in its Other Pharma segment compared to the same quarter for 2013.  During Hospira's earnings call for that quarter, F. Michael Ball, Hospira's CEO, stated that this increase was "primarily driven by the strong performance from our solutions products, which benefitted from the continued strong demand from protracted market shortages."

93.     During a May 2015 investor conference, Baxter's CEO, Parkinson, indicated that, even though business was "slower . . . we've been actually increasing prices in the U.S. on IV solutions."

94.     Repeatedly throughout the Class Period, amid the most expensive IV Saline shortage in history, Parkinson's successor as CEO, José E. Almeida, boasted of "favorable pricing and demand" for IV Saline Solution in the United States. He used this phrase or near-verbatim equivalents on Baxter's earnings calls for the fourth quarter of 2015 and all four quarters of 2016, though since the first quarter of 2017 he has begun to refer to "strong sales," "robust sales," or "continued strength in the U.S." with respect to IV Saline Solution, rather than "favorable pricing." Baxter CFO James K. Saccaro also spoke on earnings calls about the profitability of Baxter's Fluid Systems franchise and particularly of IV Saline Solution sales.

95.     On Baxter's earnings call for the fourth quarter of 2017, Almeida even expressed optimism about the flu season's impact on company profits: "The flu season is clearly picking up a significant amount of steam, it's already high for all accounts. And there's always a slight positive impact, because a couple of our business and products are used for situations where the

patient is in ICU with distress and multi-organ failure. So there's a pick-up for our business when there's a good flu season. Flu season is all-time high [*sic*]."

96.     Defendants' price increases for IV Saline Solution cannot be explained by the purported shortage alone.  The bipartisan group of Senators recognized that, although "prices tend to increase during a shortage," the price increases for IV Saline Solution "appear to be outside the bound of natural market forces."  The Senators further stated to the FTC that "[t]he ongoing shortage, the fact that the shortage has not cleared even with significant price increases, and the behavior reported by hospitals raises questions about potential coordination between the saline suppliers."[34]

97.     Indeed, according to Craig Garthwaite, an economist and assistant professor of strategy at the Kellogg School of Business at Northwestern University, "[s]aline shortages are something that shouldn't happen, they baffle economists."[35]

### G.     Defendants' Actions Would Be Irrational, Absent A Conspiracy

98.     Defendants' conspiracy is best understood not simply as a series of discrete actions that collectively exerted upward price pressure on the IV Saline Solution market, but as an integrated and coordinated scheme of acts that functioned collectively and cumulatively to distort that market and reap supracompetitive profits for Defendants.[36] Basic economic theory

---

[34] Press Release, n.7 *supra*.

[35] Lapointe, n.10 *supra*.

[36] *See Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 839 (7th Cir. 2011) ("[A] plaintiff 'should be given the full benefit of [its] proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each'") (quoting *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962)); *Std. Iron Works v. ArcelorMittal*, 639 F. Supp. 2d 877, 902 (N.D. Ill. 2009) ("[T]he character and effect of a

*(continued)*

dictates that destruction of saleable inventory would be economically irrational without an understanding between competitors to restrict supply and fix prices in the market. This is because, if Producer A in a given product market elects to cut its level of production of the good in question, its competitors can capitalize on that decision by increasing their own production, in essence "filling the gap" in demand. That is, Producer A's competitors can raise production and thereby seize for themselves a portion of Producer A's market share, as well as the accompanying profits.[37]

99.     In a competitive market, it would make no sense for Defendant Hospira unilaterally to set a production quota for IV Saline Solution and to destroy saleable IV Saline Solution containers. Such conduct is economically rational only if each Defendant was restraining output in order to maintain artificially high, supracompetitive prices and was assured that its competitor was doing the same. Therefore, this behavior is highly suggestive of collusion.

### H.     The IV Saline Solution Market Structure And Characteristics Support The Existence Of A Conspiracy

100.     The relevant product market for purposes of this Complaint is the IV Saline Solution market. The relevant geographical market is the United States.

---

*(continued)*

conspiracy are not to be judged by dismembering it and viewing its separate parts.") (quoting *Cont'l Ore*, 370 U.S. at 699).

[37] *See In re Plasma-Derivative Protein Therapies Antitrust Litig.*, 764 F. Supp. 2d 991, 1000 (N.D. Ill. 2011) ("In a perfectly competitive market, supply reductions by one firm would presumably lead to other competitors filling in the gaps and prices remaining lower.").

101.    The structure and other characteristics of the market for IV Saline Solution in the United States make it conducive to a price-fixing agreement among market participants and made collusion particularly attractive.  Specifically, the IV Saline Solution market: (1) is highly concentrated; (2) has high barriers to entry; (3) has inelastic demand; (4) is highly homogenized; and (5) is comprised of participants who have motives to conspire.  Additionally, facts exist that are highly indicative of a price-fixing conspiracy, including that: prices increased while input prices remained stable or were declining; there was no corresponding IV Saline Solution shortage during other flu outbreaks; and Defendant Baxter is a recidivist violator of the antitrust laws, having previously been charged with colluding with a competitor to create a shortage in a blood plasma derivatives market.

### 1.    The Market For IV Saline Solution Is Highly Concentrated

102.    A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

103.    The IV Saline Solution market is highly concentrated.  Only three manufacturers control nearly 100% of the United States IV Saline Solution market.  As demonstrated in Figure 3 below, Defendants Baxter and Hospira maintain a combined 75.7% market share in the IV Saline Solution market.  B. Braun holds another 10.9% market share.

### Figure 3

| Company | Market Share (2018) |
| --- | --- |
| Baxter | 49.3% |
| ICU (including HIS) | 26.4% |
| Braun | 10.9% |
| Other | 13.4% |
| Top 3 | 86.6% |
| ICU + Baxter | 75.7% |

104. The Herfindahl–Hirschman Index ("HHI") measures the competitive concentration of a particular industry. An HHI of 0 indicates a perfectly competitive market. The higher the number, the less competitive the market. Figure 4 below provides the ranges of HHI concentration levels used by the U.S. Department of Justice and FTC to classify markets as unconcentrated, moderately concentrated, and highly concentrated. The higher the market concentration, the easier it is for market participants to effectively execute price fixing.

**Figure 4**

**Concentration Levels**

| Level | HHI |
|---|---|
| Highly Concentrated | > 2,500 |
| Moderately Concentrated | 1,500 to 2,500 |
| Unconcentrated | < 1,500 |

105. The estimated HHI for the IV Saline Solution market is 3,306. Thus, the IV Saline Solution market is highly concentrated and conducive to a price-fixing conspiracy. Indeed, the ASHP has pointed to the concentrated nature of the IV Saline Solution market as contributing to the recent shortages.[38]

**2.    The Market For IV Saline Solution Has High Barriers To Entry**

106. A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. When, however, there are significant barriers to entry, new entrants

---

[38] Lydia Ramsey, "We're Running Out of Commonly Used Drugs—and Hospitals Say It's 'Quickly Becoming a Crisis,'" BUS. INSIDER (Nov. 10, 2017), https://www.businessinsider.com/drug-shortages-are-getting-worse-american-hospital-association-2017-11.

are much less likely to enter the market. Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

107. Significant barriers preclude, reduce, or make more difficult for competitors to enter the IV Saline Solution market. IV Saline Solution production is capital-intensive. It would take years for a new market entrant to establish the necessary manufacturing plants where IV Saline Solution could be produced. FDA economist Marta Wosinska estimated that it would take three to five years, and hundreds of millions of dollars, to open a new IV Saline Solution plant.[39] Any new plant would also need to meet strict FDA requirements, adding additional burdens and costs on a potential entrant.

108. According to an industry report, Defendants have also become increasingly vertically integrated by acquiring companies within the IV Saline Solution supply chain. As a result, Defendants' per-unit production costs were expected to decrease. It would be onerous and time-consuming for a potential market entrant to gain the economies of scale already achieved by Defendants to compete effectively with them on prices of IV Saline Solution.

109. Additionally, establishing a sophisticated distribution network would require a great deal of time and investment by a new entrant.

### 3. The Demand For IV Saline Solution Is Inelastic

110. "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline in the quantity sold of that product, if any. In

---

[39] Dembosky, n.4 *supra*.

other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

111. For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

112. Demand for IV Saline Solution is highly inelastic. A small, non-transitory increase in the price for IV Saline Solution would not cause purchasers to switch to another product in significant enough numbers to negate the value to sellers of the price increase.

113. IV Saline Solution is an essential product that health care facilities must have in stock at all times to treat patients with a countless number of medical conditions.

114. There is no adequate alternative to IV Saline Solution for health care facilities other than IV Saline Solution. Other forms of saline cannot replace IV Saline Solution because it is specifically designed to be administered through injection. The ASHP issued a bulletin warning health care providers that saline solutions designed for irrigation cannot be used as a substitute for IV Saline Solution during the shortage. According to ASHP, the irrigation saline is not approved for injection due to the potential of having higher levels of particulates.[40]

115. Moreover, although a type of saline can be administered orally, it is not an adequate substitute for many patients who are unable to ingest fluids and must receive them

---

[40] Am. Soc'y of Health-Sys. Pharmacists, *Critical Shortage of I.V. Saline Solution* (Jan. 17, 2014), http://www.ashp.org/menu/News/NewsCapsules/Article.aspx?id=524.

intravenously. IV Saline Solution is also superior to saline administered orally because it is absorbed by a patient's body more quickly.

### 4. IV Saline Solution Is A Highly Homogeneous Product

116. When products or services offered by different suppliers are viewed as interchangeable by customers, it is easier for suppliers to unlawfully agree on the price for the product or service in question, and it is easier to effectively police the collusively set prices. This makes it easier to form and sustain an unlawful cartel.

117. IV Saline Solution is a ubiquitous medical product. All Defendants' IV Saline Solution meets the same specifications: 0.9% sodium chloride dissolved in water in injectable form.

118. Because all IV Saline Solution is the same, the core consideration for a health care facility when purchasing the product is price.

119. The interchangeability of IV Saline Solutions facilitated Defendants' conspiracy by enabling coordination on price that would be more difficult if purchasers were able to choose from various distinct types of IV Saline Solution to meet their medical care needs.

### 5. Defendants Had Ample Opportunities To Meet And Conspire

120. Defendants, who are nominally direct competitors and market leaders in the IV Saline Solution industry, had numerous opportunities to meet and conspire under the guise of legitimate business contacts and perform acts necessary for the operation and furtherance of the conspiracy. In particular, Defendants were members of industry associations, which afforded them the opportunity to meet and have improper discussions to enter into and further their anticompetitive agreement.

121.    For example, both Baxter and Hospira executives attended multiple iterations of the Annual JP Morgan Healthcare Conference during the time the alleged conspiracy was conceived and executed.

122.    From January 7 to 10, 2013, both Baxter and Hospira sent executives to and made presentations at the 31st Annual JP Morgan Healthcare Conference in San Francisco.  A partial transcript of the conference shows Baxter attendees included Bob Hombach, its chief financial officer at the time, and Norbert Riedel, chief scientific and innovation officer, while Hospira attendees included its CEO, F. Michael Ball.

123.    From January 13 to 16, 2014, both Baxter and Hospira sent executives to and made presentations at the 32nd Annual JP Morgan Healthcare Conference, again in San Francisco.  On January 17, 2014, Hospira and Baxter sent letters to their customers regarding the expected duration of the IV Saline Solution shortage.  Braun also sent letters to its customers around the same time, stating that the tight supply would last until April.[41]

124.    From January 12 to 16, 2015, both Baxter and Hospira sent executives to and made presentations at the 33rd Annual JP Morgan Healthcare Conference.

125.    From January 11 to 16, 2016, ICU Medical, Pfizer, and Baxter each sent representatives to the 34th Annual JP Morgan Healthcare Conference, and Pfizer made a presentation.[42]

---

[41] B. Braun's letter stated, among other things, "Please be assured that you are aligned with the only IV manufacturer investing in additional IV solution capacity and new technology."  Letter from Tim Cokkinias, B. Braun Vice President of Distribution, to Distributors (Feb. 24, 2014).

[42] *See* Edelman, https://www.edelman.com/post/jp-morgan-34th-annual-healthcare-conference (mentioning companies planning to attend).

126. From January 9 to 13, 2017, at least Baxter's new Chairman and CEO Jose E. Almeida attended and made a presentation at the 35th Annual JP Morgan Healthcare Conference.

127. In September 2015 and September 2017, at least Baxter and ICU Medical sent representatives to and/or made presentations at the Morgan Stanley Annual Global Healthcare Conference.

128. Additionally, all Defendants are members of the Advanced Medical Technology Association ("AdvaMed"). AdvaMed is a trade association that holds numerous conferences and workshops throughout the year covering topics in the medical industry and promotes meetings held by federal agencies. Baxter and Hospira both had executives on AdvaMed's board of directors as of December 31, 2013; December 31, 2014; and December 31, 2015.

129. Defendants Baxter and Hospira were both members of the Generic Pharmaceutical Association ("GPhA") during the Class Period. GPhA is a trade association for manufacturers of pharmaceutical chemicals, generic prescription drugs and other medical goods and services used in the generic drug industry. GPhA's website states that its "core mission is to improve the lives of patients and the U.S. healthcare system by advancing timely access to affordable generic medicines." GPhA advances the interest of its members through scientific, regulatory and federal and state initiatives. GPhA holds workshops and conferences throughout the year for its members. Baxter and Hospira both sent representatives to GPhA's Fall Technical Conference in 2014 and 2015.

130. In 2015, several executives from both Baxter and Hospira attended the 2015 Business and Leadership Conference of the Healthcare Distribution Alliance ("HDMA") in San Antonio, Texas. The HDMA describes the annual event as "the healthcare distribution industry's signature annual conference, developed by and for healthcare supply chain leaders and

innovators," bringing together "high-level executives, thought leaders and influential managers from across the healthcare supply chain to hold strategic business discussions on the most pressing industry issues," and offering "unmatched opportunities to network with your peers and trading partners at all levels of the healthcare distribution industry."

131.    On March 12 to 13, 2015, industry executives attended a kick-off meeting of the National Coalition for Infusion Therapy Safety in Annapolis, Maryland, organized by the Association for the Advancement of Medical Instrumentation ("AAMI"). AAMI, founded in 1967, has 7,000 members, including Baxter, Hospira, Pfizer, ICU Medical, and B. Braun. Industry partners of the new coalition included Baxter, Hospira, and B. Braun, according to an article about the event. According to another article about the coalition, its membership included Mike Golebiowski, B. Braun's vice president of marketing, automation, and infusion systems; Pat Baird, a technical director at the time for Baxter; Tim Hoh, Baxter's senior manager for medical affairs; Idal Beer, at the time Baxter's director of global medical affairs; Pamela Krueger, Hospira's senior manager for marketing communications; Cynthia Ansari, at the time Hospira's vice president of U.S. marketing; and Candida Arvelo, at the time Hospira's director of clinical consulting.

132.    In March 2016, executives from both Baxter and Pfizer (after Pfizer acquired Hospira) attended the Cowen and Company 36th Annual Healthcare Conference.

133.    Moreover, Defendants Baxter and Hospira are located in close proximity, providing them with ease of access to each other to meet and conspire. Both are headquartered in Illinois, with offices separated by less than 10 miles.

134.    Several Baxter executives previously held positions at Hospira, strengthening the companies' shared ability to communicate with one another and to effectuate an anticompetitive

conspiracy without attracting unwanted attention. Robert Felicelli, President of Baxter's Pharmaceuticals division, worked at Hospira from 2004 to 2009, including as its Vice President and General Manager, Specialty Pharmaceuticals and as Vice President, Global Business Optimization.[43] Sumant Ramachandra, Baxter's Senior Vice President, Chief Science and Technology Officer, served as Chief Scientific Officer at Hospira from 2008 to 2015—that is, he switched from one conspirator firm to another in the middle of the conspiracy.[44] Cathy Skala, Baxter's Vice President, Business Transformation Office, previously worked in a "senior information technology position[ ]" at Hospira.[45] Stacy T. Eisen, Baxter International's senior vice president for communications, was previously head of global public affairs for Hospira. Kris Rapp was vice president for global ethics and compliance at Hospira for more than ten years, and associate general counsel and chief regulatory counsel at Baxter for nine years. Rohit Vishnoi, who was at Hospira for six years including as corporate vice president for device research and development, was previously a longtime Baxter Healthcare employee including vice president for global product development (renal division).

### 6.    Defendants Had Motives To Conspire

135.    Each Defendant was economically motivated to collusively restrict output and increase prices of IV Saline Solution to supracompetitive levels.

---

[43] Biography, Robert Felicelli, https://www.baxter.com/our-story/baxter-leadership/robert-felicelli.

[44] Biography, Sumant Ramachandra, https://www.baxter.com/our-story/baxter-leadership/sumant-ramachandra-md-phd.

[45] Biography, Cathy Skala, https://www.baxter.com/our-story/baxter-leadership/cathy-skala.

136. Given that long-term contracts with certain customers were set to expire during the Class Period, Defendants were motivated to restrict output to create panic among customers to force them into long-term contracts with higher price terms. These contracts enabled Defendants to prolong the purported shortage and maintain their conspiracy while avoiding price competition and erosion of market share.

137. According to the bipartisan group of Senators, "[e]ven absent coordination, [Defendants'] ability to extract several-hundred-percent price increases and to lock their customers into long term contracts is likely reducing their incentive to alleviate this troubling shortage." The Senators recognized that Defendants' motivation to increase prices and further restrict output "further exacerbates the shortage and results in consumer harm."[46]

138. Defendants and their co-conspirators were also motivated to conspire to enable their foreign affiliates to enter the U.S. market. To mitigate the shortage, the FDA allowed imports of IV Saline Solution from foreign countries. In particular, IV Saline Solution has been imported from Defendant Baxter's plant in Spain during the Class Period. Additionally, Baxter stated in its earnings call for the second quarter of 2015 that the FDA is reviewing its application to source IV Saline Solution from its plant in Mexico. Due to lower production costs in foreign countries like Mexico, Defendants and their co-conspirators were motivated to continue the shortage to increase their margins on U.S. sales of IV Saline Solution that were manufactured by their foreign plants.

---

[46] Press Release, n.7 *supra*.

**7.     IV Saline Solution Prices Rose Despite Falling Raw Material
Prices And Defendants' Increased Economies Of Scale**

139.     Increasing prices for a product during a time of stable or decreasing input costs are indicative of a price-fixing conspiracy.  The drastic price increases of IV Saline Solution throughout the Class Period cannot be explained by an increase in raw material costs.

140.     The primary inputs for IV Saline Solution are plastic materials and resins, which are used to manufacture the packaging for IV Saline Solution (*e.g.*, plastic bags or bottles). Operators in this industry manufacture plastic packaging in the form of sealed bags and bottles for IV solutions. As a result, the price of plastic factors into a company's purchasing expense and can bear on profitability, which can affect capital investments and overall growth.

141.     As reflected in Figure 5 below, prior to and during the Class Period, the Producer Price Index for plastic remained stable and even dropped sharply during the last quarter of 2014. Current plastic price levels are on par with those preceding the IV Saline Solution shortage and ensuing conspiracy.

**Figure 5**



142.    Moreover, according to an industry report, increased vertical integration in the IV

Saline Solution industry resulting from mergers and acquisitions by Defendants safeguarded

their profits against any rising costs associated with plastic prices.

143.    That Defendants' economies of scale increased and input costs remained stable or

declined during the Class Period, while prices for IV Saline Solution increased drastically, is

highly indicative of a price-fixing conspiracy among Defendants.

---

[47] U.S. Bureau of Labor Statistics, "Producer Price Index by Industry: Plastics Material and
Resins Manufacturing" [PCU325211325211],
https://fred.stlouisfed.org/series/PCU325211325211.

### 8. Similar Supply Shortages And Price Increases For IV Saline Solution Did Not Occur During Other Flu Outbreaks

144.　A harsher-than-expected 2013 to 2014 flu season alone cannot justify the extended IV Saline Solution shortages experienced through today and the 200-300% price increases for IV Saline Solution.

145.　According to a study conducted by the U.S. Centers for Disease Control and Prevention and published in 2004 by The Journal of the American Medical Association, between 1979 and 2001, approximately 200,000 people on average were hospitalized from seasonal influenza-related complications each year. During earlier major flu outbreaks, there was no corresponding nationwide shortage of, or significantly increasing prices for, IV Saline Solution.

146.　For example, during the notable 2009 to 2010 global pandemic of the swine flu, or H1N1 virus, it was estimated that over 274,000 people in the United States were hospitalized due to the swine flu, in addition to those hospitalized for the regular flu season. However, there was no shortage or substantial price increase for IV Saline Solution during that time.

147.　Thus, the purported supply shortage and escalating IV Saline Solution prices experienced throughout the Class Period cannot be attributed to a harsh flu season.

### 9. Defendant Baxter Is A Recidivist Violator Of The Antitrust Laws

148.　This is not the first time a Defendant has been accused of creating a supply shortage of a medical product and using it as a pretext for an unlawful price increase.

149.　In 2009, while evaluating the anticompetitive effects of a proposed merger between CSL Ltd. ("CLS"), a manufacturer of blood plasma derivatives immunoglobulin and albumin ("plasma derivatives"), and a competitor, Talecris Biotherapeutics Holdings Corp., the FTC uncovered evidence regarding "troubling signs of coordinated behavior" among the "tight oligopoly" of firms in the plasma derivatives industry, including Defendant Baxter.

150.    Private class actions on behalf of direct and indirect purchasers of plasma derivatives against Baxter and CLS ensued.  The private plaintiffs alleged that, between 2003 and 2009, Baxter and its competitors exploited a supply shortage following plant shutdowns, restricted output and increased prices of plasma derivatives.  Baxter also allegedly engaged in price signaling by using meetings called by the FDA to address the shortage as a means to communicate with its competitors regarding supply levels and distribution of blood plasma.  Baxter settled the class actions for $64 million in 2014.

151.    The allegations against Baxter relating to plasma derivatives bear a striking resemblance to the allegations of Defendants' wrongdoing alleged herein and support the existence of Baxter's participation in the conspiracy to restrict output and increase prices of IV Saline Solution as alleged herein.

## CLASS ACTION ALLEGATIONS

152.    Plaintiffs bring this action on behalf of themselves and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following class (the "Class"):

> All persons and entities in the United States who directly purchased IV Saline Solution sold by any of the Defendants, or any current or former subsidiary or affiliate thereof, or any co-conspirator, during the period from and including January 1, 2013 through such time as the anticompetitive effects of Defendants' conduct cease.  Excluded from the Class are Defendants, their parent companies, subsidiaries, affiliates, agents, co-conspirators, federal governmental entities and instrumentalities of the federal government, and states and their subdivisions, agencies and instrumentalities.

153.    While Plaintiffs do not know the exact number of the members of the Class, Plaintiffs believe there are (at least) thousands of members.

154.    Common questions of law and fact exist as to all members of the Class.  This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all the members of the Class, thereby making appropriate relief with respect to the Class as a whole.  Such questions of law and fact common to the Class include, but are not limited to:

(a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to restrict output and fix, raise, maintain or stabilize the prices of IV Saline Solution;

(b)    The identities of the participants of the alleged conspiracy;

(c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

(d)    Whether the alleged conspiracy violated the Sherman Act, as alleged in the First Count;

(e)    Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the businesses or property of Plaintiffs and the members of the Class;

(f)    The effect of the alleged conspiracy on the prices of IV Saline Solution sold in the United States during the Class Period;

(g)    The appropriate injunctive and related equitable relief for Plaintiffs and the Class; and

(h)    The appropriate class-wide measure of damages.

155.    Plaintiffs' claims are typical of the claims of the members of the Class, and Plaintiffs will fairly and adequately protect the interests of the Class.  Plaintiffs and all members

of the Class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for IV Saline Solution sold by Defendants and/or their co-conspirators.

156.    Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class.  Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

157.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

158.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender.  The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

159.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY

160.    Defendants' price-fixing conspiracy had the following effects, among others:

(a)      Price competition has been restrained or eliminated with respect to IV Saline Solution;

(b)      The prices of IV Saline Solution have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)      Purchasers of IV Saline Solution have been deprived of the benefits of free and open competition; and

(d)      Purchasers of IV Saline Solution paid artificially inflated prices.

161.      The purpose of the conspiratorial conduct of Defendants and their co-conspirators was to fix, raise, stabilize and/or maintain the price of IV Saline Solution.

162.      The precise amount of the overcharge impacting the prices of IV Saline Solution paid by Plaintiffs and the Class can be measured and quantified. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supracompetitive charge passed-through the chain of distribution. Thus, the economic harm to Plaintiffs and the members of the Class can be quantified.

163.      By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Class sustained injury to their businesses or property, having paid higher prices for IV Saline Solution than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

**<u>FIRST COUNT</u>**
**Violation of Section 1 of the Sherman Act (15 U.S.C. § 1)**
**(Conspiracy in Restraint of Trade)**

164.      Plaintiffs repeat the allegations set forth above as if fully set forth herein.

165.    Defendants and unnamed co-conspirators entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

166.    The acts done by each of Defendants as part of, and in furtherance of, their contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

167.    During the Class Period, Defendants and their co-conspirators entered into a continuing agreement, understanding and conspiracy in restraint of trade to artificially fix, raise, stabilize, and control prices for IV Saline Solution.

168.    The conspiratorial acts and combinations have caused unreasonable restraints in the market for IV Saline Solution.

169.    As a result of Defendants' unlawful conduct, Plaintiffs and other similarly situated purchasers in the Class who purchased IV Saline Solution have been harmed by being forced to pay inflated, supracompetitive prices for IV Saline Solution.

170.    In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices and course of conduct set forth herein.

171.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for IV Saline Solution has been restrained, suppressed, and/or eliminated in the United States;

(b)     Prices for IV Saline Solution provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States; and

(c)     Plaintiffs and members of the Class who purchased IV Saline Solution from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

172.     Plaintiffs and members of the Class have been injured and will continue to be injured in their business and property by paying more for IV Saline Solution purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

173.     The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

174.     Plaintiffs and members of the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

WHEREFORE, Plaintiffs demand judgment that:

1.     The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, determine that Plaintiffs be named representatives of the Class, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

2.     That the unlawful conduct, contract, conspiracy, or combination alleged herein be adjudged and decreed:

(a)     An unlawful unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act; and

(b)     A *per se* violation of Section 1 of the Sherman Act;

3.      Plaintiffs and the members of the Class recover damages, to the maximum extent allowed under the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

4.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

6.      Plaintiffs and the members of the Class be awarded pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

8.      Plaintiffs and the members of the Class recover their costs of suit, including reasonable attorneys' fees, as provided by law; and

9.      Plaintiffs and members of the Class have such other and further relief as the case may require and the Court may deem just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

Dated:  September 6, 2018        Respectfully submitted,

By:  */s/ Robert J. Wozniak*
Steven A. Kanner
William H. London
Douglas A. Millen
Robert J. Wozniak
**FREED KANNER LONDON & MILLEN LLC**
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
Facsimile: (224) 632-4521
rwozniak@fklmlaw.com
skanner@fklmlaw.com
wlondon@fklmlaw.com
dmillen@fklmlaw.com

*Interim Liaison Counsel for Plaintiffs and the Putative Class*

Hollis Salzman
Eamon O'Kelly
Meegan Hollywood
Nathaniel Ament-Stone
**ROBINS KAPLAN LLP**
399 Park Avenue
Suite 3600
New York, NY 10022
(212) 980-7400
hsalzman@robinskaplan.com
eokelly@robinskaplan.com
mhollywood@robinskaplan.com
nament-stone@robinskaplan.com

Thomas J. Undlin
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
tundlin@robinskaplan.com

W. Joseph Bruckner
Heidi M. Silton
Brian D. Clark
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900
wjbruckner@locklaw.com
hmsilton@locklaw.com
bdclark@locklaw.com

Linda P. Nussbaum
Bart D. Cohen
**NUSSBAUM LAW GROUP, P.C.**
1211 Avenue of the Americas, 40th Floor
New York, NY 10036
(917) 438-9189
lnussbaum@nussbaumpc.com
bcohen@nussbaumpc.com

*Interim Co-Lead Class Counsel for Plaintiffs and
the Putative Class*

Paul E. Slater
Thomas D. Brooks
**SPERLING & SLATER**
55 West Monroe Street
Suite 3200
Chicago, IL 60603
(312) 641-3200
pes@sperling-law.com
tdbrooks@sperling-law.com

Roberta D. Liebenberg
Jeffrey S. Istvan
Donald L. Perelman
Matthew Duncan
**FINE, KAPLAN AND BLACK, R.P.C.**
One South Broad St., 23rd Floor
Philadelphia, PA 19107
(215) 567-6565
rliebenberg@finekaplan.com
jistvan@finekaplan.com
dperelman@finekaplan.com
mduncan@finekaplan.com

Arthur N. Bailey
Marco Cercone
R. Anthony Rupp, III
**RUPP BAASE PFALZGRAF & CUNNINGHAM LLC**
1600 Liberty Building
424 Main St.
Buffalo, NY 14202
(716) 854-3400
bailey@ruppbaase.com
cercone@ruppbaase.com
rupp@ruppbaase.com

M. Stephen Dampier
**DAMPIER LAW FIRM, P.C.**
55 North Section Street
Fairhope, AL 36532
(251) 929-0900
stevedampier@dampierlaw.com

*Additional Plaintiffs' Counsel*