# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

WASHINGTON COUNTY HEALTH )
CARE AUTHORITY, INC. ET AL., )
                                          )
        Plaintiffs, )
                                          )
        v. )        No. 16-CV-10324
                                          )
BAXTER INTERNATIONAL INC. ET )        Judge John J. Tharp, Jr.
AL. )
        Defendants. )

## MEMORANDUM OPINION AND ORDER

In the age of COVID-19 and other public health challenges, supply levels in the medical industry occupy a prominent place in our national consciousness. In this antitrust suit, the plaintiffs allege, for a second time, that the defendants conspired to artificially manipulate the market of a crucial supply in that industry: intravenous ("IV") saline solution. In their previously dismissed consolidated amended complaint ("CAC"), the plaintiffs—direct purchasers of IV saline solution—alleged that Baxter and Hospira, the two biggest IV saline solution producers in the country, violated Section 1 of the Sherman Act by using a series of bogus voluntary recalls designed to reduce supply and increase prices. The Court granted the defendants' motions to dismiss the CAC without prejudice, concluding that the allegations did not suffice to plausibly show an agreement between the defendants to restrict output. Although the Court allowed the plaintiffs the opportunity to amend the CAC, it also cautioned that "there is reason to doubt" that amendment could make the plaintiffs' conspiracy claim plausible. Mem. Op. and Order, ECF No. 113.

Perhaps as a result of the Court's skepticism, the plaintiffs' second consolidated amended complaint ("SCAC") abandoned the theory that the defendants created an artificial shortage of IV

saline solution through bogus voluntary recalls. In its stead, the SCAC now advances a theory, based on information provided by an anonymous former Hospira employee, that the defendants restricted output by setting production quotas and discarding any IV saline solution manufactured in excess of those quotas. This theory suffers all of the defects of the plaintiffs' "voluntary recall" theory and then some. Most notably, where the CAC at least alleged facts that showed conduct reducing the available supply of IV saline solution by each defendant, the SCAC alleges only facts concerning Hospira's unilateral conduct; the SCAC offers no non-conclusory allegations that Baxter engaged in similar conduct. The SCAC similarly dispenses with fact allegations concerning new defendant ICU Medical, which is alleged to have done nothing more than purchase Hospira's solutions business unit in early 2017. Substituting unilateral action for parallel conduct, however, is no way to make an antitrust conspiracy claim more viable. For this and the other reasons discussed below, the SCAC, and this case, are dismissed with prejudice.

## BACKGROUND

Although the facts alleged in the SCAC are largely the same as those originally set forth in the CAC, there are some significant differences between the two pleadings. First and foremost, the SCAC has abandoned the CAC's allegations and theory that Baxter and Hospira conspired to reduce their output by engaging in a series of coordinated recalls of IV saline solution. Whereas the CAC alleged that the recalls were not legitimate and were a means for restricting the supply of IV saline solution, the SCAC deleted all of the specific allegations detailing the recalls. Instead, the SCAC alleges only that, whether or not legitimate, the recalls exacerbated existing shortages in the IV saline solution market. That is not evidence of antitrust conspiracy, of course, and the plaintiffs' response to the defendants' motions to dismiss the SCAC mentions the recalls only in passing and offers no argument that the recalls provide any support for the plaintiffs' conspiracy claim. And, as this Court noted in dismissing the CAC, "without any fact allegations to plausibly

establish that the recalls were shams, the plaintiffs' theory that the defendants raised prices by artificially restricting output by conducting a series of spurious recalls collapses: no sham recalls means no collusive scheme to restrict output means no agreement to charge supracompetitive prices." Mem. Op. and Order 12.

In the SCAC, the plaintiffs now allege that "the defendants" restricted output by imposing production quotas and discarding production in excess of those quotas. These allegations rest on information provided to the plaintiffs' counsel by "a former production line employee" of Hospira, who reported that "he and his co-workers had standing instructions from their supervisors not to produce IV Saline Solution above a certain supply quota and to discard any IV Saline Solution that had been produced above that limit but not yet placed in container bags." SCAC ¶ 78, ECF No. 120. The SCAC includes no allegations that Baxter imposed production quotas on IV saline solution or that it had discarded any saleable saline solution that it had produced.

The SCAC also names a new defendant, ICU Medical, but similarly omits any allegations that the newcomer engaged in any output restricting practices. ICU Medical acquired Hospira's infusion systems business ("HIS"), the division that produced Hospira's IV Saline Solution, in February 2017. *Id.* ¶ 43. Beyond the fact that ICU Medical purchased HIS, the SCAC alleges only that ICU Medical received subpoenas for documents in a grand jury investigation by the Department of Justice Antitrust Division and in an investigation by the New York Attorney General's office (and complied with those subpoenas) and that ICU Medical "sent representatives to" several large healthcare conferences; of the four conferences identified, three took place in 2015 and 2016, more than a year before ICU Medical acquired HIS.

The plaintiffs tag the commencement of the DOJ and NYAG investigations as another significant new development pled in the SCAC that was not part of the CAC. It is true enough that

the CAC did not include allegations about these investigations (whether because they had not then begun or become known to the public), but in any event the plaintiffs advised the Court about these investigations before it ruled on the motions to dismiss the CAC. The Court found the investigations to add nothing to the plausibility of the plaintiffs' claim. Mem. Op. and Order 26-27 n.16. The SCAC's allegations about the ongoing investigations, then, add nothing new to the mix. The only new information concerning the investigations is that, after the plaintiffs filed the SCAC, the DOJ closed its investigation without taking any action at all against any of the defendants. Hospira's Reply in Supp. of Mot. to Dismiss Ex. A, ECF No. 151; Baxter's Reply in Supp. of Mot. to Dismiss 12, ECF No. 153.

The plaintiffs also allege that the saline solution shortage that began in 2013 still continued when the SCAC was filed. As of the filing of the SCAC, the plaintiffs allege that the defendants manufactured just over 75% of the IV saline solution produced in the United States. That combined market share, however, has declined from the 90% of the market Baxter and Hospira shared equally as of 2013, when the shortage of IV saline solution first hit the country. The SCAC also shows that while Baxter's share of the market increased to almost 50% by 2018, Hospira's share decreased by more than 40%, declining from about 45% to 26.4%. Other producers accounted for almost 25% of production in 2018, up from just 10% in 2013.

The SCAC also adds a few other miscellaneous factual allegations: the continued rise in price of saline; the public comments made by Baxter's CEO about the favorable pricing and sales conditions in the industry; additional healthcare conferences that both Baxter and Hospira executives (but not ICU executives, apparently) attended; the board of directors on which executives of Hospira and Baxter both serve; and the transition of multiple employees from Hospira to Baxter over the course of the prior decade and a half.

New or old, alone or in combination, the facts set forth in the SCAC continue to fall short of plausibly alleging an agreement between the defendants to restrict the supply of IV saline solution.

## DISCUSSION

At the motion to dismiss stage, the Court accepts as true all well-pleaded facts in the plaintiffs' complaint. *Zemeckis v. Global Credit & Collection Corp.*, 679 F.3d 632, 634 (7th Cir. 2012). To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). As the Court explained in its ruling on the first set of motions to dismiss in this case:

> Section 1 of the Sherman Act, 15 U.S.C. § 1, prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade or commerce." The Act "is designed to prevent businesses from entering into collusive agreements," and "[a]greements to fix prices unambiguously fall within the ambit of § 1." *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 705 (7th Cir. 2011). To state a claim under § 1, a plaintiff must allege the existence of "(1) a contract combination, or conspiracy; (2) a resultant unreasonable restraint of trade in a relevant market; and (3) an accompanying injury." *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012). There must be "an explicit agreement, not merely a tacit one." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 661 (7th Cir. 2002). A typical price-fixing scheme features "sellers who collude to set their prices above or below prevailing market prices." *Omnicare*, 629 F.3d at 705. This case concerns price-fixing's first cousin, output restriction, a scheme in which market participants agree to reduce the amount of a product in the marketplace, thereby "reducing supply below demand" and "rais[ing] prices above a competitive level." *United States v. Andreas*, 216 F.3d 645, 667 (7th Cir. 2000).

Mem. Op. and Order 6-7.

The key element in this case remains the first prong of a Section 1 claim: the existence of some sort of agreement between the defendants to restrict output. To satisfy the standard put forth by the Supreme Court in *Twombly*, a § 1 claim under the Sherman Act must provide "enough

factual matter (taken as true) to suggest that an agreement was made." 550 U.S. at 556. *Twombly* teaches that oligopolistic markets often incentivize producers to engage in "conscious parallelism," or the independent restriction of output using cues from competitors. *Id.* at 553 (explaining that such conduct is "a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions"). For that reason, parallel conduct on the part of the defendants can help establish that factual basis, but it "needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory." *Id.* at 557.

Bearing *Twombly*'s teaching in mind, the Court previously dismissed the CAC largely because the parallel conduct alleged was not actually parallel and did not, in any event, provide a sufficient factual basis for an inference of agreement between Baxter and Hospira to manufacture a shortage of saline solutions. Mem. Op. and Order 23. The Court also concluded that the so-called "plus factors" included in the CAC failed to support an inference of agreement. These factors included specific characteristics of the saline solution industry that make it more susceptible to collusive behavior (for example, the concentration of production in a small number of corporate actors, the homogenous character of the product, the relatively inelastic demand for the product, the defendants' alleged prior history of anticompetitive conduct, and some industry-wide conferences and meetings that executives from both defendants had attended). The addition of these so-called "plus factors" to the mix, however, did not add to the plausibility of the CAC's factual allegations in any meaningful way, as they were "either equally consistent with conscious parallelism, or to be expected regardless of whether the defendants unlawfully colluded." Mem. Or. and Opinion 30. As a result, the Court concluded that the CAC's theory that the defendants

had worked together to restrict output by conducting voluntary recalls was "quite implausible." Mem. Op. and Order 10, 23.

The SCAC suffers from similar shortcomings and fails to remedy the deficiencies of the CAC. The most significant factual allegation added to the SCAC stems from an anonymous former Hospira employee reportedly confiding in plaintiffs' counsel that the company had a standing policy to limit saline production and dispose of any product manufactured above that threshold. The plaintiffs admit that they have no direct evidence of any similar policy at Baxter. They insist, however, that Hospira would only enact that type of measure if there were an agreement in place with its competitors to limit saline solution supply. According to the plaintiffs, because market prices were at an all-time high, it would be "economically irrational" for Hospira to unilaterally restrict its output and dispose of saleable solution. Pl.'s Mem. of Law in Opp'n 10, ECF No. 149. Consequently, they maintain, the Court should infer a collusive agreement between the parties and allow the complaint to proceed.

The plaintiffs' argument fails for at least four fundamental reasons. First, even accepting the allegations of the former Hospira employee as true, those allegations do not suffice to infer that Hospira materially limited its production of IV saline solution. Second, even if the allegations warranted such an inference, the premise that Hospira's conduct was rational only if it had an agreement with Baxter to jointly restrict the supply of saline solution is flawed; there is nothing inherently irrational (or unlawful) about an oligopolist's unilateral limitation on its production. Third, even if Hospira restricted its output with hopes of inducing Baxter to do the same, there are no allegations, and so no basis to infer, that Baxter followed suit. And fourth, even if Baxter had followed suit, there remains no evidence that would allow an inference of agreement from such parallel conduct.

To begin, the Court must, of course, accept the truth of the allegations attributed to the former Hospira employee in evaluating a motion to dismiss, and must as well give the plaintiffs the benefit of all reasonable inferences that can be drawn from those facts. But given the lack of detail provided about the conduct they describe, the statements are too spare to warrant the additional inferences the plaintiffs heap upon them. On their face, the allegations say nothing that reveals inherently irrational conduct and the SCAC provides no basis to infer that they describe any material restriction in the production or supply of saline solution.

Perhaps most critically and most obviously, the SCAC says nothing about when these policies were in place or how long they were in effect; the witness is identified only as a former employee and the SCAC provides no basis to infer that this practice was in place during the entire period of the alleged conspiracy, or even any portion of it. Nor does the SCAC tell us what the production quotas were, whether they were historically high or low, at what capacity plants had to operate to reach those quotas, whether they varied over time, or what factors influenced them. It sheds no light on how often saline solution was discarded or in what quantities. It does not tell us whether the discarded solution had been bagged or not.[1] The SCAC reports no information as to what explanation production workers were given for discarding saline solution; was its purpose to

---

[1] The plaintiffs dismiss Hospira's criticism of the inconsistency of the SCAC's allegations concerning the stage at which excess saline solution was discarded as "quibbl[ing]," Pl.'s Mem. of Law in Opp'n 11 n.5, but the point is more consequential than they suggest. This is the central fact allegation in the SCAC, yet the plaintiffs describe the allegation inconsistently. In paragraph 78, which is the paragraph in which the plaintiffs most fully describe the statements of the former employee, they allege both that Hospira discarded saline solution "that had been produced above that limit *but not yet placed in container bags*," and that Hospira "instructed line employees "to destroy *functional, saleable IV Saline Solution containers* above the production quota." Apart from undermining the credibility of the plaintiffs' description of the former employee's statements (at no point in the SCAC do the plaintiffs actually quote the former employee), these inconsistencies are material. A policy of discarding small quantities of unpackaged saline solution would be more readily explained than would a practice of destroying "saleable bags" of IV saline solution, yet the SCAC allegations conflate, rather than distinguish, the two possibilities.

keep prices high or to avoid the burden and cost of ensuring sterile preservation until the next production cycle? The bare facts alleged in the SCAC—that at some point Hospira set production quotas for IV saline solution at some level and discarded an unquantified amount of saline solution produced in excess of those quotas—fall well short of plausibly showing that Hospira was seeking to materially reduce the supply of saline solution in order to drive up its price.

In assessing the import of the statements attributed to the former Hospira employee, there are only four explanations for the dearth of detail alleged in the SCAC, and none provides a basis to draw the inferences the plaintiffs urge. First, the absence of additional information about Hospira's practices may not have been included in the SCAC because the questions were not asked, but that of course would provide no license to guess at the answers. Second, the questions may have been asked and answered with information that provided further support for the plaintiffs' position, but were that the case, the plaintiffs would surely have buttressed their claim with that information. Third, the answers to the questions may not have supported the plaintiffs' claims, but that would of course provide no reason to draw inferences in the plaintiffs' favor. And fourth, it is also possible that the SCAC provides no further information about quotas or the discard of saline solution because the former employee had no additional information to offer. Of these explanations for the lack of detail concerning this statement, which is the central fact allegation in the SCAC, only the last two are plausible; more importantly, none warrants an inference that the reported conduct was an effort on Hospira's part to materially limit its production of saline solution in a bid to raise prices to a supracompetitive level.

Accordingly, the Court accepts the truth of the allegation that, at some point, Hospira had production quotas for IV saline solution and discarded solution manufactured in excess of those

quotas. There is no basis to infer anything further from the information obtained from the former Hospira employee, however.

Even if the information from the former Hospira employee was sufficient to warrant an inference that Hospira was materially restricting its production of IV saline solution (as opposed, say, to reducing costs or freeing up capital to pursue other investments[2]), that fact would not make the plaintiffs' claim under Section 1 of the Sherman Act plausible. As discussed in the Court's opinion dismissing the CAC, restricting output can be a rational decision by actors in an oligopolistic market; by keeping supply down, sellers can keep prices up. The plaintiffs concede that rational oligopolists may set quotas to restrict output, Pl.'s Mem. of Law in Opp'n 3, but say that Hospira would not have acted unilaterally to restrict output when saline solution prices were at record levels. Putting aside the absence (noted above) of any information about when Hospira engaged in the alleged output restricting practices, the prevailing price level is the result, not the cause, of actions affecting production levels. The suggestion that Hospira would not "stay out" of a "red-hot" market for IV saline solution ignores the simple truth that, by definition, any oligopolist that restricts output would necessarily be willing to forego sales at the prevailing market price (whatever it may be). *Id.* The prevailing price level does not change the basic relationship between supply and demand: restrict output, increase price. An oligopolist, moreover, may rationally forego sales **to keep prices high**; as the Third Circuit explained in *Valspar Corp. v. E.I. Du Pont De Nemours and Co.,* 873 F.3d 185, 191 (3d Cir. 2017), an oligopolist "is unlikely to lower its price

---

[2] Another shortcoming of the SCAC is its failure to allege that limitations on IV saline solution production were not a rational response to the availability of more attractive business opportunities. *See Twombly*, 550 U.S. at 568 (noting plaintiffs' failure to allege "that competition as CLECs was potentially any more lucrative than other opportunities being pursued by the ILECs during the same period."); *id.* at 569 ("firms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets.").

[*i.e.*, increase its production] in an effort to win market share because its competitors will quickly learn of that reduction and match it . . . ."[3]

Perhaps recognizing the problem with their production quota argument, the plaintiffs emphasize that Hospira told employees to discard saline solution in excess of the quota, arguing that there would be no rational basis to throw out product that had already been manufactured, other than to limit supply. The costs of manufacturing that product had already been incurred; surely, they maintain, Hospira would not have discarded finished product unless it was sure that it would make up those costs through an agreement with its competitors. But this argument hardly explains why Hospira would discard finished product, even in furtherance of a conspiracy to restrict the supply of saline solution; conspiratorial agreement or no, Hospira had no incentive to produce saline solution that it was not going to sell. That it did so provides no basis, then, to infer that it was trying to reduce supply in order to maintain or increase price. If Hospira wanted to limit production, the rational way to do that would be . . . well, to limit production, not to spend, produce, and discard. The theory that Hospira restricted supply by discarding saleable product differs little from the plaintiffs' original theory that the defendants restricted supply by conducting sham product recalls and suffers from the same inherent implausibility: no monopolist is likely to restrict output by discarding finished product.[4]

---

[3] The plaintiffs also argue that the saline solution industry is an essential industry in which supply shortages can have life-and-death consequences. Pl.'s Mem. of Law in Opp'n 10. As a result, the plaintiffs encourage the Court to conclude that the nature of the industry further demonstrates that Hospira would not rationally reduce production in the absence of a conspiracy. This position is unpersuasive. The nature of the industry does not change the calculus here; the incentives to restrict output remain in an oligopoly, regardless of whether the industry is "non-essential." *Id.* Predictably, the plaintiffs can cite no case law drawing such distinctions, and the Court finds no reason that the nature of the industry is probative in this context.

[4] The plaintiffs also reassert the claim that the defendants "collusively pressured" customers using tactics such as requiring buyers to purchase additional products if they wanted to purchase saline solution. Pl.'s Mem. of Law in Opp'n 6. The plaintiffs seemingly cite this practice

This is not to say that the allegations that Hospira discarded finished product are not true; it is only to recognize the limits of those allegations. The former production line employee evidently provided no information about the amount of saline solution that Hospira discarded; for all the SCAC tells us, the discarded amount could have been trivial. Indeed, given the implausibility that any producer would discard significant quantities of finished product as a means of restricting output, the reasonable inference to draw is that the quantity discarded was immaterial, not that Hospira adopted an irrationally expensive means of limiting market supply. This is particularly true if one considers, as Hospira urges, how much solution would have to be discarded in order to have a material effect on the market price.[5]

But even if we assume that Hospira's conduct was as nefarious as the plaintiffs suggest, their claim would still fail because the SCAC alleges no comparable facts concerning output restricting conduct by Baxter (or ICU-Medical, but the Court will defer discussion of ICU for the moment). In this way, the theory advanced by the SCAC is even less plausible than that alleged in the CAC, which at least included allegations that Baxter had participated in the voluntary recalls that were alleged to have been the mechanism for the conspiracy's output restrictions. The information obtained from the former Hospira employee says nothing about Baxter's adoption of

---

as additional circumstantial evidence of coordination on the part of the defendants. But as the Court explained in its prior opinion, such tying arrangements must be pursued in standalone tying claims, which the plaintiffs have not included here. Mem. Op. and Order 23, n.15. The plaintiffs add no meaningful detail to these allegations that did not appear in the CAC and there is thus again "no basis to draw that inference. At best, plaintiffs' allegations bespeak efforts by the defendants to use the shortage to bolster other areas of their business. The complaint contains no facts suggesting that these efforts were the product of an agreement, and not the result of independent strategies designed to expand defendants' business relationships." *Id.*

[5] Based on the SCAC's allegation that over 1 billion units of IV saline solution are used in the United States each year, ¶ 9, Hospira points out that to reduce supply by just one percent, some 27,000 units would have to be discarded every day of the year. Regardless of its degree of precision, the point is well taken: it is unreasonable to infer that Hospira pursued a plan to reduce the supply of IV saline solution by discarding substantial quantities of saleable product.

production quotas, or its practice of discarding solution manufactured in excess of such quotas, yet the SCAC alleges not just that Baxter must also have limited its production in some way, but expressly alleges that it did so: "***Defendants*** began instructing ***their*** production line employees to adhere to artificially low production quotas and began discarding saleable IV Saline Solution produced in excess of those targets." SCAC ¶¶ 70, 77-78 (emphasis added). This statement is a conclusion masquerading as an allegation of fact and it should not have been included in the SCAC.

The plaintiffs attempt to justify misstatements like this by insisting that it is plausible to infer from Hospira's otherwise irrational conduct that Baxter engaged in similar conduct. As discussed above, however, Hospira's conduct was not inherently irrational, so the premise of the argument fails. In any event, even indulging the assumption that Hospira acted with the hope and intention that Baxter would follow its lead, that fact, standing alone, would plausibly establish no more than that. And that Hospira hoped that Baxter would follow suit tells us nothing about whether Baxter did so—and the SCAC does not either. "A bare allegation that a corporate policy is against a single corporation's economic interest does not imply joint action in any way. If alleging that a business policy was contrary to a corporation's interests was enough alone to plead an antitrust conspiracy, a host of unilateral business decisions would be caught within the antitrust net." *Rochester Drug Co-op., Inc. v. Biogen Idec U.S.*, 130 F. Supp. 3d 764, 778 (W.D.N.Y. 2015); *see also Hinds Cty., Miss. v. Wachovia Bank N.A.*, 708 F. Supp. 2d 348, 362 (S.D.N.Y. 2010) ("to state a viable § 1 claim, Plaintiffs must allege a factual connection between each defendant and the alleged conspiracy, and may not rely solely on . . . conclusory allegations based on mere participation in the [relevant] market").

As Hospira observes, the plaintiffs "muster no case where a court made the inferential leap from single-firm conduct to conspiracy." Hospira's Reply in Supp. of Motion. to Dismiss 2. Instead, they cite two cases in which courts have found that complaints adequately alleged a conspiracy in which multiple defendants "reduce production by various means." Pl.'s Mem. of Law in Opp'n 10; *see, e.g., In re Broiler Chicken Antitrust Litig.,* 290 F. Supp. 3d 772 (N.D. Ill. 2017); *In re Processed Egg Prods. Antitrust Litig.*, 821 F. Supp. 2d 709 (E.D. Pa. 2011). The cases cited, however, are neither remarkable nor on point; they involved allegations that all of the defendants engaged in output restricting conduct, not inferences that because some defendants restricted output all must have done so. *See Broiler Chicken,* 290 F. Supp. 3d at 796 ("Plaintiffs have cited industry reports to support their allegation ***that all Defendants destroyed Broiler flocks***") (emphasis added); *Processed Egg Prods.*, 821 F. Supp. 2d at 714-15 (E.D. Pa. 2011) (alleging means of restricting output by each defendant). Here, the problem is not that the SCAC alleges that Baxter cut production by some means other than those employed by Hospira, but that the plaintiffs have not sufficiently alleged *any* output restricting action by Baxter. That won't do; an inference cannot be drawn from a vacuum. Before it can reasonably be inferred that Baxter restricted its production of IV saline solution, there must be fact allegations from which that inference can be drawn. The SCAC contains none.

Apart from the infirmity of the plaintiffs' premise that it can reasonably be inferred from Hospira's unilateral conduct that Baxter also engaged in output restricting conduct, other allegations in the SCAC also undermine the plaintiffs' claim. Most significantly, the SCAC reports that ***Baxter gained market share*** in the two years before the SCAC was filed—a result obviously inconsistent with an inference that Baxter followed Hospira's lead in setting restrictive production quotas and discarding finished product. SCAC ¶ 103. The plaintiffs protest that these statistics do

not rule out conspiracy in earlier years, but they certainly render it implausible over the period they cover. It is, moreover, the plaintiffs' burden to allege facts that plausibly support their claim; the defendants can only respond to what has been pleaded. And what has been pleaded makes the plaintiffs' claim that Baxter must also have set production quotas and discarded product in an effort to reduce supply less plausible, not more.

So, the Court finds no basis in the SCAC on which one can reasonably infer that Baxter engaged in parallel conduct. But even if there were, there remains the lesson of *Twombly*: "lawful parallel conduct fails to bespeak unlawful agreement." 550 U.S. at 556. As the Supreme Court explained, "even conscious parallelism, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions is not in itself unlawful." *Id.* at 553–54 (cleaned up). Self-interested but not unlawful oligopolistic behavior supplies an "obvious alternative explanation" for parallel conduct, *id*. at 567, that renders an inference of agreement implausible. *See, e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010) ("Twombly makes clear that a claim of conspiracy predicated on parallel conduct should be dismissed if "common economic experience," or the facts alleged in the complaint itself, show that independent self-interest is an "obvious alternative explanation" for defendants' common behavior.").

There must, in short, be more than parallel conduct to plausibly infer antitrust conspiracy, but here the plaintiffs have not alleged even that much. If parallel conduct among oligopolists is not itself a sufficient basis to infer participation in an antitrust conspiracy, it is certainly not sufficient to draw such an inference on the basis of allegations about a single firm's unilateral conduct.

And, again, the statistics the SCAC includes bear out the absence of agreement between Baxter and Hospira (or ICU). Over the intervening time frame between the filings of the CAC and SCAC, the plaintiffs' allegations show that Hospira's (and ICU's) market share declined from 45% to 26%. SCAC ¶ 103; CAC ¶ 96. Again, the plaintiffs contend that this shift, which occurred between late 2016 and 2018, paints an incomplete picture of the conspiracy, which allegedly stretches back to 2013. The plaintiffs nonetheless fail to explain why Hospira (or ICU) would continue to engage in a conspiracy that appears to be having an enormously detrimental impact on its business—especially one that has also directly enriched its primary competitor and opened the market to additional competitors. The plaintiffs deny the import of Hospira's lost market share, noting that the majority of Hospira's lost share went to new players in the industry, but that fact is hardly probative of an agreement between Baxter and Hospira to reduce the overall production of saline solution. Why on earth would two firms that controlled 90% of the market agree to a course of action that transferred a substantial portion of that market share to new entrants in the saline solution market? The plaintiffs offer no plausible answer.

Relatedly, the plaintiffs also fail to satisfactorily address why it is plausible to infer that the conspiracy continued after Hospira's solutions business was sold to ICU in 2017. Indeed, they do not even try to explain why ICU would plausibly have agreed to conspire with Baxter upon stepping into Hospira's shoes. The plaintiffs allege no facts about output reducing conduct after ICU's acquisition of HIS;[6] rather, with classic *post hoc ergo propter hoc* reasoning, the plaintiffs

---

[6] The SCAC contains very few allegations regarding ICU. It briefly details its acquisition of HIS, includes some information relating to ICU's responses to and cooperation with the federal and New York investigations, and cites the attendance of some of its executives at industry-wide meetings and conferences. The plaintiffs also allege that the acquisition-related agreement between ICU and Pfizer to mutually indemnify each other with respect to any claims arising from their respective ownership of the solutions business counts as a "public acknowledgement" of the plausibility of the plaintiffs' claim that the conspiracy continued after ICU purchased the business.

assert that because shortages and high prices continued after the acquisition, they must be the product of the alleged antecedent conspiracy. Antitrust conspiracy claims require fact allegations that plausibly show agreement, however, not assumptions about causation.[7] And here, given the implausibility of the premise that ICU would agree to join a conspiracy involving conduct that was already the subject of multiple government investigations at both the federal and state levels, as well as class action litigation like this case, the alternative inference is far more reasonable: if conditions didn't change after ICU replaced Hospira, then it is implausible to believe that the status quo was the product of an antecedent conspiracy. In short, not only does the SCAC fail to allege facts that plausibly show that ICU joined a conspiracy to reduce the supply of saline solution going forward, the fact that ICU acquired HIS undermines the inference that there was any conspiracy before the acquisition.

The other new allegations in the SCAC, with which the plaintiffs seek to adorn the so-called "plus factors" pled, considered, and rejected in the order dismissing the CAC, again fail to bridge the gap between the plaintiffs' claim and a plausible claim. Indeed, like the other new additions to the SCAC (*e.g.*, the information from the former Hospira employee and the allegations that the conspiracy continued after ICU's acquisition of HIS), the new "plus factor" allegations actually weaken, rather than strengthen, the plausibility of the plaintiffs' claim.[8]

---

That contention is silly; the agreement says nothing of the sort and mutual indemnification agreements are a staple of corporate acquisitions. The plaintiffs' reliance on it is indicative of nothing more than the tenuous and threadbare nature of the plaintiffs' claim against ICU.

[7] Remarkably, the plaintiffs argue that ICU has it "backwards" in arguing that the pleadings fail to show that ICU conspired with Baxter. Pl.'s Mem. of Law in Opp'n 36. That is precisely what the plaintiffs are required to plausibly allege. They cannot simply assume that an alleged conspiracy continued in the absence of evidence that ICU reached an agreement with Baxter.

[8] Again, because the SCAC does not even allege facts to plausibly infer parallel conduct by the defendants, as discussed *supra*, even if the "plus-factors" did strengthen the plaintiffs' claim, they still would not be enough to meet the bar set by *Twombly*, in which the Supreme Court held that adequately pled facts of parallel conduct and market conditions conducive to collusion

Most significantly in that regard, the plaintiffs add a substantial amount of detail in the SCAC relating to the two governmental investigations into the defendants' conduct. As the Court stated in its previous opinion, those investigations do little to further plaintiffs' arguments:

> The mere fact that an investigation is being conducted says nothing about whether unlawful conduct has occurred. Investigations require no minimum predication or threshold of evidence to begin; indeed, the purpose of an investigation is to determine whether there is evidence of unlawful conduct; its existence does not therefore signal that there must be such conduct. The Court therefore accords no weight to the [investigations].

Mem. Op. and Order 26 n.16. The additional allegations in the SCAC add no meat to the bone; they merely reflect that subpoenas were issued and that the defendants have complied with them by producing records—acts that shed no light whatsoever on whether the defendants engaged in an antitrust conspiracy. As if to prove the point, moreover, the Department of Justice has closed its investigation without taking any adverse action against the defendants.[9] Having vested the

---

were not enough. 550 U.S. at 553. Indeed, the defendants do not contest the allegations that the saline solution industry is susceptible to collusive practices. Those allegations, though, are not new to the SCAC and were included in the CAC. As the Court explained in its prior opinion: "[W]hile market structure can provide some evidence of an unlawful agreement, it (even combined with parallel conduct) cannot sustain plaintiffs' complaint all on its own." Mem. Op. and Order 26.

[9] The Court may properly take judicial notice of the formal closure of a DOJ investigation, which the defendants have made publicly known, *see, e.g.,* Nate Raymond, *U.S. Closes IV Solution Shortage Antitrust Probe, Baxter Says*, REUTERS, Feb. 22, 2019, *https://www.reuters.com/article/us-baxter-intl-antitrust/u-s-closes-iv-solution-shortage-antitrust-probe-baxter-says-idUSKCN1QB25K*, and the veracity of which the plaintiffs do not contest. *See, e.g., Daniels–Hall v. Nat'l Educ. Ass'n,* 629 F.3d 992, 998 (9th Cir. 2010) ("It is appropriate to take judicial notice of this information, as it was made publicly available by government entities (the school districts), and neither party disputes the authenticity of the web sites or the accuracy of the information displayed."); *Taleff v. Southwest Airlines Co.*, 554 Fed. App'x 598, 599 n.1 (9th Cir. 2014) ("We grant Appellants' request for judicial notice of a Department of Justice press release dated April 26, 2011, announcing the closure of its investigation into the challenged merger. . ."); *Shaw v. City of Dayton*, 183 F. Supp. 3d 876, 882 n.2 (S.D. Ohio 2016 ("The Court takes judicial notice of the DOJ's press release titled, "Federal Officials Close the Investigation Into the Death of Kylen English" and DOJ's letter to City Manager Timothy H. Riordan on July 20, 2012, summarizing its investigation and findings regarding Mr. English's death".) (internal citations omitted).

ongoing DOJ investigation with substantial probative force, the plaintiffs would be hard pressed now to assert that closure of that investigation does nothing to weaken the plausibility of their claims.

As for the remaining new "plus factor" allegations, they continue to fall short. The plaintiffs devote an inordinate amount of space to identifying the industry-wide conferences attended by defendants' "executives" and "representatives," but none of those allegations offers more probative force than the fact that attendance at such conferences provides an "opportunity" for the defendants to conspire.[10] That is true enough, but that is merely to say that it is possible the defendants conspired at such conferences; they add nothing, however, to push past the possible to the plausible. *See Twombly*, 550 U.S. at 570 (concluding that "plaintiffs here have not nudged their claims across the line from conceivable to plausible"). The closest the plaintiffs come to alleging facts that representatives of Baxter and Hospira ever communicated during such a conference or meeting is to allege that one day after a conference attended by both Hospira and Baxter, both defendants sent letters to their customers concerning the saline solution shortage. Those letters, the plaintiffs assert, are evidence that the defendants used the conference as a place to meet and further their conspiracy, much like the defendants in *Kleen Prods., LLC et al. v. Packaging Corp. of Am., et al.* 775 F. Supp. 2d 1076 (N.D. Ill. 2011). That case is easily distinguished, however, because the eight defendants there all raised prices after an industry event on six separate occasions. *Id.* at 1080. There is no such pattern here; the SCAC describes only a single occasion when representatives of the two defendants sent out descriptive letters relating to the industry-wide shortage in saline. One would expect the two largest producers of saline solution to report to

---

[10] This is an extremely generous evaluation of these allegations, moreover. Nowhere in the SCAC do the plaintiffs allege any details about who attended these conferences and meetings or that they ever communicated with their counterparts.

customers about the long-term supply prognosis for this critical product, and the fact that they did so coming off a global healthcare conference is hardly revelatory of collusion. The facts in the SCAC relating to the attendance of industry-wide conferences and meetings continue to reflect nothing more than lawful and entirely unremarkable behavior by the defendants.[11]

The same holds true of the plaintiffs' allegations that employees moved from Hospira to Baxter or vice versa in the more than ten years leading up to the alleged conspiracy period.[12] That type of employee movement is just another example of normal and competitive activity in the corporate world. *See, e.g., St. Clair v. Citizens Fin. Grp.*, 340 F. App'x 62, 65 (3d Cir. 2009) ("conspiracy claims rely[ing] on . . . the assertion that the individual defendants . . . each had prior work experience at other banks . . . are wholly inadequate"). In the same vein, there is nothing conspiratorial about the executives' public comments that current aspects of the market were favorable to the defendants. Pointing out that prices were high due to the shortage is precisely the

---

[11] The plaintiffs contend that defendants are unreasonable in their assertion that the SCAC provides no specificity as to how Baxter and Hospira used these conferences and meetings in furtherance of the supposed conspiracy. Pl.'s Mem. of Law in Opp'n. While the plaintiffs are correct that they need not provide "exquisite detail" about "which coffee break between sessions" the defendants used to meet, they must provide some plausible basis to infer that the defendants used the conferences or meetings to further a conspiracy. *Id.* Merely pointing out that unidentified executives from both companies attended industry-wide events attended by hundreds or thousands of others serves only to raise the question: why was the attendance of Baxter and Hospira representatives probative of illicit agreement rather than indicative that they shared the same non-collusive reasons that prompted thousands of others to attend? The SCAC provides no answer; it does not even allege that the defendants met with one another or communicated in any way at these events.

[12] In yet another argument that pushes the boundaries of credibility, the plaintiffs argue that the mere fact that the headquarters of Baxter and Hospira are only 10 miles apart supports an inference of conspiracy. SCAC ¶ 133. There is simply no logical relationship between the distance between competitors and the likelihood of collusion. By the plaintiffs' logic, it would be reasonable to infer that competitors located in New York and Los Angeles are less likely to collude than competitors located in New York and Philadelphia. In an era in which global communications are instantaneous and inexpensive, the argument that physical proximity—whether by virtue of headquarters locations or attendance at the same industry conferences—makes collusion more likelihood is antiquated and unpersuasive.

type of observation that one would expect to see in a quarterly report or hear as part of a corporate-wide presentation.[13]

In short, even if the plaintiffs had adequately pleaded a factual basis for a strong inference of parallel action between the defendants, which they have not, the complaint would still fail to state a claim because the plus factors do not add to the plausibility of their allegations. Circumstantial evidence still must be probative of an anticompetitive agreement; the plus-factors alleged here detail nothing that is inconsistent with lawful business conduct in the ordinary course. As such, the defendants' "plus factor" allegations do nothing to enhance the plausibility of the plaintiffs' claim that the defendants have conspired to reduce the supply of IV saline solution over the past seven years.

\*      \*      \*

In their complaints, the plaintiffs have alleged that the defendants are responsible for a public health crisis because they have conspired to restrict the supply of IV saline solution. After more than three years and multiple attempts, however, they have not been able to allege facts that plausibly support that claim. Accordingly, the Court grants the defendants' motions to dismiss the Second Consolidated Amended Complaint. And because the plaintiffs have had ample opportunity to investigate and amend, and because the resulting second consolidated amended complaint is

---

[13] The plaintiffs also argue that the Court should not consider each of the plus-factors independently of the others, but rather the totality of all of the factors. They conclude that "[t]aken together, the plus factors alleged by Plaintiffs individually and collectively make plausible the claim that Defendants conspired to reduce the supply and thus drive up the prices of IV Saline Solution." Pl.'s Mem. of Law in Opp'n 23. The problem for the plaintiffs is that the sum of their plus-factors is no greater than their parts. The plus-factors alleged, even when taken as true, illustrate nothing more than legal, routine, and competitive behavior—both when considered in isolation and in total.

even weaker than the first, the Court concludes that any further attempt to amend would be futile.

The SCAC is therefore dismissed with prejudice.

Date: April 3, 2020

_____
John J. Tharp, Jr.
United States District Judge